# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| **v.** | : **CRIMINAL NO.  20-417** |
| **HASSAN ELLIOTT** | : |
| **a/k/a "Haz,"** | |
| **KHALIF SEARS** | : |
| **a/k/a "Leaf,"** | |
| **a/k/a "Lil Leaf,"** | |
| **KELVIN JIMINEZ** | : |
| **a/k/a "Nip,"** | |
| **DOMINIQUE PARKER** | : |
| **a/k/a "Dom"** | |

## <u>GOVERNMENT'S TRIAL MEMORANDUM</u>

JACQUELINE C. ROMERO
United States Attorney

Christopher Diviny
Ashley N. Martin
Lauren E. Stram
Assistant United States Attorneys
615 Chestnut Street, Suite 1250
Philadelphia, PA 19106

Dated: December 4, 2024

**TABLE OF CONTENTS**

I.      PROCEDURAL BACKGROUND .................................................................................... 1

II.     FACTUAL BACKGROUND ........................................................................................... 4

   A.   The Criminal Enterprise .................................................................................. 4

   B.   Evidence Sources ............................................................................................. 6

III.    ELEMENTS OF THE CHARGED OFFENSES ............................................................ 7

   A.   RICO Conspiracy, 18 U.S.C. § 1962(d) (Count 1) ......................................... 7

   B.   Conspiracy to Distribute a Controlled Substance, 21, U.S.C. § 846 (Count 2) ............ 12

   C.   VCAR Murder in Aid of Racketeering, 18 U.S.C. § 1959(a)
      (Counts 3, 10, 14, and 26) ............................................................................ 13

      1.   Pennsylvania Law ............................................................................ 13

   D.   VCAR Assault in Aid of Racketeering, 18 U.S.C. § 1959(a)
      (Counts 4, 5, 7, 8, 12, 15, 17, 19, 20, 22, and 30) ........................................ 14

      1.   Pennsylvania Law ............................................................................ 14

   E.   Discharge of a Firearm During and In Relation to a Crime of Violence, 18 U.S.C. §
      924(c)(1)(A)(iii) (Counts 9, 13, 18, 21, and 23) .......................................... 14

   F.   Possession of a Firearm in Furtherance of a Drug Trafficking Crime, 18 U.S.C. §
      924(c)(1)(A)(i) (Count 25) ............................................................................ 15

   G.   Murder During and In Relation to a Drug Trafficking Offense, 18, U.S.C. § 924(j)(1)
      (Count 27) ...................................................................................................... 16

   H.   Murder During and In Relation to a Crime of Violence, 18, U.S.C. § 924(j)(1)
      (Counts 6, 11, and 16) .................................................................................... 17

   I.   Maintaining a Drug Involved Premises, 21 U.S.C. § 856(a)(1) (Count 29) ................. 17

   J.   Possession of a Firearm by a Convicted Felon, 18 U.S.C. § 922(g)(1)
      (Counts 28 and 31) ........................................................................................ 17

IV.     THE TRIAL EVIDENCE ............................................................................................. 18

      1.   Murder of Kaseem Rogers and assault of D.S. and J.L.
         (Counts 3, 4, 5, and 6; Overt Act 9) .............................................. 19

      2.   Shooting of C.S. and M.H. (Counts 7, 8, and 9; Overt Act 13) .................... 24

      3.   Murder of Tyrone Tyree (Counts 10 and 11; Overt Act 15) ...................... 25

      4.   Shooting of R.D. (Overt Act 18) .................................................................. 28

      5.   Shooting of R.B. (Counts 12 and 13; Overt Act 21) .................................. 29

      6.   Murder of Dontae Walker and Shooting at U.W.
         (Counts 14, 15, and 16; Overt Act 22) ........................................... 30

      7.   Crack Cocaine Purchases from SG1700 ....................................................... 34

      8.   Shooting of B.C. (Overt Act 31) ................................................................... 37

9.     Shooting of R.F. (Counts 17 and 18; Overt Act 34) ................................. 38

10.    Shooting of R.R. and Attempted Shooting of L.H. and G.T.
       (Counts 19-21; Overt Act 35) ............................................................... 39

11.    Shooting of M.M. (Counts 22 and 23; Overt Act 41) ............................. 40

12.    Tres Fuego Shooting (Overt Act 44) ...................................................... 41

13.    Murder of Philadelphia SWAT Sergeant James O'Connor and 1688 Bridge Street
       (Counts 25-29; Overt Act 46) ............................................................... 42

14.    Attempted Shooting of B.L. (Counts 30 and 31; Overt Act 49) .............. 46

V.      THE GOVERNMENT'S CASE ................................................................. 48

VI.     STIPULATIONS ........................................................................................ 49

VII.    TRIAL ISSUES ......................................................................................... 49

    A.   The Defendants' Discovery Obligations ................................................. 49

    B.   Sequestration ......................................................................................... 50

    C.   Introductory Overview and Summary Witness ........................................ 52

    D.   Recalling law enforcement officers and case agents .............................. 54

    E.   Audio Recordings and Transcripts .......................................................... 56

    F.   Authentication and Admissibility ........................................................... 56

    G.   The Defendants' Rap Videos Are Admissible Evidence of Their Knowledge of and
         Participation in the Enterprise. ............................................................... 60

    H.   Exhibits - Presented in Electronic Format .............................................. 67

    I.   Cellular Telephone, iCloud, and Instagram Cellebrite Reports .............. 67

    J.   Existence of the Conspiracy .................................................................... 69

    K.   Co-Conspirator Liability ......................................................................... 69

    L.   Other Conspiracy Evidence ..................................................................... 70

    M.   Evidence Regarding Background or Formation of the Conspiracy .......... 71

    N.   Co-Conspirator Statements ...................................................................... 72

    O.   Evidence Inextricably Intertwined .......................................................... 76

    P.   Violent Crimes in Aid of Racketeering ("VCAR") ................................ 79

    Q.   Evidence of Plea Agreements and Dishonesty ........................................ 81

    R.   Hostile Witnesses ................................................................................... 82

    S.   Admission of Prior Testimony as Substantive Evidence ........................ 85

    T.   Lay Opinion Testimony .......................................................................... 88

    U.   Photos of Defendant and Co-Conspirator Tattoos .................................. 90

    V.   Photos of Co-Conspirators Not on Trial ................................................. 90

    W.   Prohibition of Using of Agents' Reports to Cross-Examine Witnesses ....... 91

X.    Summary Charts ................................................................................................ 92

Y.    Summary Witnesses .......................................................................................... 94

Z.    Business Records/Public Records ..................................................................... 95

   1.  Business Records .......................................................................................... 95

   2.    Public Records ........................................................................................... 97

   3.    Crawford and Business and Public Records ............................................... 98

AA.   Admissibility of Defendants' Text messages and Social Media Chats ............ 100

BB.   Defense Use of Defendant's Statements ......................................................... 101

CC.   Reference to Punishment for Charged Offenses .............................................. 105

The United States of America, through its attorneys, Jacqueline C. Romero, United States Attorney, and Christopher Diviny, Ashley N. Martin, and Lauren E. Stram, Assistant United States Attorneys, submits this trial memorandum to assist the Court in the trial scheduled to begin on February 3, 2025, in compliance with the Court's Pretrial Order. It contains briefing on evidentiary issues likely to arise at trial, and the applicable authority the government submits should guide the Court in its evidentiary rulings.

## I.    PROCEDURAL BACKGROUND

On November 18, 2020, a grand jury sitting in the Eastern District of Pennsylvania returned a seven-count indictment charging co-defendants Hassan Elliott, Bilal Mitchell, Khalif Sears, and Sherman Easterling with offenses relating to a drug trafficking conspiracy and the killing of Philadelphia Police Sergeant James O'Connor, and related offenses. Specifically, they were charged with violating 21 U.S.C. §§ 846 (conspiracy to distribute controlled substances), 841(a)(1), (b)(1)(B) (possession with intent to distribute 28 grams or more of cocaine base ("crack") and marijuana), and 856(a)(1) (maintaining a drug involved premises), and 18 U.S.C. §§ 924(c)(1)(A)(i) (possession of a firearm in furtherance of a drug trafficking crime), 924(j)(1) (murder in the course of using, carrying and discharging a firearm), and 2 (aiding and abetting) stemming from their participation in a drug trafficking conspiracy and the killing of Philadelphia Police Sergeant James O'Connor. Defendants Elliott and Easterling were also charged with 18 U.S.C. § 922(g)(1) (possession of a firearm by a felon).

On March 22, 2023, a federal grand jury returned a 31-count superseding indictment charging Elliott, Sears, Kelvin Jiminez, and Dominique Parker with conspiracy to engage in a racketeer influenced corrupt organization ("RICO"), in violation of 18 U.S.C. § 1962(d), violent crimes in aid of racketeering ("VCAR") to include murder, in violation of 18 U.S.C. §

1959(a)(1), stemming from the killings of victims Kaseem Rogers, Tyrone Tyree, Dontae

Walker, and Philadelphia Police Sergeant James O'Connor, and related offenses.  The

superseding indictment included charges as follows:

| COUNT | CHARGE | STATUTE | DEFENDANTS | DATES OF OFFENSE |
|---|---|---|---|---|
| 1 | RICO Conspiracy | 18 U.S.C. § 1962(d) | All defendants | June 2017 to May 2021 |
| 2 | Drug Conspiracy | 21 U.S.C. § 846 | All defendants | June 2017 to May 2021 |
| 3 | VCAR – Murder in aid of racketeering (Kaseem Rogers) | 18 U.S.C. §§ 1959(a)(1) and 2 | Elliott Jiminez | December 3, 2018 |
| 4 | VCAR – Assault with a dangerous weapon in aid of racketeering (D.S.) | 18 U.S.C. §§ 1959(a)(3) and 2 | Elliott Jiminez | December 3, 2018 |
| 5 | VCAR – Assault with a dangerous weapon in aid of racketeering (J.L.) | 18 U.S.C. §§ 1959(a)(3) and 2 | Elliott Jiminez | December 3, 2018 |
| 6 | Causing death through the use of a firearm during and in relation to a crime of violence (Kaseem Rogers) | 18 U.S.C. §§ 924(c)(1)(A), (j)(1) and 2 | Elliott Jiminez | December 3, 2018 |
| 7 | VCAR – Assault with a dangerous weapon in aid of racketeering (C.S.) | 18 U.S.C. §§ 1959(a)(3) and 2 | Elliott | January 25, 2019 |
| 8 | VCAR – Assault with a dangerous weapon in aid of racketeering (M.H.) | 18 U.S.C. §§ 1959(a)(3) and 2 | Elliott | January 25, 2019 |
| 9 | Carrying and using a firearm during a crime of violence | 18 U.S.C. §§ 924(c) and 2 | Elliott | January 25, 2019 |
| 10 | VCAR – Murder in aid of racketeering (Tyrone Tyree) | 18 U.S.C. §§ 1959(a)(1) and 2 | Elliott | March 1, 2019 |
| 11 | Causing death through the use of a | 18 U.S.C. §§ 924(c)(1)(A), | Elliott | March 1, 2019 |

| | firearm during and in relation to a crime of violence (Tyrone Tyree) | (j)(1) and 2 | | |
|---|---|---|---|---|
| 12 | VCAR – Assault with a dangerous weapon in aid of racketeering (R.B.) | 18 U.S.C. §§ 1959(a)(3) and 2 | Elliott Jiminez Parker | August 20, 2019 |
| 13 | Carrying and using a firearm during a crime of violence | 18 U.S.C. §§ 924(c) and 2 | Elliott Jiminez Parker | August 20, 2019 |
| 14 | VCAR – Murder in aid of racketeering (Dontae Walker) | 18 U.S.C. §§ 1959(a)(1) and 2 | Elliott Parker | August 22, 2019 |
| 15 | VCAR – Assault with a dangerous weapon in aid of racketeering (U.W.) | 18 U.S.C. §§ 1959(a)(3) and 2 | Elliott Parker | August 22, 2019 |
| 16 | Causing death through the use of a firearm during and in relation to a crime of violence (Dontae Walker) | 18 U.S.C. §§ 924(c)(1)(A), (j)(1) and 2 | Elliott Parker | August 22, 2019 |
| 17 | VCAR – Assault with a dangerous weapon in aid of racketeering (R.F.) | 18 U.S.C. §§ 1959(a)(3) and 2 | Elliott Sears Jiminez | December 20, 2019 |
| 18 | Carrying and using a firearm during a crime of violence | 18 U.S.C. §§ 924(c) and 2 | Elliott Sears Jiminez | December 20, 2019 |
| 19 | VCAR – Attempted assault with a dangerous weapon in aid of racketeering (L.H.) | 18 U.S.C. §§ 1959(a)(6) and 2 | Elliott | December 27, 2019 |
| 20 | VCAR – Assault with a dangerous weapon in aid of racketeering (R.R.) | 18 U.S.C. §§ 1959(a)(3) and 2 | Elliott | December 27, 2019 |
| 21 | Carrying and using a firearm during a crime of violence | 18 U.S.C. §§ 924(c) and 2 | Elliott | December 27, 2019 |
| 22 | VCAR – Assault with a dangerous weapon in aid of racketeering | 18 U.S.C. §§ 1959(a)(3) and 2 | Elliott Sears Jiminez | January 28, 2020 |

3

| | (M.M.) | | | |
|---|---|---|---|---|
| 23 | Carrying and using a firearm during a crime of violence | 18 U.S.C. §§ 924(c) and 2 | Elliott Sears Jiminez | January 28, 2020 |
| 24 | Possession with intent to distribute cocaine and marijuana | 21 U.S.C. § 841(a) | Elliott Sears | March 13, 2020 |
| 25 | Possession of a firearm in furtherance of a drug trafficking crime | 18 U.S.C. §§ 924(c) and 2 | Elliott Sears | March 13, 2020 |
| 26 | VCAR – Murder in aid of racketeering (James O'Connor) | 18 U.S.C. §§ 1959(a)(1) and 2 | Elliott Sears | March 13, 2020 |
| 27 | Causing death through the use of a firearm during and in relation to a drug trafficking crime (James O'Connor) | 18 U.S.C. §§ 924(c)(1)(A), (j)(1) and 2 | Elliott Sears | March 13, 2020 |
| 28 | Possession of a firearm by a felon | 18 U.S.C. § 922(g) | Elliott | March 13, 2020 |
| 29 | Maintaining a drug-involved premises | 21 U.S.C. § 856(a)(1) | All defendants | March 13, 2020 |
| 30 | VCAR – Attempted assault with a dangerous weapon in aid of racketeering (B.L.) | 18 U.S.C. §§ 1959(a)(6) and 2 | Parker | May 22, 2021 |
| 31 | Possession of a firearm by a felon | 18 U.S.C. § 922(g) | Parker | May 22, 2021 |

## II.    FACTUAL BACKGROUND

### A.  The Criminal Enterprise

All of the charged defendants are known members and associates of a violent drug trafficking organization that operates out of the Frankford section of Philadelphia.  The enterprise, "1700 Scattergood/SG1700" and "5300 Lesher/L-Block" (hereinafter referred to as "SG1700"), is an association in-fact and is a wide-ranging drug trafficking organization.  The defendants and others in the gang trafficked more than five kilograms of cocaine which they

4

processed into cocaine base ("crack"). The gang further constituted a racketeering enterprise and committed violent acts including murders in furtherance of their enterprise. The gang members and associates sold wholesale and retail quantities of "crack" cocaine and marijuana and defended their drug distribution interests with violence and threats of violence.

Members of the organization proved their loyalty to the gang by progressively selling larger quantities of controlled substances for the organization, committing violent acts against opposing drug gangs (like the Tackawanna Projects or Hawthorne Street gangs), and refusing to cooperate with law enforcement if arrested (e.g., not "ratting"). Members of the gang committed a number of homicides and shootings in the name of the organization to protect the enterprise's reputation and territory, including the murders of Kaseem Rogers (a/k/a "Glizzy"), Tyrone Tyree, Dontae Walker (a/k/a "Mugga"), and Sergeant James O'Connor. The gang's reputation for violence was an integral part of the success of the enterprise. The gang's territory abuts Frankford Avenue, a heavily trafficked thoroughfare in the Frankford section of Northeast Philadelphia. Members of the gang often sold narcotics on Frankford Avenue but also allowed associates to sell along Frankford Avenue as long as there was enough business to go around. The members of the gang had a right of first refusal to drug buyers. Associates chose to affiliate with the gang, purchase drugs from them, and sell in areas controlled by the gang because the gang's reputation itself protected them from being robbed by rival dealers. Moreover, if the gang did not enjoy a reputation for violence, it could not maintain its own ability to sell drugs along this highly coveted thoroughfare.

To maintain their reputation for violence, the gang routinely traveled to the Tackawanna Projects and the area of Hawthorne and Marlowe Streets, nearby territories controlled by opposition gangs, to shoot rival gang members. This was done to show their willingness to kill

or engage in violence to protect their drug area and retaliate against any threats, perceived or actual, from other gangs.

The defendants used social media to demonstrate their affiliation with SG1700, display access to firearms, celebrate the gang's success, and intimidate witnesses and rivals. The group created numerous music videos and rap songs which they distributed on social media and YouTube. The government intends to introduce many social media posts from SG1700 members and rap videos as outlined in this memorandum.

### B. Evidence Sources

Evidence in this case includes the testimony of numerous cooperating members of the SG1700 enterprise, as well as members of opposing gangs. The testimony will detail their criminal activities, including illegal drug dealing, shootings, and murders on behalf of the enterprise. This testimony will be supported by: (a) the police officers who arrested Elliott and Sears inside the room in 1688 Bridge Street from which Elliott shot and killed Sergeant O'Connor; (b) the police officers who arrested Parker after he fired shots, trying to shoot an individual in the gang's territory in May 2021; (c) video evidence of several of the charged crimes; (d) social media photographs, videos, and statements from the defendants regarding their association and criminal activity; (e) undercover law enforcement agents and confidential informants cooperating with the government who engaged in purchases of "crack" cocaine from members of the enterprise; (f) law enforcement surveillance of and interactions with defendants and other members of the enterprise engaged in criminal activities; (g) audio recordings of defendants discussing the enterprise and its criminal activities; (h) civilian witnesses who were shooting victims or who reside in the neighborhood controlled by SG1700; (i) drug users who purchased narcotics from the defendants; (j) numerous ballistics comparisons connecting

different murders, shootings, and recovered weapons; (k) DNA and fingerprint evidence; (l) text messages, photographs, and videos stored on cellular telephones and in iCloud accounts; and (m) evidence seized from the second floor middle room of 1688 Bridge Street, including the weapon used to murder Sergeant O'Connor amongst a total of ten firearms, "crack" cocaine, marijuana, and narcotics packaging and paraphernalia.

### III.    ELEMENTS OF THE CHARGED OFFENSES

#### A. RICO Conspiracy, 18 U.S.C. § 1962(d) (Count 1)

The Third Circuit Pattern Criminal Jury Instructions outline three elements that the government must prove to find a defendant guilty of RICO conspiracy:

> 1) That two or more persons agreed to conduct or to participate, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity;
>
> (2) That the defendant was party to or member of that agreement; and
>
> (3) That the defendant joined the agreement or conspiracy knowing of its objective to conduct or participate … in the conduct of an enterprise's affairs through a pattern of racketeering activity, and intending to join together with at least one other alleged conspirator to achieve that objective; that is, that the defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve the objective of conducting or participating in the conduct of an enterprise's affairs through a pattern of racketeering activity.

The main element that the government must prove to establish a conspiracy to violate section 1962(c) is a voluntary agreement to participate in an enterprise through a pattern of racketeering activity. *See United States v. Riccobene*, 709 F.2d 214, 224 (3d Cir. 1983). The Supreme Court held in *Salinas v. United States* that section 1962(d) does not require that a defendant must personally commit or agree to personally commit the substantive RICO offense, or any specific element of that offense including the racketeering activity. 522 U.S. 52 (1997); s*ee also, e.g.*, *United States v. Pungitore*, 910 F.2d 1084, 1130 (3d Cir. 1990).

The Court in *Salinas* held that the statute and traditional conspiracy law would "not permit us to excuse from the reach of the conspiracy provision an actor who does not himself commit or agree to commit the two or more predicate offenses requisite to the underlying offense," but its reasoning was broader: "If conspirators have a plan which calls for some conspirators to provide support, the supporters are as guilty as the perpetrators." Based on *Salinas*, the Third Circuit has joined a majority of courts of appeals in holding that the defendant need not personally participate or agree to personally participate in the conduct of the affairs of the enterprise to be guilty of a section 1962(d) conspiracy or of a section 1962(c) substantive offense committed by a co-conspirator. *See Smith v. Berg*, 247 F.3d 532, 536 (3d Cir. 2001).

<u>Agreement to Commit a RICO Offense</u>

The jury may find that a defendant has entered into the requisite agreement to violate RICO when the government has proven beyond a reasonable doubt that the defendant agreed with at least one other co-conspirator that at least two racketeering acts would be committed by a member of the conspiracy in the conduct of the affairs of the enterprise. The government is <u>not</u> required to prove that the defendant personally committed two racketeering acts, or that he agreed to personally commit two racketeering acts. Rather, the government must prove beyond a reasonable doubt that the defendant agreed to participate in the enterprise with the knowledge and intent that at least one member of the RICO conspiracy (which could be the defendant himself) would commit at least two predicate racketeering acts in the conduct of affairs of the enterprise.

In addition, the indictment need not specify the predicate racketeering acts that the defendant agreed would be committed by some member of the conspiracy in the conduct of the affairs of the enterprise. The jury may consider evidence presented of racketeering acts

committed or agreed to be committed by any co-conspirator in furtherance of the enterprise's
affairs to determine whether the defendant agreed that at least one member of the conspiracy
would commit two or more racketeering acts. *See, e.g., United States v. Glecier*, 923 F.2d 496,
499-500 (7th Cir. 1991); *United States v. Crockett*, 979 F.2d 1204, 1208-09 (7th Cir. 1992);
*United States v. Phillips*, 874 F.2d 123, 125-28 (3d Cir. 1989).

Moreover, in order to convict the defendant of the RICO conspiracy offense, the jury's
verdict must be unanimous as to which type or types of predicate racketeering activity the
defendant agreed would be committed. Furthermore, to establish the requisite conspiratorial
agreement, the government is not required to prove that each co-conspirator explicitly agreed
with every other co-conspirator to commit the substantive RICO offense, or knew all his fellow
conspirators, or was aware of all of the details of the conspiracy. Rather, to establish sufficient
knowledge, it is only required that the defendant know the general nature and common purpose
of the conspiracy and that the conspiracy extends beyond his individual role. Moreover, the
elements of a RICO conspiracy, such as the conspiratorial agreement, the defendant's knowledge
of it, and the defendant's participation in the conspiracy, may be inferred from circumstantial
evidence. For example, when the evidence establishes that the defendant and at least one other
conspirator committed several racketeering acts in furtherance of the charged enterprise's affairs,
the jury may infer the existence of the requisite agreement to commit a RICO offense. *See, e.g.,*
*United States v. Ashman*, 979 F.2d 469, 492 (7th Cir. 1992); *United States v. Crockett*, 979 F.2d
1204, 1208-09 (7th Cir. 1992); *United States v. Carlock*, 806 F.2d 535, 547 (5th Cir. 1986);
*United States v. Melton*, 689 F.2d 679, 683 (7th Cir. 1982); *United States v. Sutherland*, 656 F.2d
1181, 1187 n. 4 (5th Cir. 1981); *United States v. Elliott*, 571 F.2d 880, 903 (5th Cir. 1978).
However, it is for the jury to determine whether, based on the entirety of the evidence, the

government has proven that the defendant entered into the required conspiratorial agreement.

Furthermore, it is not necessary that the government prove that a particular defendant was a member of the conspiracy from its beginning. Different persons may become members of the conspiracy at different times.

If the jury finds that there is a conspiracy, the jury may consider the acts and statements of any other member of the conspiracy during and in the furtherance of the conspiracy as evidence against a defendant whom they found to be a member of it. When persons enter into a conspiracy, they become agents for each other, so that the act or statement of one conspirator during the existence of, and in furtherance of, the conspiracy is considered the act or statement of all the other conspirators and is evidence against them all.

Moreover, a defendant may be convicted as a conspirator even though he or she plays a minor role in the conspiracy, provided that the jury finds beyond a reasonable doubt that the conspiracy existed, and that the defendant knowingly participated in the conspiracy with the intent to assist other conspirators in accomplishing its objective or objectives.

Definition of Enterprise

The term "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

The term "enterprise" may include a group of people associated in fact, even though this association is not recognized as a legal entity. Thus, an enterprise need not be a formal business entity such as a corporation but may be merely an informal association of individuals. A group or association of people can be an "enterprise" if these individuals have "associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576,

583 (1981).

Such an association of persons may be established by evidence showing an ongoing

organization, formal or informal, and by evidence that the people making up the association

functioned as a continuing unit. The government does not have to prove that an association-in-

fact enterprise has a hierarchical structure or any particular structure "beyond what is necessary

to perpetuate the predicate crimes." *Turkette*, 452 U.S. at 583. The enterprise's existence may be

inferred from the evidence showing the associates engaged in a pattern of racketeering. *Boyle v.*

*United States*, No. 07-1309 (U.S. June 8, 2009); *United States v. Riccobene*, 709 F.2d 214, 222-

24 (3d Cir. 1983).

The government is not required to prove each and every allegation about the enterprise or

the manner in which the enterprise operated.

<u>Pattern of Racketeering Activity</u>

To establish a "pattern of racketeering activity," the government must prove three

elements beyond a reasonable doubt:

<u>One</u>:    The defendant intentionally committed, or caused, or aided and abetted the

commission of, two or more of the racketeering acts alleged in the indictment. These two or

more racketeering acts must have been committed within ten years of each other.

<u>Two</u>:    The racketeering acts have a "nexus" to the enterprise and the racketeering acts

are "related." A racketeering act has a "nexus" to the enterprise if it has a meaningful connection

to the enterprise. To be "related," the racketeering acts must have the same or similar purposes,

results, participants, victim, or methods of commission, or be otherwise interrelated by

distinguishing characteristics and not be merely isolated events. Two racketeering acts may be

"related" even though they are dissimilar or not directly related to each other, provided that the

racketeering acts are related to the same enterprise. For example, for both "nexus" and "relatedness" purposes, the requisite relationship between the RICO enterprise and a predicate racketeering act may be established by evidence that the defendant was enabled to commit the racketeering act solely by virtue of his position in the enterprise or involvement in or control over its affairs, or by evidence that the defendant's position in the enterprise facilitated his commission of the racketeering act, or by evidence that the racketeering act benefitted the enterprise, or by evidence that the racketeering act was authorized by the enterprise or by evidence the racketeering act promoted or furthered the purposes of the enterprise.

Third:  The racketeering acts themselves either extended over a substantial period of time or they pose a threat of continued criminal activity. The government need not prove such a threat of continuity by any mathematical formula or by any particular method of proof, but rather may prove it in a variety of ways. For example, the threat of continued unlawful activity may be established when the evidence shows that the racketeering acts are part of a long-term association that exists for criminal purposes or when the racketeering acts are shown to be the regular way of conducting the affairs of the enterprise.

Moreover, in determining whether the government has proven the threat of continued unlawful activity, you also may consider the nature of the enterprise, and other unlawful activities of the enterprise and its members viewed in their entirety, including both charged and uncharged unlawful activities.

### B.  Conspiracy to Distribute a Controlled Substance, 21, U.S.C. § 846 (Count 2)

To establish a violation of Title 21, United States Code, Section 846 (in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)), the government must prove the following elements beyond a reasonable doubt:

(1) That two or more persons agreed to distribute or possess with the intent to distribute a controlled substance;

(2) The defendant was a party to or member of that agreement;

(3) The defendant joined the agreement or conspiracy knowing of its objectives to distribute and possess with the intent to distribute a controlled substance and intending to join together with at least one other alleged conspirator to achieve those objectives, that is, that the defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve that objective; and

(4) That cocaine base is a Schedule II controlled substance; and

(5) 5 kilograms or more of cocaine base as a result of his own conduct or conduct that was reasonably foreseeable to the defendant.

*See* Third Circuit Model Jury Instructions (Criminal) 6.21.846B, *Apprendi v. New Jersey*, 120 S.

Ct. 2348, 2362-63 (2000).

### C. VCAR Murder in Aid of Racketeering, 18 U.S.C. § 1959(a) (Counts 3, 10, 14, and 26)

Title 18, United States Code, Section 1959(a), provides in pertinent part, that:

> (a) Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States.

#### 1. Pennsylvania Law

Title 18, Pennsylvania Consolidated Statutes Annotated, Section 2502(a), provides in

pertinent part, that:

> (a) Murder of the first degree— a criminal homicide constitutes murder in the first degree when it is committed by an intentional killing;
>
> (b) Murder of the second degree—a criminal homicide constitutes murder of the second degree when it is committed while a defendant was engaged as a principal or an accomplice in the perpetration of a felony;
>
> (c) Murder of the third degree—all other kinds of murder shall be murder of the third degree;

and defines an "intentional killing" as any "killing by means of poison, or by lying in wait, or by

any other kind of willful, deliberate and premeditated killing."

Title 18, Pennsylvania Consolidated Statutes Annotated, Section 2501 states, "a person is guilty of criminal homicide if he intentionally, knowingly, recklessly or negligently causes the death of another human being."

### D. VCAR Assault in Aid of Racketeering, 18 U.S.C. § 1959(a) (Counts 4, 5, 7, 8, 12, 15, 17, 19, 20, 22, and 30)

Title 18, United States Code, Section 1959(a), provides in pertinent part, that:

> (a) Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States.

#### 1. Pennsylvania Law

Title 18, Pennsylvania Consolidated Statutes Annotated, Section 2702(a)(4), provides in pertinent part, that a "person is guilty of aggravated assault if he attempts to cause or intentionally or knowingly causes bodily injury to another with a deadly weapon."

Section 2301 defines "bodily injury" as "impairment of physical condition or substantial pain" and "deadly weapon" as "any firearm."

### E. Discharge of a Firearm During and In Relation to a Crime of Violence, 18 U.S.C. § 924(c)(1)(A)(iii) (Counts 9, 13, 18, 21, and 23)

Section 924(c)(1)(A)(iii) of Title 18 provides in relevant part:

> [Any] person, who, during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States . . . or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime (i) be sentenced to a term of imprisonment of not less than 5 years; (ii) if the firearm is brandished, be sentenced to a term of imprisonment not less than 7 years; and (iii) if the firearm is

14

discharged, be sentenced to a term of imprisonment not less than 10 years.

To establish a violation of 18 U.S.C. § 924(c)(1)(A)(iii), the government must prove the

following elements beyond a reasonable doubt:

> (1) The defendant committed the crime of violence, as charged in the indictment;
> (2) During and in relation to the commission of that crime the defendant knowingly used or carried a firearm; and
> (3) The defendant used, carried and discharged the firearm during and in relation to the crime of violence.

See Third Circuit Model Criminal Jury Instructions § 6.18.924B; *United States v. Bailey*, 840 F.3d

99 (3d Cir. 2016).

### F. Possession of a Firearm in Furtherance of a Drug Trafficking Crime, 18 U.S.C. § 924(c)(1)(A)(i) (Count 25)

Section 924(c)(1)(A)(i) of Title 18 provides in relevant part:

> [Any] person, who, during and in relation to any crime of violence or drug trafficking crime . . . for which the person may be prosecuted in a court of the United States . . . or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime (i) be sentenced to a term of imprisonment of not less than 5 years.

To establish a violation of 18 U.S.C. § 924(c)(1)(A)(i), the government must prove the

following elements beyond a reasonable doubt:

> (1) The defendant committed the crime of possession with intent to deliver, in violation of 21 U.S.C. § 841(a)(1), as charged in Count Twenty-four of the indictment;
> (2) The defendant knowingly possessed a firearm;
> (3) The defendant knowingly possessed the firearm in furtherance of the crime of possession with intent to deliver, in violation of 21 U.S.C. § 841(a)(1).

See Third Circuit Model Criminal Jury Instructions § 6.18.924A; *United States v. Bailey*,

840 F.3d 99 (3d Cir. 2016).

To prove the "in furtherance of" element, "the evidence must demonstrate that possession

of the firearm advanced or helped forward a drug trafficking crime." *United States v. Sparrow*,

15

371 F.3d 851, 853 (3d Cir. 2004). The "mere presence of a gun is not enough." *Id*. In making this determination, courts in the Third Circuit consider factors including "the type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the weapon was stolen, the status of the possession (legitimate or illegitimate), whether the gun is loaded, proximity to drugs or drug profits, and the time and circumstances under which the gun is found." *Id*. In *United States v. Iglesias*, the Third Circuit found the evidence sufficient to show possession "in furtherance" of drug trafficking where a gun was found in a briefcase alongside a loaded magazine and "several hundred Ziploc packets," and narcotics were found in the same room. 353 F.3d 150, 157 (3d Cir. 2008) ("considering that the gun, magazine, and drug packaging paraphernalia all were stored together in the briefcase that was found in the same room as methamphetamine[,] a rational juror easily could have concluded that the gun was used "in furtherance of" drug trafficking).

### G.  Murder During and In Relation to a Drug Trafficking Offense, 18, U.S.C. § 924(j)(1) (Count 27)

Title 18, United States Code, Section 924(j) makes it unlawful to cause the death of another person through the use of a firearm during and in relation to a drug trafficking crime, or the possession of a firearm in furtherance of a drug trafficking crime.

To establish a violation of Title 18, United States Code, Section 924(j)(1), the government must prove the following elements beyond a reasonable doubt:

(1)  The defendant possessed a firearm;
(2)  The defendant did so in furtherance of a drug trafficking crime which may be prosecuted in federal court [namely, conspiracy to distribute a controlled substance under 21 U.S.C. § 846]; and
(3)  The defendant caused the death of a person through the use of the firearm.

*See* Pattern Jury Instructions from the District of South Carolina.

18 U.S.C. § 1111 defines murder as "the unlawful killing of a human being with malice

aforethought" and includes "any . . . kind of willful, deliberate, malicious, and premeditated killing." *Id*.

### H.  Murder During and In Relation to a Crime of Violence, 18, U.S.C. § 924(j)(1) (Counts 6, 11, and 16)

Title 18, United States Code, Section 924(j) makes it unlawful to cause the death of another person through the use of a firearm during and in relation to a crime of violence.

To establish a violation of Title 18, United States Code, Section 924(j)(1), the government must prove the following elements beyond a reasonable doubt:

(1)  The defendant used or possessed a firearm;
(2)  The defendant did so in furtherance of a crime of violence which may be prosecuted in federal court [namely, VCAR murder in aid of racketeering under 18 U.S.C. § 1959(a)]; and
(3)  The defendant caused the death of a person through the use of the firearm.

*See* Pattern Jury Instructions from the District of South Carolina.

18 U.S.C. § 1111 defines murder as "the unlawful killing of a human being with malice aforethought" and includes "any . . . kind of willful, deliberate, malicious, and premeditated killing." *Id*.

### I.  Maintaining a Drug Involved Premises, 21 U.S.C. § 856(a)(1) (Count 29)

To establish a violation of Title 21, United States Code, Section 856(a)(2), the government must prove the following elements beyond a reasonable doubt:

(1)  The defendant opened or maintained any place for the purpose of manufacturing, distributing or using any controlled substance; and
(2)  The defendant did so knowingly.

### J.  Possession of a Firearm by a Convicted Felon, 18 U.S.C. § 922(g)(1) (Counts 28 and 31)

To establish a violation of felon in possession of firearm, in violation of 18 U.S.C.

§ 922(g)(1), the government must prove the following elements beyond a reasonable doubt:

(1) The defendant had been convicted of a felony, that is, a crime punishable by imprisonment for a term exceeding one year;

(2) That after this conviction, the defendant knowingly possessed a firearm or ammunition;

(3) That at the time the defendant possessed the firearm, the defendant knew of the previous conviction and knew that is was for a crime punishable by imprisonment for a term exceeding one year; and

(4) that defendant's possession was in or affecting interstate commerce.

Third Circuit Model Criminal Jury Instructions 6.18.922G (revised February 2021).

## IV.    **THE TRIAL EVIDENCE**

The organization, means, methods, and purposes of SG1700 are all set forth in the superseding indictment. SG1700 was involved in various types of racketeering activity as set forth in paragraphs 1-10 and 12 of Count 1 of the superseding indictment. Specifically, the racketeering activity in which the defendants agreed that each of them or another participant in the conspiracy would participate, directly or indirectly, included: multiple threats and acts involving aggravated assault and murder under Pennsylvania law and multiple offenses involving the distribution and possession with intent to distribute of controlled substances in violation of various provisions of federal law.

The superseding indictment's overt acts detail some of the conduct the government will present at trial. The defendants used social media to demonstrate their affiliation with SG1700, display access to firearms, celebrate the gang's success, and intimidate rivals and witnesses. The group created numerous videos and rap performances that they distributed on social media. The government intends to introduce many social media posts and rap videos containing statements of the defendants and other SG1700 members.

Count 1 recites 49 overt acts attributable to the defendants and others in furtherance of

the racketeering conspiracy. While not detailing every fact that the government intends to prove

at trial, the below is a description of many prominent acts that the government will present at

trial.

### 1. Murder of Kaseem Rogers and assault of D.S. and J.L. (Counts 3, 4, 5, and 6; Overt Act 9)

Kaseem Rogers (a/k/a "Glizzy"), a 19-year-old man from the Frankford section of

Philadelphia, was murdered on December 3, 2018, at approximately 8:15 p.m. outside of a

corner store at the intersection of Tackawanna and Harrison Streets. Prior to the murder, Rogers

and three other individuals were outside of the corner store. Two of those individuals, D.S. and

J.L., were also injured during the shooting but survived. This murder was committed by Elliott,

Mitchell, and C.A. as shooters, while Kelvin Jiminez (a/k/a "Nip") and S.J. acted as lookouts for

this murder.

<u>Evidence</u>

Surveillance video from the corner store shows gunfire from the vehicles. Fired cartridge

casings ("FCCs") at the scene indicated that there were three weapons fired, a 9mm, a .40

caliber, and a .22 caliber firearm.

Social media accounts, iCloud information, and cell phones that belonged to Elliott and

Mitchell connect Elliott and Mitchell to the murder through ballistics comparison, text messages,

photographs, and internet searches. The following section summarizes the evidence that links

Elliott and Mitchell to the murder and the source of the information.

*November 20, 2018 – Shooting at Bridge & Hawthorne* (Overt Act 8)

Police recovered three sets of FCCs at the scene of the Rogers murder—9mm, .40

caliber, and .22 caliber. The 9mm FCCs match FCCs from a shooting committed on November

20, 2018, at Bridge and Hawthorne Streets (Overt Act 8), just 13 days prior to the murder. At

19

that shooting, police recovered two sets of 9mm FCCs at that scene—one set matches the Rogers murder and the second matches a gun purchased by S.G., an individual with numerous ties to Hassan Elliott.[1]

Messages from Elliott's iCloud immediately prior to the November 20, 2018, shooting indicate that he was trying to keep his paramour out of the area where the shooting was about to happen., The following day, she asks Elliott if he was the "one shooting yesterday," and Elliott tells her not to text him "dumb shit" like that and to "be smarter" because "it's just that small mistake that can cause big problems." On November 21, 2018, a SG1700 member, D.K. was arrested for this shooting after his own mother identified him in surveillance footage from the shooting. Elliott's iCloud indicates that he believed D.K.'s arrest was his fault ("[D.K.] got booked for some shit my fault."). The intended target was an opposition gang member, L.H.

*December 2, 2018 – Day before the murder*

The day before the Rogers murder, D.S., a 4800 Tackawanna member and later victim of the shooting, sent Mitchell a direct message on Instagram making fun of one of Elliott's original rap songs (originally posted to Bilal Mitchell's Instagram story, tagging another Elliott account, "sg_haz").



The same day, Elliott screen recorded a Youtube video titled, "Shooting The Mossberg Tact 22." Elliott and Bilal Mitchell additionally filmed two "selfie" videos pointing a long gun

---

[1] Elliott was stopped by local police driving a vehicle owned by S.G. (Overt Act 14). Additionally, one of the guns used in the Tyrone Tyree murder, discussed below, was purchased by S.G.

(consistent with a .22 caliber Mossberg) at the camera. In Elliott's video, he says, "If I catch an

opp, I'm gonna kill em." The videos appear to be filmed in an abandoned property.

*December 3, 2018 – Day of the murder*

A video from Hassan Elliott's Instagram account that appears to

have been posted on the day of the murder, December 3, 2018, declaring

"Haz is MVP OF THE YEAR." A still photograph of the video appears

to the right.



There are no messages at the time of the murder. Generally,

SG1700 members did not carry their phones, turned their phones off or

put them in "airplane mode" when they committed a murder or shooting.

It was "common knowledge" in Philadelphia that police use cellular phone data to track the

whereabouts of individuals suspected of committing crimes.

An hour after the murder, Elliott sent a text message to C.A., asking him to bring Elliott a

t-shirt. SG1700 members would often change clothes immediately after a murder or shooting to

eliminate the possibility of being arrested by police with gunshot residue on clothing.

*December 4, 2018*

In the early morning hours of December 4, 2018, approximately 13 hours after the

murder, Elliott googled a Fox29 article about the murder.

That day, Elliott and Mitchell took a series of photographs holding various weapons. In

the photographs, some of which are included below, Mitchell is wearing an "SG1700" jacket. An

expert from Philadelphia Police Department (PPD) Firearms Investigation Unit (FIU) found that

the long gun is consistent with a .22 caliber Mossberg rifle, which is also consistent with one set

of FCCs from the Rogers murder and the instructional video Elliott saved the day before the

murder. Location information embedded in the below photographs indicates that they were taken

at 1774 Scattergood Street.

The residence at 1774 Scattergood Street was a "bando" (abandoned property) utilized by SG1700 and members of the group often took pictures of themselves holding guns—in this case the actual murder weapons—and posted them on social media to look "cool" and let rival gangs know that they were responsible for specific crimes. Text messages in Mitchell's phone following the shooting discuss the location of one of the murder weapons—stashed in the "bando"— and how, if the owner of the "bando" finds the gun, it will be a "bad jawn." The photos below are geotagged to 1774 Scattergood Street.



*Elliott iCloud*

On December 5, 2018, Elliott took a screenshot of candlelight vigil information for Rogers. On December 6, 2018, Elliott obtained surveillance video of the murder, which was saved to his iCloud account.

*Prison Letters/Wall* (Overt Acts 47 and 48)

In a prison letter written by Elliott to Mitchell, Elliott discusses the murder of Kaseem Rogers, stating, "you was Kobe & I was Shaq n*ggas cant fuck wit us honestly we held that shit

down when it came to drama fr (for real) it took 3 years for a project n*gga to die we did it our first year on the block together lol."

Finally, Elliott included "SeemGlizz," one of Rogers' nicknames, on the kill-list on his prison wall. As discussed below, "Mugga" (Dontae Walker's nickname) and "O'Connor" appear on the list. "Mugga" was a known nickname for Walker and "Seem Glizz" was a known nickname for Rogers.



*Glizzy Memorial Sweatshirt* (Overt Act 11)

Instagram photos (at least one of which was saved to Elliott's iCloud account) show that 4800 Tackawanna members created memorial sweatshirts for Rogers with his photograph on the front and "GLIZZY" written on the hood. A few months after the murder, Mitchell went to Franklin Mills Mall and ordered a fake memorial sweatshirt using the same photograph of Rogers. Instead of "GLIZZY" on the hood of the sweatshirt, the hood read "FUCK THE OPPS."



There are numerous photographs and videos of Elliott and Mitchell wearing this sweatshirt. Mitchell wears the sweatshirt in a music video where SG1700 members burn the memorial teddy bear of a deceased 4800 Tackawanna member; Elliott wears the sweatshirt in the "Frankford Purge" video. The photograph to the right shows Mitchell

(center) wearing the sweatshirt, while Dominique Parker is to the right.

*Frankford Purge* (Overt Act 45)

SG1700 produced a music video in early

2020. The lyrics of the song relate the real events of

numerous shootings and murders committed by the

group. There is a portion of the song about the

murder of Kaseem "Glizzy" Rogers.



In these lyrics, Elliott takes credit for the

Rogers ("Glizzy") murder. Elliott is also wearing the "Fuck the Opps" sweatshirt with Rogers'

photograph on the front of it during the music video. Elliott also states that "Seemy got hit with a

Ruger." Ballistics evidence confirms that a 9mm Ruger semi-automatic handgun was used in this

murder.

### 2. Shooting of C.S. and M.H. (Counts 7, 8, and 9; Overt Act 13)

On January 25, 2019, at approximately 5:00 a.m., Hassan Elliott and Bilal Mitchell went

to the 1800 block of Harrison Street to destroy the memorial set up by Kaseem Rogers' friends

and family on the corner where Rogers was killed. While Mitchell destroyed the memorial,

Elliott noticed movement inside a car a few feet from the memorial and started shooting at the

car. The car was occupied by C.S. and M.H., who were sleeping inside. C.S. was shot in the

thigh and M.H. was shot in the hip. Police responded to the scene and recovered a bullet

fragment from inside the car and one .40 caliber FCC. Based on the injuries sustained and the

crime scene photos, it is clear that additional rounds were fired.

<u>Evidence</u>

The incident was captured on surveillance video and shows two males dressed in dark

clothing approach the corner. While one male destroys the memorial, another shoots at the car. The evidence includes the surveillance video, crime scene photos, ballistics evidence, and eyewitness testimony. Text messages on Mitchell's phone also discuss the incident.

Ballistics comparison indicates that the FCC recovered at this scene (.40 caliber) was fired from the same gun used to kill Tyrone Tyree on March 1, 2019 (discussed below). Elliott's fingerprint was on the magazine of this firearm when it was recovered.

### 3. Murder of Tyrone Tyree (Counts 10 and 11; Overt Act 15)

On March 1, 2019, at approximately 11:59 a.m., Hassan Elliott and Khalif Sears[2] murdered Tyrone Tyree on the 5300 block of Duffield Street.

Evidence

Tyree went to the 5300 block of Duffield Street in his 2004 Pontiac to buy marijuana. Elliott and Sears approached to sell to him but saw that he had a wad of cash and decided to rob Tyree. Before they approached to commit the robbery, Elliott and Sears called Kelvin Jiminez for permission to leave the drug block unattended.

When they pointed their guns at Tyree, Tyree reached down – likely for the gearshift – and Elliott and Sears shot and killed him. After the shooting, Tyree's car rolled forward and struck the corner house at Duffield and Brill Streets. Tyree was pronounced dead at Jefferson Torresdale Hospital at 12:27 p.m.; the cause of death was multiple gunshot wounds. At the scene, officers recovered seven .40 caliber FCCs and four 9mm FCCs. Bullet specimens were recovered from Tyree's body and from his car.

Elliott and Sears fled down alleyways between Brill and Scattergood streets toward

---

[2] Khalif Sears was 17-years old at the time of this murder. He turned 18 in July 2019, prior to committing any other substantive charges.

Charles Street. They stashed the handguns inside a barbecue grill in the rear yard of 1775 Scattergood Street (captured on residential surveillance video), and Sears left his coat on the fence. Officers followed footprints in the snow down the alleyway and discovered the abandoned evidence. Police ultimately recovered (1) a .40 caliber Smith and Wesson semiautomatic handgun, loaded with two live rounds in the magazine and one in the chamber, and (2) a 9mm Smith & Wesson semiautomatic handgun, loaded with 11 live rounds in the magazine, with an obliterated serial number. Inside the coat pockets, Sears left an ALCATEL flip phone, a tube of Chapstick, and headphones.

*Ballistics Comparison*

Ballistics analysis confirmed the following: (1) the 9mm and .40 caliber FCCs were fired from the weapons recovered in the grill; (2) a bullet jacket and bullet jacket fragment collected at Jefferson Torresdale Hospital came from the recovered 9mm handgun; and (3) a bullet and bullet jacket collected from Tyree's 2004 white Pontiac came from the recovered .40 caliber handgun.

Both guns were also used in other crimes. FIU officers conducted microscopic comparison of the ballistics evidence in this case and others. They confirmed that the .40 caliber handgun was also used in a shooting on December 19, 2018, at 1600 Bridge Street (shooting of innocent bystander M.C.), and a shooting on January 25, 2019, at 1836 Harrison Street (this is the shooting Elliott committed at the "Glizzy" memorial, detailed above as Overt Act 13).

The .40 caliber firearm was purchased by S.G. Elliott was stopped in a vehicle owned by S.G. on January 29, 2019 (Overt Act 14) – four days after the "Glizzy" memorial shooting.

FIU comparison confirmed that the 9mm firearm was also used in the same December 19, 2018, shooting at 1600 Bridge Street where M.C. was shot.

*Latent Print Analysis*

Officers attempted to secure fingerprints from the two handguns and the ACATEL flip

phone. Hassan Elliott's left thumb print was located on the magazine of the .40 caliber Smith and Wesson semiautomatic handgun. The remaining prints were unsuitable for comparison.

*DNA Evidence*

PPD Crime Scene Unit officers secured samples of biological material for DNA comparison testing from the two handguns, the ammunition, the ALCATEL cell phone, the coat, and the headphones and Chapstick in the coat pocket. DNA analysis showed strong links between the .40 caliber handgun and Hassan Elliott, between the ALCATEL phone and Khalif Sears and Elliott, between the coat and Sears, between the earbuds and Sears, and between the Chapstick and Sears. The DNA results are as follows:

| | |
|---|---|
| **.40 caliber handgun** | The results are consistent with a mixture originating from at least three individuals, at least one of whom is male. Under the scenario that this DNA mixture originates from **Hassan Elliott** and two random unrelated individuals, it is **800 billion** times more likely to occur than if from three random unrelated individuals in the Caucasian population, **419.5 million** times more likely to occur than if it originates from three random unrelated individuals in the African American population, and **98.66 billion** times more likely to occur than if it originates from three random unrelated individuals in the Hispanic population. |
| **ALCATEL phone** | The results are consistent with a mixture originating from at least two individuals, at least one of whom is male. The major component of the DNA mixture detected in this sample is consistent with the DNA profile obtained from Khalif Sears. **Excluding an identical twin, Khalif Sears is the source of the major component of the DNA mixture detected in this sample.**<br><br>Under the scenario that this DNA mixture originates from **Khalif Sears and Hassan Elliott**, it is **328.2 quadrillion** times more likely to occur than if it originates from Khalif Sears and one random unrelated individual in the Caucasian population, **198.2 trillion** times more likely to occur than if it originates from Khalif Sears and one random unrelated individual in the African American population, and **21.12 quadrillion** times more likely to occur than if it originates from Khalif Sears and one random unrelated individual in the Hispanic population. |
| **Inside collar of coat** | The results are consistent with a mixture originating from at least two individuals, at least one of whom is male. **The major component of the DNA mixture detected in this sample matches the DNA profile obtained from Khalif Sears.** |
| **Headphones** | The results are consistent with a mixture originating from a male source. **The DNA detected in this sample matches the DNA profile obtained from Khalif Sears. Excluding an identical twin, Khalif Sears is the source of the DNA detected in** |

| | this sample. |
|---|---|
| **Chapstick** | The results are consistent with a mixture originating from at least two individuals, at least one of whom is male. The major component of the DNA mixture detected in this sample matches the DNA profile obtained from Khalif Sears. **Excluding an identical twin, Khalif Sears is the source of the major component of the DNA mixture detected in this sample.** |

*Gunshot Residue*

The coat recovered from 1775 Scattergood Street was swabbed and tested for gunshot residue in three places: (1) front/back sleeve of right arm of jacket; (2) inside left and right front pockets; and (3) outside front and back sleeve of left arm of jacket. Pennsylvania State Police Analyst Jessica Mulhollem analyzed the samples and determined that each of the items contained particles that are consistent with, and indicative of, gunshot residue.

*Video Recovery*

Video was recovered from various sources in the neighborhood. The video shows Elliott and Sears walking in the alleyways after the murder and captures Sears mimicking firing a handgun. Residential surveillance from 1775 Scattergood Street shows the men approach the backyard with the barbeque grill at 12:04 p.m. – approximately five minutes after the shooting.

Investigators also recovered footage from a convenience store two weeks prior. A PPD officer at the crime scene remembered that he had seen one of the defendants wearing the recovered coat at the store on that date. The video shows the officers and the defendants enter and leave the store. Sears appears to be wearing a coat matching the one recovered behind 1775 Scattergood Street. Elliott appears to be wearing the same shoes depicted in the video from the date of the murder.

### 4. Shooting of R.D. (Overt Act 18)

On August 5, 2019, at approximately 1:34 p.m., 63-year-old R.D. was standing outside of her church at 1600 Allengrove Street when a stray bullet hit her ankle. This shooting was

committed by Mitchell, C.A., Dominique Parker, and M.E.

Evidence

SG1700 members were planning to fistfight 4800 Tackawanna members who were riding bikes in the area. An associate of SG1700, S.T., drove Mitchell, Parker, C.A., and M.E. to the area in a white Chevrolet Impala. Mitchell, Parker, and C.A. got out of the car. As they approached, C.A. started shooting at men on bikes.

*Surveillance Footage*

Surveillance footage prior to the shooting shows the intended targets, two men riding BMX bikes, at the intersection of Allengrove Street and Frankford Avenue. The shooting is not captured on video, but you can see people reacting to the shooting and running away. Police obtained flash information from a 911 call that a white Chevrolet Impala with PA tag KYG1157 was involved in the shooting. Additional surveillance footage from a homeowner on the 1600 block of Wakeling Street shows Mitchell and C.A. running down the sidewalk one minute after the shooting.

*Ballistics Comparison*

Police recovered seven 9mm FCCs at the location of the shooting. These FCCs match the 9mm FCCs from the shooting R.F. on December 20, 2019 (Overt Act 34, detailed below).

### 5.  Shooting of R.B. (Counts 12 and 13; Overt Act 21)

On August 20, 2019, at approximately 12:10 a.m., 30-year-old R.B. was sitting outside on his porch near the Tackawanna Projects when he was shot a total of 10 times in the neck, shoulder, forearm, calf, and thigh. Police officers placed him in the back of their patrol car and rushed him to the hospital. The photograph to the



right shows the back of their vehicle after officers transported R.B. to the hospital. R.B. had no connection to the criminal gang activity in the area but was merely sitting on his porch.

Evidence

Police recovered 23 9mm FCCs. FIU determined that these FCCs were fired from two separate guns. Surveillance footage from the area shows two men wearing hooded sweatshirts riding bikes in the area immediately prior to the shooting, on the street where the shooting occurred. The video footage is dark but captures the shooting; the shooters fired while on the bikes. Witness testimony and call detail records show Elliott and Parker fired the shots at R.B., while Mitchell and Jiminez acted as lookouts.

*Social Media*



Mitchell posted to his Instagram "story" immediately prior to and following the shooting. The first post is a photograph of Mitchell and others during a music video shoot where they burned a teddy bear stolen from a 4800 Tackawanna member's memorial site. Mitchell added the "shh" emoji on top of the photograph with the song "Steppers" attached to the post. An hour and forty-five minutes after the shooting, Mitchell posted another Instagram story. The second post features a photograph of Mitchell wearing a t-shirt with a bruised/injured teddy bear with the lyrics to "Respect the Game" by Meek Mill overlaid on the photograph.

6. **Murder of Dontae Walker and Shooting at U.W. (Counts 14, 15, and 16; Overt Act 22)**

Dontae Walker was murdered on August 22, 2019, at the corner of Bridge and Hawthorne Streets. This murder was committed by Elliott, Mitchell, Parker, and SG1700 member M.B. SG1700 member J.W. acted as a "lookout" for this murder. After the murder the

killers returned to a house on 5300 Lesher Street to gloat about the murder, describing how they boxed Walker in by approaching from multiple angles and shot him repeatedly.

<u>Evidence</u>

This murder was committed in retaliation for the shooting of a SG1700 member on August 17, 2019.[3] The group was unsure which opposition group was responsible for the shooting, so they retaliated against both of their main opposition groups. One of these groups was the Hawthorne Street gang. The other retaliatory shooting was the shooting of R.B., outlined above (Overt Act 21).

On the evening of the murder, SG1700 members learned that members of the Hawthorne Street gang were on a nearby porch on Marlowe Street. M.B. and Mitchell discussed "spinning the block" and shooting at the people on the porch. Elliott and Mitchell approached from the alleyway behind the corner store, and M.B. and Parker approached from an alley on the other side of Bridge Street.

The killers converged on Walker who was near the corner of Hawthorne and Bridge Streets. They fired numerous shots killing Walker.

*Ballistics Evidence*

The Philadelphia Crime Scene Unit collected a total of twenty-four .40 caliber FCCs at the scene of the murder, fired from three weapons. In the week following the murder, Mitchell responded to a text message saying that he had just sold his .40 caliber firearms the previous day.

*Call Detail Records*

Call detail records show that M.B. placed two outgoing phone calls to Mitchell. The first

---

[3] On August 17, 2019, M.S. was shot in the leg. He was transported to the hospital by Kelvin Jiminez.

at 11:41 p.m. and the second at 11:58 p.m. The first 911 call for the murder went out at 12:08

a.m.

### *Surveillance Footage*

Surveillance footage from a building across from the Pedrito Minimarket, the corner

store, shows two hooded figures creep out of the alleyway (Elliott and Mitchell). A city camera

showing the intersection shows the two figures run toward Bridge and Hawthorne firing guns.



### *Frankford Purge*

As discussed earlier, SG1700 members filmed the "Frankford Purge" in early 2020

(Overt Act 45). The lyrics discuss the Walker murder, filmed at the location of the murder. In the

scene, Jiminez (a/k/a "Nip") has a broom and is sweeping the sidewalk, imitating what Walker

was doing when he was killed, on the spot where he was killed.

The following lyrics are sung by M.S. (an unindicted coconspirator) about the Walker murder:

> **My n\*ggas killas they get close and get physical**
> **Roll up, Mugga I know that shit killing them**
> They won't come through the block cuz we bully shit
>
> Fifty three down to seventeen til the youngest n\*gga
> Got a body n\*gga
> Everybody's catchin bodies, n\*gga
> Fuck around be next
> **Ya homie out there sweepin**
> **He fuck around got swept**
> **I guess he thought he was a barber**
> **For cuttin too many fades**
> **But killers walked down on him**
> **A bullet rippin through his fade**

One of Walker's nicknames was "Mugga." This is also the name that Elliott wrote in the list on his prison wall, in addition to "SeemGlizz" and "O'Connor."[4]



---

[4] Lieutenant William Hilty, an employee of the Philadelphia Department of Corrections, personally inspected Elliott's cell before he was assigned to the cell. Lt. Hilty is a twenty-five-year veteran of the Department of Corrections. He is in charge of the Restricted Housing Unit ("RHU") at the Curran-Fromhold Correctional Facility where Elliott was housed.

Lieutenant Hilty personally observed the cell prior to Elliott's arrival at the jail. The walls of the cell were clean. It was a single-person cell, meaning there was only one bed in the cell and one person assigned to the cell.

### 7.   Crack Cocaine Purchases from SG1700

In May 2019, ATF opened a drug investigation in the area. Investigators introduced a confidential informant ("CI") familiar with the area.

On June 15, 2019, at the direction of investigators, the CI walked around the area of 1700 Brill Street for approximately two hours, during which he observed that "crack" cocaine, powder cocaine, marijuana, and pills were openly available for purchase. The CI saw firearms on a couple of different individuals/cars and that he overheard another individual talking about the ongoing "beef" with Hawthorne Street (meaning that the dealers on Brill Street have an ongoing drug turf dispute with the dealers on Hawthorne Street). The CI obtained a phone number for "Nip" from another gang member, J.C.[5] A series of controlled purchases followed over the next several months, seven of which involved Kelvin Jiminez (a/k/a "Nip").

### a.   September 17, 2019 (Overt Act 22)[6]

On September 17, 2019, PPD Officer Richard Gramlich, who would act in an undercover capacity (UC) met the CI. The UC parked on the 5300 block of Duffield Street, at which time the CI placed a call to "Nip" who told the CI to exit the vehicle and walk toward Scattergood Street. The CI did so and met "Nip" near Scattergood Street on Duffield Street. Jiminez sold the CI

---

[5] The CI met J.C. randomly on June 27, 2019, by approaching him on the 1700 block of Brill Street and requesting some marijuana. In a controlled, recorded purchase, J.C. sold the CI roughly 17 grams of marijuana and provided his phone number. During a second controlled purchase from J.C., on July 10, 2019, J.C. introduced the CI to "Nip," who was present for the transaction. At that time, "Nip" apologized to the CI that the full amount of cocaine that the CI wanted to buy was unavailable, implying that he was working with J.C. "Nip" assured the CI that for the next transaction, the full amount that the CI requested would be available. During that discussion, "Nip" provided the CI with a telephone number, which is the number that the CI used to contact "Nip" on each of the dates discussed herein.

[6] Jiminez pleaded guilty to a seven-count federal indictment charging him with these drug counts. He has not been sentenced yet.

34

25.17 grams of "crack" cocaine for $1,300 in buy money.

### b.  October 7-8, 2019 (Overt Acts 24 and 25)

On October 7, 2019, the CI placed a recorded consensual phone call to J.C., which included details of a future purchase of "crack" cocaine from "Nip."[7] A few minutes later, the CI placed a recorded consensual phone call to "Nip," during which they discussed the details for a drug transaction to occur on the following day.

On October 8, 2019, the CI had several recorded consensual phone conversations with "Nip" in which they discussed the purchase of "crack" cocaine from "Nip" later that day.

Later that day, in a call with Jiminez, the CI was directed to the same location of the previous drug buy, near Duffield and Scattergood Streets. There, Jiminez sold the CI 38.16 grams of "crack" cocaine for $2,250 in buy money.

### c.  October 22-23, 2019 (Overt Acts 26 and 27)

On October 22, 2019, the CI placed a recorded consensual phone call to "Nip," during which they discussed a future drug transaction. On October 23, 2019, the CI placed multiple recorded consensual phone calls to "Nip" to discuss the details of the transaction. That afternoon, the CI met Jiminez at an alley near 5303 Duffield Street. Jiminez sold the CI 38.6 grams of "crack" cocaine for $2,250 in buy money.

### d.  November 5-6, 2019 (Overt Acts 28 and 29)

On November 5, 2019, the CI placed two recorded consensual phone calls to "Nip" to discuss a future drug transaction. On November 6, 2019, the CI had multiple recorded

---

[7] In this call to J.C., the CI told J.C. that he had seen "Nip" a few weeks ago (reference to controlled purchase #1), because the CI "couldn't get with [J.C.]." In this call, the CI told J.C. that he was having trouble getting in touch with "Nip." The CI asked J.C. to contact "Nip" and to "let him know what's up."

consensual phone conversations with "Nip," which included details for a drug transaction. That afternoon, the CI met Jiminez at an alley near 5302 Duffield Street. Jiminez sold the CI 39.17 grams of "crack" cocaine for $2,230 in buy money.

### e.  December 15 and 17, 2019 (Overt Acts 32 and 33)

On December 15, 2019, the CI placed a recorded consensual phone call to "Nip," during which they discussed a future purchase of "crack" cocaine by the CI from "Nip." On December 17, 2019, the CI conducted multiple recorded consensual phone calls with "Nip" to discuss the transaction. Later that day, after another call, Jiminez left a residence at 5368 Charles Street, entered his Nissan Altima, and drove to meet the CI. "Nip" parked his car behind UC Officer Gramlich's vehicle on the 5300 block of Duffield Street. The CI met Jiminez at an alley near 5302 Duffield Street. Jiminez sold the CI 39.4 grams of "crack" cocaine for $2,250 in buy money.

### f.  January 9, 13-14, 2020 (Overt Acts 38-40)

On January 9 and January 13, 2020, the CI placed recorded consensual phone calls to "Nip," during which they discussed a future drug transaction. On January 14, 2020, the CI placed multiple recorded consensual phone calls to "Nip" to discuss a purchase of "crack" cocaine on that same day. Later that same day, the CI met Jiminez at the same alley near 5302 Duffield Street. Jiminez sold the CI 39 grams of "crack" cocaine for $2,250 in buy money.

### g.  February 11-12, 2020 (Overt Acts 42-43)

On February 11, 2020, the CI placed a recorded consensual phone call to "Nip," during which they discussed a future drug transaction. On February 12, 2020, the CI placed multiple recorded consensual phone calls to "Nip" to confirm a drug transaction to occur that same day.

Later that day, UC Officer Gramlich parked in front of Ricky's Place Bar and Grill at

4302 E. Cheltenham Avenue. The CI placed a recorded phone call to "Nip," who stated that he

was on his way to the CI's location. "Nip" approached UC Officer Gramlich's vehicle, at which

time the CI exited the vehicle. The CI and "Nip" engaged in conversation, and "Nip" provided

the CI with the 39.5 grams of "crack" cocaine by placing it in a box in the back seat of the car.

The CI then provided "Nip" with $2,250 of buy money. "Nip" then went inside of Ricky's Place

Bar and Grill, and the CI and UC departed the location.

### 8.    Shooting of B.C. (Overt Act 31)

In the early morning hours of December 6, 

2019, Parker and two other gang members, J.W.

and S.M., went to the Tackawanna Projects to

shoot a member of the opposition gang. The three

men started their search in the parking lots near

the center of the housing complex. At one point,

they passed a white car that they believed was full

of trash. Upon further investigation, S.M. yelled to J.W. and Parker to come back to the car

because he saw someone, later identified as the victim, B.C., sleeping inside of the car. Each of

them took a position on different sides of the car and started firing into the car. S.M. was armed

with a Draco "AK-style" gun, which fires 7.62 caliber ammunition; Parker had a .40 caliber

firearm; and J.W. had both a 9mm semi-automatic pistol and a .38 caliber revolver. J.W. was

unable to fire his 9mm gun, so he used the revolver. Parker fired one shot, and then his gun

jammed. Parker cleared the gun, fired a round, and then the gun jammed again. S.M. was able to

fire without incident.

A police officer in the area heard approximately 20 shots in rapid succession and went to the area. When he drove into the parking lot, he saw two men in all black clothing running eastbound through the parking lot. At the scene, police recovered two .40 caliber live rounds, in addition to three .40 caliber FCCs. Police also recovered sixteen 7.62 caliber FCCs.

FIU conducted a ballistic comparison between a Zastava firearm (known as a "Draco" to SG1700 members) and the shooting of another innocent victim, R.F. (Overt Act 34), 14 days after the Clay shooting. It was a match.

### 9. Shooting of R.F. (Counts 17 and 18; Overt Act 34)

On December 20, 2019, at approximately 3:45 a.m., R.F. was driving home from dropping her boyfriend off at work when five SG1700 members fired at least 52 rounds at her car, hitting her once in the right hand. As explained below, SG1700 members confused her car with the make and model of a car driven by opposition gang members. SG1700 members were targeting a dark Nissan Altima they believed would hold members of the 4800 Tackawanna gang. Unfortunately, R.F. was driving a dark grey Nissan Altima through the target area. Elliott, Mitchell, Sears, and others committed this shooting.

*Ballistics Comparison*

At the scene, located at 4000 E. Cheltenham Avenue, officers recovered 52 FCCs: (21) 7.62mm FCCs; (9) 9mm Luger FCCs; (11) .40 caliber FCCs; and (11) .45 caliber FCCs. The ballistics evidence was submitted to FIU for analysis, comparison, and entry into NIBIN. A later microscopic comparison of the 7.62mm FCCs, and a Zastava firearm (known as a "Draco" to SG1700 members) recovered from a SG1700 member's car on December 28, 2019, eight days after the shooting (Overt Act 36). It was a match. This firearm was used in the December 6, 2019, shooting of B.C. (Overt Act 31) described above.

The .45 caliber FCCs from the R.F. shooting match a shooting in the Tackawanna

Projects on December 4, 2019, at approximately 12:45 a.m. (Overt Act 30) — 2 days before the B.C. shooting and 16 days before the R.F. shooting. Numerous weapons were used in the December 4, 2019, shooting; one of the 9mm FCCs recovered from the December 4, 2019, scene was fired from a gun that was ultimately recovered inside of 1688 Bridge Street when Sergeant O'Connor was murdered. This .45 caliber FCC also matches an FCC recovered from the December 27, 2019, where Elliott fired at L.H. (Overt Act 35)—23 days after the R.F. shooting.

### 10. Shooting of R.R. and Attempted Shooting of L.H. and G.T. (Counts 19-21; Overt Act 35)

On December 27, 2019, at approximately 12:12 p.m., Hassan Elliott shot at two Hawthorne Street gang members, L.H. and G.T., at the corner of Bridge and Hawthorne Streets. G.T. returned fire. R.R., an innocent bystander who was driving through the intersection, was shot in the stomach but survived.

Evidence

*Ballistics Comparison*

Police recovered two groupings of FCCs at the scene – (9) .45 caliber FCCs and (7) .40 caliber FCCs. Officers recovered the .40 caliber firearm G.T. used, along with a digital scale. The .45 caliber FCCs match the December 4, 2019, shooting at Glenloch and Wakeling Streets in the Tackawanna Projects (Overt Act 30), and the December 20, 2019, shooting of R.F. at 4000 E. Cheltenham Avenue (Overt Act 34).

*Witness Testimony*

L.H. gave a videotaped interview at Northeast Detective Division where he identified Hassan Elliott as the person who shot at him. Elliott came out of the alleyway behind the corner store at Bridge and Hawthorne (the same alleyway used by Elliott and Mitchell in the August 22, 2019, murder of Dontae Walker on the same corner).

Mitchell stood in a nearby alleyway, armed, ready to shoot any opposition members that attempted to run in that direction to avoid being shot. Text messages between Mitchell and his girlfriend on the day of the shooting show Mitchell's involvement in the shooting.

After the shooting, SG1700 members were upset with Elliott because he did not warn them that he was going to do it and the increased police presence in the area shut down the drug blocks.



*Surveillance Video*

Surveillance footage from the area shows Elliott exiting the alleyway wearing a dark green coat that matches one of the coats that was inside of 1688 Bridge Street on March 13, 2020, when Sergeant O'Connor was murdered.

### 11. Shooting of M.M. (Counts 22 and 23; Overt Act 41)

On January 28, 2020, at approximately 1:20 a.m., SG1700 members went to an area controlled by rival gang 4800 Tackawanna and engaged in a gun battle with 4800 Tackawanna gang members. Elliott, Sears, Mitchell, Easterling, Jiminez, and others committed this assault. The intended target, M.M., a 4800 Tackawanna member, was grazed in the head.

<u>Evidence</u>

Police responded to the report of gunshots in the area of 4800 Tackawanna Street. A 911 caller stated that one group of people ran into 4802 Tackawanna Street (Tackawanna Projects members) and the other group ran down Fillmore Street (SG1700 members).

*Surveillance Video*

Surveillance footage from the area shows the Tackawanna group returning fire toward the intersection of Tackawanna and Fillmore, and people picking up FCCs outside of 4802

Tackawanna Street after the shooting. The shooters are not visible in the video.

*Ballistics Comparison*

Police recovered multiple groupings of FCCs. At least one of these groupings contained a 9mm FCC that matched a 9mm Polymer 80 handgun recovered from 1688 Bridge Street on March 13, 2020.

*Social Media*

Exactly one month after the shooting, on February 28, 2020, A.D., a SG1700 associate, posted an Instagram video of Easterling dancing to "Frankford Purge" in the Tackawanna Projects at the location where the shooting occurred, taunting members of 4800 Tackawanna in order to make them look weak.

### 12. Tres Fuego Shooting (Overt Act 44)

On February 14, 2020, SG1700 members held a "welcome home" party for Easterling, who had recently been released from prison. SG1700 members present for the party included Mitchell, Easterling, Jiminez, Parker, J.W., S.M., and others in the organization. Later that night, the group went to Tres Fuego, which is an afterhours club located at 5734 Old 2nd Street in Northwest Philadelphia. At approximately 4:00 a.m., a shootout occurred outside of the bar. J.W. fired in retaliation and to protect fellow SG1700 members. Easterling and two other individuals were shot during the incident.

A ballistics comparison linked a 9mm Taurus G2c pistol bearing serial number TLW02144, recovered in the middle bedroom of 1688 Bridge Street (discussed below), to the 9mm FCCs recovered from the scene of the shooting.

### 13. Murder of Philadelphia SWAT Sergeant James O'Connor and 1688 Bridge Street (Counts 25-29; Overt Act 46)

On March 26, 2019, Philadelphia homicide detectives obtained an arrest warrant charging Hassan Elliott and Khalif Sears with murder and firearms offenses.[8] On Friday, March 13, 2020, Sergeant James O'Connor and members of the Philadelphia Police Department ("PPD") Special Weapons and Tactics ("SWAT") executed an arrest warrant for Elliott at the second-floor apartment of 1688 Bridge Street. The residence at 1688 Bridge Street is a two-story row home, divided into two apartments, one on each floor.

At approximately 5:40 a.m., Sergeant O'Connor and the SWAT Unit arrived at 1688 Bridge Street. Officer Cyprian Scott took the lead position in the tactical team—under the command of Sergeant O'Connor. Officer Scott knocked on the door to the front porch and loudly announced police presence but received no response. The SWAT officers entered the porch through the unlocked door and proceeded to the door leading to the second-floor apartment. Officer Scott knocked and loudly announced police presence again but received no response. Officer James Ashford breached the door, revealing a staircase that led to the second-floor apartment.

The SWAT officers ascended the staircase in a tightly packed "stack" formation led by Officer Scott, who was followed by Officer Patrick Saba. Sergeant O'Connor was in the third position behind Officers Scott and Saba. While ascending the staircase, the officers continued to loudly announce their presence. As they climbed the stairs, Officers Scott and Saba saw light coming from under the door of the middle bedroom and heard, "Fuck, it's the cops" and, "Yo, it's the fucking cops." Just as Officer Saba reached the landing at the top of the stairs,

---

[8] The warrant was issued for the March 1, 2019, murder of Tyrone Tyree.

gunfire erupted from behind the closed middle bedroom door, directly across from the staircase.

 

Sergeant O'Connor, who was approximately three steps from the landing, yelled, "I'm hit! I'm hit!" and fell back down the narrow stairs onto other SWAT officers. Officer Saba returned fire from the second-floor landing with his .223 M-4 service weapon.

Officers Norat and Fitzpatrick carried Sergeant O'Connor from the property and placed him in the hospital car. Sergeant O'Connor was rushed to Temple University Hospital where he was pronounced dead at 6:09 a.m. A subsequent medical examination found that Sergeant O'Connor was shot twice—once in the left forearm and once in the torso, millimeters above the area protected by his body armor.

Meanwhile, inside the property, Officer Saba backed into the kitchen—using the doorway for cover—and continued to fire until the gunshots from the middle bedroom ceased.[9] Once the gunfire stopped, Officers Saba and Scott stood silent for a few seconds. Officer Scott

---

[9] In total, Officer Saba fired 15 of his available 30 rounds of ammunition.

again announced, *"Police with a warrant!"* and ordered the occupants of the middle bedroom to come out of the room. Officers Saba and Scott heard multiple hushed voices coming from the middle bedroom. One of the men said, "We are shot." Officer Saba told the occupants to come out of the bedroom with their hands up. The same voice responded and said, "Okay, stop shooting." After a few seconds, the middle bedroom opened and four men exited.

Once the men were secured, Officers Scott and Saba entered the middle bedroom. They immediately noticed multiple firearms in plain view, littered throughout the room. The following items were recovered from the approximately 10 x 11 foot room: 10 firearms, a Glock conversion device, bulk and packaged "crack" cocaine and marijuana, new and unused drug packaging material, a scale, a cutting plate with razors and white residue, and six cell phones. DNA evidence linked all four defendants to the firearms and the narcotics.

Nine of the ten firearms were handguns littered throughout the room in plain view. The only completely concealed firearm was a Mossberg International .22 caliber semiautomatic rifle that was hidden under the bed. FIU later determined that the Mossberg was the weapon used to kill Sergeant O'Connor. PPD Crime Scene Unit (CSU) officers recovered 16 FCCs from the floor of the middle bedroom. FIU officers analyzed the FCCs and determined that they had been fired from the Mossberg .22 caliber rifle recovered from the room.

CSU officers additionally recovered nine .22 caliber bullet fragments from the wall behind the staircase. FIU officers determined that seven of those fragments were fired from the Mossberg .22 caliber rifle. The remaining two bullet fragments were not suitable for comparison due to damage.

In addition to the ten firearms, CSU officers recovered an extended ammunition magazine, a drum magazine, two additional ammunition magazines, and many rounds of live

ammunition of various calibers. CSU Officers recovered a Glock conversion device, commercially marked "Glock made in Australia" from inside of a pill bottle in the room. The device allows the user to convert a firearm from semi-automatic to fully automatic.

Narcotics officers recovered bulk and packaged "crack" cocaine from the pockets of two jackets hanging on the closet door in the middle bedroom, totaling over 28 grams. Narcotics officers additionally recovered twelve 1-ounce baggies of marijuana, in a food saver bag, inside of a black grocery bag, marked "Blue Gelato," and 166 screw-top containers of marijuana throughout the room. The total weight of the marijuana was 442.60 grams. New and unused clear "trash can" flip-top containers and multiple types of larger, screw-top containers (similar to the packaged marijuana) were recovered from the room. Officers found a digital scale on the octagonal table, an orange plate containing two razor blades and white residue, approximately $130 in denominations of $5 and $10 in a pile on the desk, a knife with white residue underneath the desk, new and unused sandwich baggies (similar to the bags that contained the marijuana), used latex gloves, and rubber bands. Officers recovered six cell phones from the middle bedroom and a seventh phone was removed from Mitchell's hand as he exited the bedroom.

CSU Officers swabbed each of the firearms recovered from the middle bedroom in five unique locations. Swabs were taken from the nine handguns on the (1) grip; (2) trigger; (3) top of the slide; (4) ammunition magazine; and (5) live cartridges inside the ammunition magazine. The Mossberg semiautomatic rifle was unloaded and therefore swabs were taken from the: (1) ammunition magazine; (2) grip; (3) trigger; (4) magazine releases and bolt handle; and (5) barrel.

PPD Homicide Detectives obtained DNA samples from the defendants pursuant to search warrants. The DNA samples from the defendants and the swabs taken from firearms were sent to an independent forensics laboratory, Bode Technology, for DNA extraction, comparison, and

analysis.

The DNA on the swabs was extracted and profiles were developed. The swabs taken from the men were analyzed and compared to the swabs taken from the guns. Of the 10 guns recovered from the room, 8 were determined to have at least one of the four defendant's DNA on the firearm.

CSU Officers swabbed the Glock conversion device for DNA. That swab was sent to Bode Technology with the swabs taken from the narcotics packaging for DNA extraction, analysis, and comparison. The results of the analysis and comparison revealed that there is very strong support for the conclusion that Hassan Elliott contributed to the mixture. Additionally, there is moderate support for the conclusion that Khalif Sears contributed to the sample.

The outer packaging of the narcotics recovered from the middle bedroom was examined and swabbed for DNA by the PPD Criminalistics Laboratory. These swabs were also sent to Bode Technology for comparison to the buccal swabs obtained from the four defendants. The swabs taken from the firearms contained DNA mixtures from multiple individuals. To summarize, the analysis of the swabs taken from the "crack" cocaine indicated *very strong support* for the conclusion that DNA from Khalif Sears and Sherman Easterling was included and *moderate support* for the conclusion that DNA from Hassan Elliott was included in the samples. Similarly, the analysis of the swabs taken from the marijuana indicated *very strong support* for the conclusion that DNA from Hassan Elliott and Khalif Sears was included in the samples.

### 14. Attempted Shooting of B.L. (Counts 30 and 31; Overt Act 49)

On May 22, 2021, at approximately 9:55 p.m., B.L.—a rival gang member, part of the Hawthorne Street gang —shot and killed SG1700 member L.H. in SG1700 territory at the

intersection of Frankford Avenue and Granite Street, as he walked alongside fellow SG1700 member, Parker. After B.L. opened fire and shot L.H., Parker darted from the line of fire, retrieved a firearm from his waistband, and returned fire. Parker shot at B.L. multiple times and continued firing even as B.L. ran away.

<u>Evidence</u>

*Police Witnesses*

SEPTA Police Officers Samuel Lynch and Andrew Olchowecky were assigned to the Frankford Terminal located just across the street from where the shootout occurred. The officers heard multiple gunshots, looked in the direction of fire, and saw Parker shooting down Granite Street in the direction B.L. ran. The officers chased after Parker but could not locate B.L. Parker led the officers on a foot pursuit for several blocks before he encountered a fence and surrendered. During his flight from the officers, Parker tossed his firearm into a yard along his path.

When the officers did not find any weapons on Parker or in his immediate area, they retraced their path in search of a firearm. As the officers searched for the firearm in the alleyway, an unknown male approached Officer Olchowecky and reported that the man they were chasing "threw a gun in the alleyway." Officer Olchowecky continued to search the path of the foot pursuit with the assistance of a police dog trained to detect explosives, including gunpowder. The police dog ultimately located a firearm with a magazine (later identified as a Taurus, model G2c, 9mm caliber, semiautomatic pistol, bearing serial number TLM61817 loaded with one live round of ammunition in the chamber and a 9mm magazine) laying nearby in the rear of a property adjacent to the alleyway where the officers briefly lost sight of Parker.

As the SEPTA police officers pursued Parker and searched for the gun, Philadelphia Police officers responded to the shooting scene where they found L.H. laying on Frankford

Avenue unresponsive and suffering from multiple gunshot wounds. The officers transported L.H. to Temple Hospital where he was pronounced dead. Prior to the transport, officers recovered a Glock 19, 9mm caliber, semiautomatic pistol, loaded with 20 rounds of ammunition from L.H.'s waistband.

### Ballistics Evidence

PPD Crime Scene Officer Michael Maresca responded to the scene to process and collect the firearm and ballistic evidence. Officer Maresca recovered 23 9mm fired cartridge casings, one lead fragment, one projectile, and one copper fragment from the intersection of Frankford Avenue and Granite Street. Officer Maresca also recovered the Taurus, previously located by Officer Olchowecky and the police dog. Firearms Identification Unit Officer Whiteman analyzed the Taurus firearm and FCCs recovered from the scene. He determined that nine of the FCCs were fired from the Taurus firearm.

### Surveillance Footage

Philadelphia Homicide Detectives also responded to the scene and recovered video from businesses near the crime scene, including surveillance video from the Frankford Terminal, which captured the shootout. Video recovered from a nearby business captured some of the foot pursuit in the alleyway.

## V.    **THE GOVERNMENT'S CASE**

The government anticipates that its case-in-chief will take approximately eight weeks. The evidence in this case will consist of testimony of law enforcement witnesses, civilian witnesses, expert witnesses, cooperating witnesses, consensually recorded audio calls and transcripts, surveillance videos, photographs, social media records, physical evidence, and audio intercepts from the prison. The physical evidence includes, but is not limited to, drug seizures,

firearms and ballistics seizures, DNA evidence, and electronic evidence.  Additionally, the government will introduce business records such as telephone toll records, internet service provider records, and property records as evidence of the charges against the defendants, and to corroborate the testimony of government witnesses.

## VI.    **STIPULATIONS**

The government will propose a number of stipulations to defendants in an effort to obviate the need for many witnesses and otherwise streamline the trial on issues such as authenticity of certain records and recordings, chain of custody, scene security, controlled substance analyses (including identity and quantity), firearm operability and interstate nexus, ballistics, DNA/serology, toxicology, fingerprint analyses, and forensic examinations of digital evidence. These stipulations would shorten the length of trial.

## VII.    **TRIAL ISSUES**

### A.  **The Defendants' Discovery Obligations**

The government notes that its obligation to make available pretrial discovery materials is governed primarily by Rule 16 of the Federal Rules of Criminal Procedure.  That rule requires the government to produce certain categories of information upon request of the defendant.  Fed. R. Evid. 16(a).  However, once the defendant demands discovery material the government is entitled to request and receive certain reciprocal discovery from the defendant.  Fed. R. Evid. 16(b).  In regulating discovery, the court may, if a party fails to comply with its obligations, "prohibit that party from introducing the undisclosed evidence."  Fed. R. Evid. 16(d)(2)(C).

The government provided the defense with a vast array of discovery including various documents, recordings, photographs, reports, and laboratory reports during the course of discovery.  The government has also demanded reciprocal discovery pursuant to Federal Rule of

Evidence 16(b).  Although requested, the government has not received any material or reciprocal discovery from the defendants to date.  If the government does not receive timely reciprocal discovery, the government may move to preclude the defendants from presenting during their case-in-chief any photographs, books, papers, documents, data, tangible objects, buildings, places, or copies thereof as required pursuant to a reciprocal discovery demand made by way of Federal Rule of Evidence 16(b)(A).  Similarly, the government may move to preclude the defendants from presenting during their case-in-chief any evidence or reports of physical, mental, or scientific examinations or the use of expert testimony as required pursuant to a reciprocal discovery demand made by way of Federal Rule of Evidence 16(b)(B) and (C).

### B.  Sequestration

A myriad law enforcement officers have been involved in this investigation, which has included the use of confidential sources, cooperating witnesses, undercover officers, search warrants, forensic evidence, arrests, and proffers. Task Force Detective Craig Fife and ATF Special Agents Ryan Rooney and Kyle Raguz have led their law enforcement agency's investigation. They were involved in numerous proffers of cooperating witnesses, search warrants, and extensive use of the federal grand jury. After the November 18, 2020, original indictment, a superseding indictment was returned on March 23, 2023.

All three case agents (Fife, Rooney, and Raguz) are essential to presenting the government's case. In fact, Detective Fife and Special Agent Raguz testified extensively before the Grand Jury. Each of the three case agents bring a different knowledge base and understanding of this sprawling, multi-year investigation.[10]

---

[10]  Overall, six defendants have been indicted in the instant federal case, while several other SG1700 members have been charged separately.

All three case agents will be needed in the courtroom to confer with the prosecutors regarding trial strategy, witnesses, and evidence. Further, the case agents will be needed to coordinate scheduling – as well as, for some civilian witnesses, transport and safety – of witnesses during the estimated eight-week trial.

Sequestration is governed by Rule 615, which provides in relevant part that:

At a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony. Or the court may do so on its own. But this rule does not authorize excluding: ...
(b)    an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney; [or]
(c)    a person whose presence a party shows to be essential to presenting the party's claim or defense ....

Fed. R. Evid. 615.

Although the Third Circuit has not directly addressed the issue, several circuits have concluded that the district court has discretion to exempt multiple case agents from sequestration. In *United States v. Jackson*, 60 F.3d 128 (2d Cir. 1995), the Second Circuit determined that the district court had discretion to exempt more than one case agent under Rule 615(b). The district court had permitted three case agents to be present at counsel's table. *See United States v. Trader*, 2015 WL 4941820, at *14-15 (E.D.Pa. Aug. 19, 2015) (DuBois, J.) (no abuse of discretion in allowing two State Troopers serving as case agents to be exempt from sequestration under Rule 615(b)).[11]

In *United States v. Green*, 293 F.3d 886 (5th Cir. 2002), the Fifth Circuit held that the district court did not abuse its discretion when it permitted three case agents – from the FBI, state

_____

[11] The Senate report which accompanied the revision of Rule 615, a report which was approvingly quoted both in the 1974 Advisory Committee notes and by the Third Circuit in *United States v. Gonzalez*, 918 F.2d 1129, 1138 n.7 (3d Cir. 1990), expressly refers to plural "investigative agents" as being excepted from the rule.

police, and a local sheriff's office – to sit at counsel's table during the trial and all testify. In an apparent reference to Rule 615(c), the Fifth Circuit stated, "Federal Rule of Evidence 615 gives the court discretion to exempt more than one case agent from sequestration if their presence is essential to the presentation of the case." *Id.* at 892. The panel concluded, "Due to the complexities of the case and the defendants' failure to show how the investigators' presence prejudiced their testimony or that their testimony had a significant impact on the conviction, the district court did not abuse its discretion." *Id.*[12]

District courts – including in the Third Circuit – have endorsed the Fifth Circuit's approach. *See Wall v. United States*, 258 F. Supp. 3d 437, 452 (D.Del. 2017) ("[T]he government successfully demonstrated that both agents were essential to the presentation of its case. Consequently, even if Rule 615(b) should be construed as only authorizing the presence of one case agent at trial, the court's refusal to sequester the second case agent fell within the ambit of Rule 615(c)."). Thus, the government submits that its three case agents should be exempt from sequestration under Rule 615(b) & (c) in a complex case such as this one.

### C. Introductory Overview and Summary Witness

The government may call a summary witness as both an introductory overview witness at the beginning of its case-in-chief and a summary witness at the end of its case-in-chief. At the beginning of the case, the witness will testify about steps that he took in his investigation. His testimony will be limited to matters within his personal knowledge. He will not opine on ultimate

---

[12]  Similarly, in *United States v. Pulley*, 922 F.2d 1283 (6th Cir. 1991), the Sixth Circuit stated, "Where the government wants to have two agent-witnesses in attendance throughout the trial, it is always free to designate one agent as its representative under subpart (2) and try to show under subpart (3) that the presence of the second agent is 'essential' to the presentation of its case." *Id.* at 1286.

issues of guilt. Given that this case involves numerous victims and witnesses, and substantial evidence, concerning four separate murders, 11 assault charges, a RICO conspiracy and a drug dealing conspiracy, introductory overview testimony from the agent will help the jury understand the evidence that will be presented through the other witnesses that will testify at trial. At the end of the case, the witness will not only introduce additional evidence that will only make sense to discuss *after* the jury has already heard from other witnesses, but he will also help summarize and "connect the dots" between the substantial, voluminous evidence that will be admitted at trial, and will also introduce summaries of voluminous records such as social media postings and text messages, which will aid the jury in their understanding of this evidence.

In *United States v. Lacerda*, 958 F.3d 196, 208 (3d Cir. 2020), the Third Circuit held that introductory overview testimony from a law enforcement officer was proper. The Court explained that "an officer who is familiar with an investigation or was personally involved may tell the story of that investigation—how the investigation began, who was involved, and what techniques were used. In addition, with proper foundation, he may offer lay opinion testimony and testify about matters within his personal knowledge." A law enforcement officer may further state "his personal observations, and his beliefs of what the evidence showed based on what he saw and heard and did." *Id.* at 210. The Third Circuit has consistently held, since *Lacerda*, that such overview testimony by a case agent is admissible. *See e.g.*, *United States v. Parnell*, 2020 WL 4736038, at *6 (3d Cir. Aug. 14, 2020) (federal agent's overview testimony was proper because it was limited to matters within his personal knowledge); *United States v. Wadley*, 2022 WL 1011693, at *4, n. 11 (3d Cir. Apr. 5, 2022) (same); *United States v. Jarmon*, 14 F.4th 268, 273 (3d Cir. 2021) (case agents may provide overview testimony that describes the structure of a group, and their activities, where the testimony is based on what the agent learned in their

investigation and their beliefs of what the evidence showed). The Court may also give a limiting instruction to the jury about the agent's role and testimony.

A case agent may also testify at the conclusion of a government's case-in-chief as a summary witness. Summary testimony is also appropriate under Rule 611(a) if the evidence would aid the jury in ascertaining the truth and would not be overly prejudicial to the defendant. The Court and jury are entitled to have a witness "organize and evaluate evidence which is factually complex and fragmentally revealed." *United States v. Shirley*, 884 F.2d 1130, 1133-34 (9th Cir. 1989) (agent's testimony regarding her review of various telephone records, rental receipts, and other previously offered testimony held to be proper summary evidence, as it helped jury organize and evaluate evidence; summary charts properly admitted); *United States v. Lemire*, 720 F.2d 1327, 1348 (D.C. Cir. 1983). A summary witness may rely on the analysis of others where he has sufficient experience to judge another person's work and incorporate as his own the fact of its expertise. The use of other persons in the preparation of summary evidence goes to its weight, not its admissibility. *United States v. Soulard*, 730 F.2d 1292, 1299 (9th Cir. 1984); *see Diamond Shamrock Corp. v. Lumbermens Mutual Casualty Co.*, 466 F.2d 722, 727 (7th Cir. 1972) ("It is not necessary . . . that every person who assisted in the preparation of the original records or the summaries be brought to the witness stand").

### D.  Recalling law enforcement officers and case agents.

During the trial, the government may recall agents and investigators to the witness stand during its case in chief to address a number of different subjects. While it would be possible for the agents and investigators to testify about several of these topics in a single appearance on the witness stand, such an unnatural constraint would not promote an efficient or clear presentation

of the case. Instead, the government intends to recall certain witnesses so that their testimony can be provided in parts, either by subject matter or chronologically.

In particular, the government may need, for example, to have an investigator present evidence relevant to aspects of the certain murders and assaults committed by the defendants, as well as the conspiracy charges (such as the myriad violent acts and evidence of affiliation to prove the RICO charges) and then, later, evidence relevant to other aspects (such as the drug dealing conspiracy and sales).

The procedure of recalling a witness has been widely endorsed in complex conspiracy cases. *See United States v. Edelin*, 128 F. Supp. 2d 23, 47 (D.D.C. 2001) (collecting cases involving complex conspiracies or activities occurring over a long period of time that have approved of the practice of recalling witnesses to testify to discrete incidents; noting that Federal Rule of Evidence 611(a) authorizes the Court to control the order of interrogation and the presentation of evidence); *see also United States v. Coleman*, 805 F.2d 474, 482 (3d Cir. 1986) ("The district court has discretion to allow the recall of a witness, even if the witness has consulted with the prosecutor in the interim."); *United States v. Butera*, 677 F.2d 1376, 1381 (11th Cir. 1982) (district court had discretion under Rule 611(a) to permit case agent to take the stand on four separate occasions to describe events in chronological order); *United States v. Jackson*, 549 F.2d 517, 528 (8th Cir. 1977) (praising the district court's exercise of its discretion as lending "a praiseworthy degree of order to this complicated trial"); *United States v. Rodgers*, 2014 WL 3735585, at *2 (W.D. Pa. July 28, 2014) (permitting recall of certain law enforcement witnesses so the government may present its evidence chronologically); *United States v. Dimora*, 843 F. Supp. 2d 799, 822-23 (N.D. Ohio 2012) (approving the recalling of a government witness because it will provide a clear and orderly trial and aid the jury's understanding of the evidence)

*United States v. Bacon*, 2012 WL 5381415, at *1 (W.D. Pa. Oct. 31, 2012) (permitting recall of police detective so the government may present its evidence chronologically); *United States v. Johnson*, 434 F. Supp. 2d 301, 305-06 (D. Del. 2006) (recall of a DEA chemist was appropriate). Given certain complexities and the specific circumstances of this case, the government submits that a similar procedure should be permitted here.

### E.  Audio Recordings and Transcripts

The government has provided the video recordings from interviews with law enforcement as well as audio recordings of certain defendants' jail cell conversations and prison calls, statements set forth as rap lyrics recited in videos, and other communications since the defendants' have been incarcerated on this case and will file a *Starks* motion to have the recordings deemed admitted at trial.  The government seeks a pre-trial ruling that the recordings are admissible as evidence at trial.  The government will play certain audio recordings during trial and in order to save time in presenting this evidence the government may synchronize some of the recordings and transcripts electronically.

### F.  Authentication and Admissibility

As a condition precedent to the admission of evidence, the proponent of that evidence must satisfy the requirements for authentication. "The requirement of authentication … is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." *United States v. Rawlins*, 606 F.3d 73, 82 (3d Cir. 2010) (quoting Fed. R. Evid. 901). "To establish a chain of custody sufficient to make evidence admissible, the proponent 'need only prove a rational basis from which to conclude' that the evidence is what the party claims it to be." *Rawlins*, 606 F.3d at 82 (quoting *United States v. Mendel*, 746 F.2d 155, 166 (2d Cir. 1984)).

<u>Social Media Evidence</u>

Among other evidence, the government intends to introduce postings, photographs, and videos from the defendants' Instagram pages, as well as the pages of other co-conspirators. In *United States v. Browne*, the Third Circuit Court of Appeals first considered authentication of social media posts (specifically Facebook), holding that it is "no less proper to consider a wide range of evidence for authentication of social media records than it is for more traditional documentary evidence." 834 F.3d 403, 437 (3d Cir. 2016). The Court reiterated that proper authentication in this context requires that the government present sufficient extrinsic evidence of authorship to meet the relevancy requirements and that those requirements are no more burdensome than traditional authentication of documentary evidence. *Id.* at 435.

The government will offer the Instagram records together with an affidavit establishing the requirements under Fed. Rule of Evidence 902(11), as discussed earlier in this memorandum. The government will authenticate these records in numerous ways, in addition to the certifications:

1. Email addresses and phone numbers used to register the subject account;

2. Testimony from individuals that are familiar with the subject social media account belonging to the subject user, have communicated with the subject user using the social media account, and have appeared in photographs or videos on the subject user's social media account;

3. Testimony from law enforcement officers regarding the methods used to follow the subject accounts and download the post or video (specifically publicly available posts and videos). Law enforcement will testify, if applicable, that they are familiar with the person or persons in the photograph or video and have reviewed numerous postings (including "live" postings) from the subject account that demonstrates the subject

account belongs to the person it is purported to be; and

4. Circumstantial evidence from the social media account establishing the identity of the author, user, and creator of the account or posting. These would include self-photographs and videos ("selfies"), the name on the account, the date of birth used to register the account, or other personal information in the subject account, or posts or messages that demonstrate the user is the person it is purported to be.

Any argument that the defendants may proffer that the social media posts, videos, stories, private messages, photographs, or other chat logs cannot be authenticated lacks merit. In *Browne*, the Third Circuit discussed this issue at length, citing numerous ways social media evidence could be authenticated. *Id.* at 437-441. There, Browne operated a Facebook account under the name "Billy Button," which was used to produce child pornography. The Court held that the government presented more than enough authentication evidence via the testimony of multiple witnesses who interacted with the account, statements from Browne that he was the user of the Button account, and biographical information displayed on the Button account that matched Browne. Browne's personal phone was also linked to the Facebook account. Other circuits have reached the same conclusion. *See United States v. Lamm*, 5 F.4th 942, 948 (8th Cir. 2021) (holding that social media evidence can be authenticated via circumstantial evidence); *United v. Lewisbey*, 843 F.3d 653 (7th Cir. 2016) (holding that extrinsic evidence was sufficient to establish authenticity of Facebook records and that the government need only "produce evidence sufficient to support the a finding that the account belong[s] to [the defendant] and the linked messages were sent and received by him").

<u>Documents</u>

In addition, there may be documents for which no witness will be able to recall that the document was authored or received by him or her. The government may nevertheless properly authenticate such an exhibit pursuant to Rule 901(b)(4), which permits authentication when "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances," support a finding that the document is what the proponent claims it to be. *See United States v. Dean*, 989 F.2d 1205, 1210 n.7 (D.C. Cir. 1993) ("The rule contains an illustrative, but not exhaustive, list of suggested methods of identification.").

<u>Audio Recordings</u>

The government also intends to introduce audio recordings in which defendants and their co-conspirators discuss gang business and defendants make inculpatory statements.[13] The same rules apply for authenticating such evidence—the government must only "produce evidence sufficient to support a finding that the item is what the [government] claims it is." Fed. R. Evid. 901(a).

Specifically, Rule 901(b)(5) provides as an example of proper authentication evidence "[a]n opinion identifying a person's voice--whether heard firsthand or through mechanical or electronic transmission or recording--based on hearing the voice *at any time* under circumstances that connect it with the alleged speaker." *See e.g.*, *United States v. Branch*, 970 F.2d 1368, 1372 (4th Cir. 1992) (emphasis added) (audio recordings properly authenticated where agent "stated that he was familiar with the voices on the tapes because he talked with many of the participants

---

[13] The government intends to file a *Starks* motion prior to the pre-trial hearing in this matter. In that motion, the government will outline the recordings it intends to introduce, along with a transcript of the same. All recordings were previously provided to defense counsel in discovery.

and because he reviewed the original tapes and voice exemplars" and "then identified various voices . . . as the recordings were played to the jury"); *United States v. Spence*, 566 F. App'x 240, 244 (4th Cir. 2014) (holding testimony was "more than sufficient to establish that [jail call] recordings were what the government claimed them to be" where agent testified that he was familiar with defendant's voice and identified it on recording; jail employee testified to method of producing recordings, including that he listened to them, discs contained full contents of originals, he signified accuracy of recordings by placing his initials on discs, and described process used to extract audio recordings from jail's phone system, noting no errors occurred when creating discs). The government intends to properly authenticate all of its audio recording evidence at trial.

### G.  The Defendants' Rap Videos Are Admissible Evidence of Their Knowledge of and Participation in the Enterprise.

The government intends to introduce videos of one or more trial defendants rapping about their involvement in SG1700 and their explicit participation in racketeering activities. This evidence is probative of the defendants' knowledge of the enterprise, association with the enterprise, and their agreement that they or other gang members would commit racketeering acts. For instance, the defendants use SG1700 code words in the videos, including words for various controlled substances and shootings, as well as other gang terminology. The defendants also provide information in the videos that indicates their personal association with the enterprise, including the filming locations, the use of gang monikers and hand signals, and gang-related clothing.

Like any piece of evidence, rap songs and videos are admissible "where they are relevant and their probative value is not substantially outweighed by the danger of unfair prejudice." *United States v. Pierce*, 785 F.3d 832, 841 (2d Cir. 2015). A defendant's prior statements are not

inherently subject to a Rule 404(b) analysis simply because they were captured on a rap recording. Like any prior statement by a defendant, they are admissible as substantive evidence under Rule 801(d)(2)(A) when offered against that defendant. The rap videos the government will seek to admit are intrinsic to the charged offenses, and therefore, they may be admitted outside of any Rule 404(b) analysis.

In *United States v. Green*, the Third Circuit made clear that the "intrinsic" label is reserved "for two narrow categories of evidence." 617 F.3d 233, 248 (3d Cir. 2010)*.* "First [and importantly here], evidence is intrinsic if it 'directly proves' the charged offense." *Id.* (citations omitted). "Second, 'uncharged acts performed contemporaneously with the charged crime may be termed intrinsic if they facilitate the commission of the charged crime.'" *Id*. at 249 (quoting *United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000)).

Courts have consistently held that rap lyrics may be appropriately admitted as direct evidence of the crimes charged without resorting to a Rule 404(b) analysis. *See United States v. Recio*, 884 F.3d 230, 236 (4th Cir. 2018) (finding that district court did not err in admitting rap lyrics where lyrics "consist[ed] of a single sentence that described only the type of conduct of which [the defendant was] accused"); *United States v. Miller*, 638 F. App'x 543, 545 (8th Cir. 2016) (unpublished) (affirming admission of lyrics to show possession of firearm despite defendant's claims that lyrics portrayed him as "another dangerous, violent black man"); *United States v. Pierce*, 785 F.3d 832, 840-41 (2d Cir. 2015) (affirming admission of rap lyrics (and tattoos) as evidence of RICO enterprise despite First Amendment concerns); *United States v. Moore*, 639 F.3d 443, 447-48 (8th Cir. 2011) (affirming admission of rap videos under plain error review even though videos totaled more than 20 minutes in length and were presented to jury without limiting instruction); *United States v. Belfast*, 611 F.3d 783, 820 (11th Cir. 2010)

(holding that rap lyrics were relevant and their probative value not substantially outweighed by any unfair prejudice in case where lyrics were used to show that defendant was associated with group that tortured Sierra Leoneans in Liberia); *United States v. Johnson*, 2024 WL 617719, (3rd Cir. 2024) (unpublished) (holding that the defendant's rap lyrics about cooking crack, published to the internet two months prior to the crime, provided direct evidence of the charged crime; "If someone tells you 'I have guns and drugs,' and then you find guns and drugs in his house, his statement is direct proof that the guns and drugs are in fact his. That he says it in rhyme does not change that. How a jury chooses to weigh that evidence is another matter, but the evidence itself is, analytically, intrinsic."); *United States v. Stuckey*, 253 F. App'x 468, 482-43 (6th Cir. 2007) (unpublished) (finding that district court did not abuse its discretion in admitting rap lyrics despite danger of unfair prejudice).

In *Recio*, the Fourth Circuit Court of Appeals explained that a rap lyric posted to the defendant's Facebook page was properly admitted where the lyric was "direct evidence of the crime charged," in addition to showing the defendant's motive for committing the crime. *See id.* at 233-38 (holding that rap lyric "It's Always Tucked, Kuz I'll B Damn If My Life Get Took!!" introduced in felon-in-possession case where defendant had gun in his waistband was not Rule 404(b) evidence).

To the extent the defendants challenge the admission of these videos on First Amendment grounds, courts have specifically rejected this argument where the lyrics constitute direct evidence of the charged crimes. In *Pierce*, the defendant argued that admission of a rap video violated his First Amendment rights and also "that the rap lyrics were merely 'fictional artistic expressions' and 'perverse puffery' that should not have been admitted against him." 785 F.3d at 841. The Second Circuit disagreed, noting that the rap lyrics were properly admitted to show the

defendant's relationship to RICO co-defendants and animosity toward others as his motive for violence. The *Pierce* Court therefore found that the probative value of the lyrics was not outweighed by the danger of unfair prejudice and did not implicate the defendant's First Amendment rights. *Id*.

Here, the defendants' rap lyrics are direct evidence of the crimes charged, including but not limited to the racketeering conspiracy, the drug conspiracy, and VCAR murders and assaults. At trial, the government will present multiple former members of SG1700 who will testify that the rap lyrics discuss real events; the government will additionally present corroborating evidence to show that the raps include details of the charged crimes like the firearms used or the manner in which a murder was committed. As part of the racketeering conspiracy charged in this case, the defendants are accused of using threats and violence to facilitate their drug trafficking and promote their enterprise. One of the ways the group communicated these threats of violence was through music videos where they displayed guns, money, drugs, gang hand signs, SG1700-branded clothing items, and rapped about their participation in, and approval of, various racketeering activities, which is specifically pled in the indictment. *See* ECF 105, Overt Act 37.

In "Frankford Purge," for example, defendants Parker and Elliott, along with unindicted co-conspirator M.S., rap about SG1700, murders committed by gang members, and drug dealing activity. Elliott brags about the murders of Kaseem Rogers ("They know we smoked Glizzy [Kaseem Rogers' nickname] in the name of King Lo [murdered SG1700 member Daniel Martinez, a/k/a "Bolo"], bitch we steppin'. . . Check the score on both blocks, n***a, Seemy [a second nickname for Kaseem Rogers] got hit with that Ruger[14]) and Dontae Walker ("Roll up,

---

[14] Ballistics evidence confirms that one of the murder weapons was a 9mm Ruger firearm.

Mugga [Walker's nickname] I know that shit killing them . . . He try to run then we boxing em").

The final verse, sung by co-conspirator M.S.,[15] details the Walker murder:

> Ya homie out there sweepin
> He fuck around got swept
> I guess he thought he was a barber
> For cuttin too many fades
> But killers walked down on him
> A bullet rippin through his fade
>
> You hit my man but he's still walkin
> Hit yours, n***ga ain't talkin

Walker, a neighborhood barber, was shot and killed next to his barber chair on the corner of Hawthorne and Bridge while he was sweeping up hair. Defendant Jiminez is featured in this portion of the music video, along with defendant Elliott, Bilal Mitchell (charged elsewhere), and M.S. The video is filmed in opposition gang territory at the exact location where Walker was murdered. Jiminez has a broom in his hand and is sweeping the sidewalk, mimicking the circumstances of the murder. In the video, Elliott is wearing a sweatshirt with a picture of Kaseem Rogers on the front. The hood of the sweatshirt reads, "FUCK THE OPPS." The video ends with the group walking toward opposition gang territory, specifically the corner where Walker was killed.

Courts have also recognized that similar evidence is admissible pursuant to Rule 404(b). *See United States v. Moore*, 639 F.3d 443, 447-48 (8th Cir. 2011) (where defendant "maintained that he was not involved in a drug conspiracy," recording of defendant rapping was "relevant to

---

[15] The lyrics sung by M.S. are admissible under multiple theories. They are adopted admissions under Rule 801(d)(2)(B) and statements in furtherance of a conspiracy under Rule 801(d)(2)(E). A coconspirator statement may be admitted under Rule 801(d)(2)(E) if it meets three conditions: "(1) there must be independent evidence establishing the existence of the conspiracy and connecting the declarant and defendant to it; (2) the statement must have been made in furtherance of the conspiracy; and (3) it must have been made during the course of the conspiracy." *United States v. Ammar*, 714 F.2d 238, 245 (3d Cir. 1983).

prove that he knew cocaine prices, used drug code words, and sold drugs to supplement his income," which proved defendant's knowledge of drug distribution and motive for engaging in it); *United States v. Foster*, 939 F.2d 445, 455 (7th Cir. 1991) (verse from defendant's notebook appropriately admitted as evidence of knowledge and intent). The government submits, consistent with *Recio*, that the videos contain direct evidence of the crimes charged. Should this Court determine otherwise, however, the government will seek to introduce them for non-propensity reasons such as evidence of motive, criminal intent, knowledge of the gang and its inner workings, and knowledge of the drug trade (specifically relevant methods of creating and distributing drugs, as well as terminology).

Regardless of whether they are admitted as direct evidence of the charged offenses or other acts, this type of evidence is appropriate under Federal Rule of Evidence 403. Federal Rule of Evidence 403 permits a district court to exclude relevant evidence only if the evidence's probative value is *substantially* outweighed by the danger of *unfair* prejudice. Fed. R. Evid. 403 (emphasis added). "Unfair prejudice" refers to an undue tendency to suggest a decision on an improper basis. *See* Rule 403, Advisory Committee Notes. Rule 403 does not entail a simple "balancing." Rather, the rule makes clear that exclusion is allowed only if the prejudicial impact "substantially outweighs" the probative value. In part, this means that the test is almost surely not met where the probative value of the evidence is itself high.

In speaking of "prejudice," the rule is not asking simply whether the evidence is harmful to the defendant's case:

> [Rule 403] does not offer protection against evidence that is merely prejudicial, in the sense of being detrimental to a party's case. Rather, the rule only protects against evidence that is unfairly prejudicial. Evidence is unfairly prejudicial only if it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."

Advisory Committee's Note, Fed. R. Evid. 403; *Carter v. Hewitt*, 617 F.2d 961, 972 (3d Cir. 1980). "[T]he prejudice against which [Rule 403] guards is unfair prejudice – that is, prejudice of the sort which clouds impartial scrutiny and reasoned evaluation of the facts, which inhibits neutral application of principles of law to the facts as found.'" *United States v. Starnes*, 583 F.3d 196, 215 (3d Cir. 2009) (quoting *Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 670 (3d Cir. 2002) (emphasis in original)). "Virtually all evidence is prejudicial or it isn't material." *Carter*, 617 F.2d at 972 n.14 (quoting *Dollar v. Long Manufacturing Co.*, 561 F.2d 613, 618 (5th Cir. 1977)); *United States v. Cross*, 308 F.3d 308, 323 (3d Cir. 2002) ("[W]hen evidence is highly probative, even a large risk of unfair prejudice may be tolerable.").

The remedy of exclusion under Rule 403 is "extraordinary" and should be applied sparingly; the balance should be struck in favor of admissibility. *United States v. Terzado-Madruga*, 897 F.2d 1099, 1117 (11th Cir. 1990); accord, *United States v. Dennis*, 625 F.2d 782, 797 (8th Cir. 1980); *United States v. Day*, 591 F.2d 861, 878 (D.C. Cir. 1978). As noted above, "Rule 403 does not provide a shield for defendants who engage in outrageous acts, permitting only the crimes of Caspar Milquetoasts to be described fully to a jury. It does not generally require the government to sanitize its case, to deflate its witnesses' testimony, or to tell its story in a monotone." *Cross*, 308 F.3d at 325 (quoting *United States v. Gartmon*, 146 F.3d 1015, 1021 (D.C. Cir. 1998)).

The evidence proffered here does not produce unfair prejudice. It simply uses the defendants' own rap videos to prove the conduct of which they are accused. To the extent the evidence is inflammatory, a limiting instruction at the time the evidence is received (or a final jury instruction) will ameliorate any prejudice, and as the Third Circuit has often held, a properly instructed jury may surely be trusted to consider the evidence only for the proper purposes for

which it is admitted. *See, e.g.*, *Brunson*, 516 Fed. Appx. at 157-58 (admission of evidence of subsequent completed armed robbery in trial of three previous armed robberies not unfairly prejudicial).  The model Third Circuit jury instruction for this purpose, Third Circuit Model Jury Instructions-Criminal § 4.29, was approved by the Court in *United States v. Lee*, 612 F.3d 170, 191-92 & 191 n.25 (3d Cir. 2010), should therefore be presented here should the Court rule that the rap videos are extrinsic evidence.

In sum, the rap videos aid in establishing essential elements of the charged offenses and are properly admissible at trial.

### H.  Exhibits - Presented in Electronic Format

The government will provide defense counsel with electronic copies of the exhibits prior to the start of testimony.  Further, in order to move quickly and save significant time in presenting the evidence, the government will use a trial presentation program to allow for their display electronically to the jury.

Many of the documents that the government intends to offer into evidence are photographs, photocopies, or scans of the original. Such copies are admissible pursuant to Rules 1002 and 1003. Rule 1003 provides that "[a] duplicate is admissible to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original or (2) in the circumstances if would be unfair to admit the duplicate in lieu of the original."

### I.   Cellular Telephone, iCloud, and Instagram Cellebrite Reports

During the course of law enforcement's investigation of the criminal activity of SG1700 members, including the defendants, law enforcement seized numerous cell phones from the defendants and others following arrests and pursuant to the execution of search warrants. Subsequently, law enforcement conducted physical extractions of the cell phone data using a

Cellebrite Universal Forensic Extraction Device ("Cellebrite"). The physical extraction is a mechanical download of the contents of the cellular phone through a mechanical process using the Cellebrite device. The download creates an extraction report of the contacts, call logs, text messaging, photographs, and videos contained inside the phone itself. Law enforcement additionally executed search warrants for the defendants' iCloud accounts; law enforcement then took the raw data and placed it into Cellebrite, which parsed the data into a readable format and created the extraction reports that were passed to defense in discovery (along with the raw data).

FBI Task Force Officer Thorsten Lucke has extensive experience utilizing the Cellebrite device, and no expert testimony is required to authenticate the Cellebrite extraction from the cellular telephones in this case. *See United States v. Williams*, 83 F.4th 994, 997-98 (5th Cir. 2023) (holding that no expert testimony required to interpret a Cellebrite report); *United States v. Chavez-Lopez*, 767 F.App'x 431, 434 (4th Cir. 2019); *United States v. Marsh*, 568 Fed. Appx. 15, 16 (2d Cir. 2014) (Summary Order); *see also Sec. & Exch. Comm'n v. Sabrdaran*, No. 14-CV-04825-JSC, 2016 WL 7826653, at *1 (N.D. Cal. Oct. 20, 2016) (denying defense motion to exclude testimony about Cellebrite extraction, quoting *Marsh*).

In addition to containing enterprise evidence of association and membership in SG1700, these Cellebrite extractions also contain relevant text messages between the defendants and others related to narcotics trafficking, shootings, and murders.

Accordingly, any objection to introduction of the extraction reports should be overruled as they are relevant, probative, and will be authenticated through the testimony of the law enforcement officers who conducted the extractions.

### J.  Existence of the Conspiracy

The proof at trial will clearly show that a conspiracy existed. A criminal conspiracy is established when the agreement is formed between two or more persons to undertake illegal activity. *See United States v. Torres*, 2012 U.S. App. LEXIS 9344, *13-14 (2d Cir. 2010). This conspiracy continues until the conspiracy fails or achieves its objective, or until all members of the conspiracy have withdrawn. *See Krulewitch v. United States*, 336 U.S. 440, 442 (1949); *see also United States v. Spero*, 331 F.3d 57, 60 (2d Cir. 2003).

### K.  Co-Conspirator Liability

At trial, the government intends to introduce evidence of criminal acts committed by the charged SG1700 members and other members. This evidence will be used against the defendants to show the existence of the conspiracy, the associations within the conspiracy, and the conspirators' involvement in the conspiracy. It is well-settled that circumstantial evidence of association among alleged co-conspirators is relevant and admissible in a conspiracy prosecution. "Since agreement is an element of conspiracy, evidence of association is relevant." *United States v. Armone*, 363 F.2d 385, 403-04 (2d Cir. 1966).

The law is clear that the acts of a conspirator are admissible against a co-conspirator as long as sufficient evidence of the existence of the conspiracy has been presented. See, e.g., *United States v. Henderson*, 446 F.2d 9960, 965 (8th Cir. 1971); United States v. Sepulveda, 710 F.2d 188, 189 (5th Cir. 1983); *United States v. Ortiz-Rengifo*, 832 F.2d 722, 725 (2d Cir. 1987). To be admissible against a conspirator, the acts of a co-conspirator do not have to meet the standards for the admission of co-conspirator declarations. *See United States v. Geany*, 417 F.2d 1116, 1120 n.3 (2d Cir. 1969). In other words, to be admissible against a conspirator, the acts of a co-conspirator must simply be shown to be relevant within the meaning of Federal Rule of

Evidence 401, i.e., the acts "ha[ve] a tendency to make the existence of a material fact more probable." *United States v. Ortiz-Rengifo*, 832 F.2d at 725.

When a conspiracy has been established, the criminal liability of its members "extends to all acts of wrongdoing occurring during the course of and in furtherance of the conspiracy." *United States v. Bryser*, 954 F.2d 79, 88 (2d Cir. 1992), *citing, Pinkerton v. United States*, 328 U.S. 640, 646-48 (1946). As such, it is permissible to argue, and for the jury to be charged, that they may "find a defendant guilty on a substantive count without specific evidence that he committed the act charged if it is clear that the offense had been committed, that it had been committed in the furtherance of an unlawful conspiracy, and that the defendant was member of the conspiracy." *United States v. Miley*, 513 F.2d 1191, 1208 (2d Cir. 1975).

### L.  Other Conspiracy Evidence

Evidence linking alleged co-conspirators, even if not produced as part of the alleged conspiracy, is admissible because of "the commonsense notion that people whose names are associated together in writing in this way are somewhat more likely for that reason to be associated also in other ways." *United States v. Garelle*, 438 F.2d 366, 370 (2d Cir. 1970).

Specifically, the admission of an address book found in one defendant's luggage containing the name and address of a co-conspirator was upheld in *United States v. Garelle*, 438 F.2d at 369-70. A conspirator's business card found in a co-defendant's apartment was held admissible in *United States v. Nathan*, 476 F.2d 456, 460 (2d Cir. 1973). Lastly, the admission of both a photograph showing co-defendants at a nightclub and a telephone number book containing the names of co-defendants was upheld in *United States v. Armone*, 363 F.2d at 403.

Here, the government may introduce evidence of co-conspirator phone downloads or postings on social media websites, which were seized at various times by law enforcement. All

of these items, and more like them, will be properly introduced during trial as conspiracy evidence.

With respect to any other co-conspirator documents, the prosecution need only provide a rational basis from which the jury could infer that the document did, in fact, belong to a defendant. *See United States v. Maldonado-Rivera*, 922 F.2d 934, 957 (2d Cir. 1990), *citing United States v. Natale*, 526 F.2d 1160, 1173 (2d Cir. 1975); *United States v. Mendel*, 746 F.2d 155, 167 (2d Cir.1984), cert. denied, 469 U.S. 1213, 105 S. Ct. 1184, 84 L.Ed.2d 331 (1985). In accordance with Federal Rule of Evidence 901(b)(4), "the contents of a writing may be used to aid in determining the identity of the declarant," *United States v. Wilson*, 532 F.2d 641, 644 (8th Cir.), cert. denied, 429 U.S. 846, 97 S. Ct. 128, 50 L.Ed.2d 117 (1976), if, for example, the writing "deal[s] with a matter sufficiently obscure or particularly within the knowledge of the persons corresponding so that the contents of the [writing] were not a matter of common knowledge." 5 J. Weinstein & M. Berger, Weinstein's Evidence, ¶ 901(b)(4) [01], at 901–49 (1990). *Id*.

Along related lines, various items of evidence, i.e., firearms, ammunition, documents, letters, papers, photographs, etc., possessed by one of the co-conspirators, whether charged or uncharged, are admissible against all the defendants, especially in the context of the RICO conspiracy alleged in this case. The Indictment alleges that co-conspirators personally possessed firearms, stored them in areas common to the SG1700 gang, used them in crimes, and maintained access to firearms for all members of the enterprise.

### M. Evidence Regarding Background or Formation of the Conspiracy

The government may introduce evidence of drug possession and distribution and acts of violence engaged in by the defendants at various times during the preceding decades. A

71

defendant may contend that certain of this evidence reflects conduct which pre-dates his joining the conspiracy. Even assuming the validity of this anticipated contention, it is well-settled that, in a conspiracy prosecution, evidence of conduct that has occurred prior to the time period covered by the superseding indictment is admissible for the purpose of showing the defendant's intent, association, purpose and the nature of his plan. *See, e.g., United States v. Cioffi*, 493 F.2d 1111, 1115 (2d Cir. 1974); *United States v. Rosa*, 11 F.3d 315, 334 (2d Cir. 1993) (the evidence of prior dealings was properly admitted to explain how the illegal relationship developed and to explain why the defendant was appointed to a leading position in the Organization).; *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990); *United States v. Morton*, 483 F.2d 573, 575-76 (8th Cir. 1973); *United States v. Nelson*, 570 F.2d 258, 262 (8th Cir. 1978) (holding that evidence introduced to prove a mail fraud scheme may go back to the period before the scheme was fully formed). Accordingly, the Court should permit evidence concerning the nature, background, and history of the charged conspiracy, and the defendants' association with SG1700.

### N.  Co-Conspirator Statements

At trial, the government intends to offer co-conspirator statements made in furtherance of the conspiracies.  The government will offer this evidence, in part, to establish the existence of the criminal conspiracies charged.  Federal Rule of Evidence 801(d)(2)(E) provides that "a statement made by a co-conspirator of a party during the course and in furtherance of that conspiracy" is not hearsay and may be admitted as evidence against a co-conspirator. In order for a court to admit the co-conspirator statement, the government must prove that (1) a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, (3) the statement was made in the course of the conspiracy, and (4) the statement was made in

furtherance of the conspiracy.  *United States v. Bourjaily*, 483 U.S. 171, 175 (1987); *United States v. McGlory*, 968 F.2d 309, 333-34 (3d Cir. 1992); *United States v. Gambino*, 926 F.2d 1355, 1360 (3d Cir. 1991).

In making a preliminary factual determination as to the existence of a conspiracy and the defendant's participation in it, courts may consider the offered hearsay statement itself. *Bourjaily*, 483 U.S. at 180-81.  "[T]here is little doubt that a co-conspirator's statements could themselves be probative of the existence of a conspiracy and the participation of both the defendant and the declarant in the conspiracy."  *Id.; see also McGlory*, 968 F.2d at 334.  The district court should consider the totality of the circumstances when deciding the admissibility of such evidence.  "The circumstances surrounding the statement, such as the identity of the speaker, the context in which the statement is made, or evidence corroborating the contents of the statement," should be considered by the trial court.  *See* Fed. R. Evid. 801(d)(2) (Advisory Committee Notes); *United States v. Traitz*, 871 F.2d 368, 399 (3d Cir. 1989).  When determining the admissibility of a co-conspirator statement, the existence of the conspiracy and the party's participation in that conspiracy need only be proved by a preponderance of the evidence. *Bourjaily*, 483 U.S. at 175. Although casual conversations between co-conspirators are inadmissible, statements that, among other things, maintain cohesiveness and convey information relevant to conspiratorial objectives are in furtherance of the conspiracy and admissible under Rule 801(d)(2)(E). *Traitz*, 871 F.2d at 399.

The Third Circuit has commented that the "in furtherance" requirement is to be given a broad interpretation.  *United States v. Gibbs*, 739 F.2d 838, 843 (3d Cir. 1984); *United States v. DePeri*, 778 F.2d 963, 981 (3d Cir. 1985).  Although the "during the course of" and "in furtherance" requirements do not overlap entirely, they are closely related.  *United States v.*

*Ammar*, 714 F.2d 238, 253 (3d Cir.1983).  While mere narratives of past events or mere idle

chatter that has no current purpose are not generally deemed to occur in furtherance of the

conspiracy, statements that "provide reassurance, serve to maintain trust and cohesiveness

among co-conspirators, or inform each other of the current status of the conspiracy" further the

conspiracy.  *Id.*, at 252; *see United States v. Harris*, 908 F.2d 728, 737 (11th Cir. 1990); *United*

*States v. Hudson*, 970 F.2d 948, 958-59 (1st Cir. 1992).  For example, statements which are

relevant to the distribution of the proceeds of the conspiracy are considered in furtherance of the

conspiracy.  *Ammar*, 714 F.2d at 253.  In order for statements to be deemed "in furtherance of

the conspiracy," they need not actually "further" the conspiracy; it is sufficient that a statement

was intended to promote the conspiracy, even if it did not actually do so.  *See United States v.*

*Williams*, 989 F.2d 1061, 1068 (9th Cir. 1993); *United States v. Mayes*, 917 F.2d 457, 464 (10th

Cir. 1990).

        The trial court may admit statements pursuant to the Rule even if the statements relate to

a conspiracy not charged in the indictment.  *United States v. Ellis*, 156 F.3d 493, 497 (3d Cir.

1998); *United States v. Trowery*, 542 F.2d 623, 626 (3d Cir. 1976).  The rationale for this rule is

that the co-conspirator provision in Rule 801(d)(2)(E) is merely a rule of evidence founded on

the theory "that a person who has authorized another to speak or act to some joint end will be

held responsible for what is later said or done by his agent . . ."  *Trowery*, 542 F.2d at 626.

        These statements are admissible, and not hearsay, under Rule 801(d)(2)(E), which

provides that a statement offered against the opposing party that was made by the party's co-

conspirator during and in furtherance of the conspiracy is not hearsay. The government need

only demonstrate to the Court under Rule 104 by a preponderance of the evidence that: (1) a

conspiracy existed, (2) the declarants and the party against whom the statement is offered were

members of the conspiracy, (3) the statement was made in the course of the conspiracy, and (4)

the statement was made in furtherance of the conspiracy. *See United States v. Turner*, 718 F.3d

226, 231 (3d Cir. 2013); *United States v. Kemp*, 360 F. Supp. 2d 697, 701 (E.D. Pa. 2005). Here,

the government has not only alleged a conspiracy charge in the Second Superseding Indictment,

but will be able to establish at trial these factors. There is no requirement that the co-conspirator

be indicted for this hearsay exemption to apply, and the government need not produce the

declarant-co-conspirator for testimony or prove that the declarant-co-conspirator is unavailable.

As the Supreme Court explained in *United States v. Inadi*, 475 U.S. 387, 395-400 (1986):

> Because they are made while the conspiracy is in progress, such statements
> provide evidence of the conspiracy's context that cannot be replicated, even if
> the declarant testifies to the same matters in court. … Conspirators are likely to
> speak differently when talking to each other in furtherance of their illegal aims
> than when testifying on the witness stand. Even when the declarant takes the
> stand, his in-court testimony seldom will reproduce a significant portion of the
> evidentiary value of his statements during the course of the conspiracy. … The
> admission of co-conspirators' declarations into evidence thus actually furthers
> the 'Confrontation Clause's very mission' which is to 'advance 'the accuracy of
> the truth-determining process in criminal trials.'' … Any marginal protection to
> the defendant by forcing the government to call as witnesses those co-
> conspirator declarants who are available, willing to testify, hostile to the defense,
> and yet not already subpoenaed by the prosecution, when the defendant himself
> can call and cross-examine such declarants, cannot support an unavailability
> rule. We hold today that the Confrontation Clause does not embody such a rule.

*See also United States v. Pecora*, 798 F.2d 614, 627 (3d Cir. 1986) (finding that communications

between the unindicted co-conspirators were not hearsay under Rule 801(d)(2)(E), where the

communications were shown to be reliable); *United States v. Johnson*, 119 F. App'x 415, 419

(3d Cir. 2005) (finding that recorded calls between defendant and co-conspirator in furtherance

of the conspiracy were not testimonial, and therefore, there was no error when the District Court

admitted these recordings without a showing of unavailability). Moreover, the defendant need

not even be a party to the conversation statements to be admissible under Rule 801(d)(2)(E).

*Pecora*, 798 F.2d at 628 ("the fact that the defendants were not participants in the taped

conversations does not impede their admissibility so long as the statements are determined to be reliable").

### O. Evidence Inextricably Intertwined

While the government submits that virtually all criminal activity presented during trial will fall within the time periods alleged in the superseding indictment, and is related to, or will be offered to prove the existence of, the conspiracy, the defendants may still attempt to claim that such testimony or evidence is inadmissible because it does not relate to the conspiracy. Assuming this objection is proffered by the defense, it should be rejected.

Even if some evidence is arguably unrelated to the RICO conspiracy set forth in the superseding indictment, at a minimum such evidence will be inextricably intertwined with the charged conspiracies. As the Second Circuit has observed:

> [E]vidence of uncharged criminal activity is not considered 'other crimes' evidence under FED. R. EVID. 404(b) if it "arose out of the same transaction or series of transactions as the charged offense, if it [is] inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime [on] trial."

*United States v. Towne*, 870 F.2d 880, 886 (2d Cir. 1989) (*quoting United States v. Weeks*, 716 F.2d 830, 832 (11th Cir. 1983) (citations omitted)).

This is especially true in conspiracy cases where the government alleges that certain acts are committed in furtherance of the conspiracy. *See United States v. Miller*, 116 F.3d 641, 682 (2d Cir. 1997). In *Miller*, a case involving a RICO enterprise and other offenses, the court upheld the trial court's admission into evidence of murders not charged in the superseding indictment, and observed:

> Where, as here, the Superseding Indictment contains a conspiracy charge, "uncharged acts may be admissible as direct evidence of the conspiracy itself." *United States v. Thai*, 29 F.3d 785, 812 (2d Cir.), cert. denied, 513 U.S. 977

76

(1994). "An act that is alleged to have been done in furtherance of the alleged conspiracy ... is not an 'other' act within the meaning of Rule 404(b); rather, it is part of the very act charged." *United States v. Concepcion*, 983 F.2d 369, 392 (2d Cir. 1992), cert. denied, 510 U.S. 856 (1993).

The district court concluded that the proof of these murders was relevant to show the existence and nature of the enterprise and the conspiracy and that the probative value of the evidence was not substantially outweighed by its potential for unfair prejudice, see FED. R. EVID. 403. Such an assessment is reviewable only for abuse of discretion, see, e.g., *Thai*, 29 F.3d at 813, and we see no abuse of discretion here.

*Id*.

In *United States v. Pike*, 292 Fed.Appx. 108, 111 (2d Cir. 2008), the Second Circuit affirmed a conviction wherein the court permitted evidence of uncharged homicides because they were relevant to the charged drug conspiracy. Similarly, in *United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997), the Second Circuit found that references that the defendant made about drug deals, loan sharks, and his own probation status during phone messages are not other bad acts meriting exclusion under Federal Rule of Evidence 404(b). Rather, the court found that such evidence is the extortionate means by which the defendant attempted to collect on a loan and was therefore inextricably intertwined with the alleged conduct. *See, e.g., United States v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997); *see also United States v. Mauro*, 80 F.3d 73 (2d Cir. 1996) (not abuse of discretion for court to permit the government to reveal that defendant was simply in prison, and not the reason for his incarceration); *United States v. Vargas*, 279 Fed. Appx. 56, 58 (2d Cir. 2008) (prior heroin conviction and incarceration admitted for rebutting defense claim that someone else was leader of the conspiracy); *United States v. Pitre*, 960 F.2d 1112, 1113 (2d Cir. 1992) (other act evidence may be admitted to help explain illegal relationship and mutual trust between co-conspirators).

In the context of RICO prosecutions, courts routinely admit proof of uncharged criminal acts by members of a racketeering enterprise, despite the risk of prejudice to a single defendant. *United States v. Coppola*, 671 F.3d 220, 245-246 (2d Cir. 2012). In *Coppola*, the Second Circuit addressed a defendant's contention that his racketeering trial was unfair because the jury heard evidence of crimes committed by the crime syndicate which "did not specifically implicate" the particular defendant and stated that such evidence was "relevant to prove both the enterprise and pattern elements of the charged racketeering crimes." Citing *United States v. Turkette,* 452 U.S. 576, 583 (1981). Thus, even though a defendant "may reasonably claim no direct participation" in the acts of others, evidence of those acts may be relevant to prove (1) the "existence and nature" of the racketeering enterprise, and (2) a pattern of racketeering activity by the defendant "by providing the requisite relationship and continuity of illegal activities." *Coppola*, at 245. Indeed, the court stated, such "conduct is not 'other' crime evidence subject to Fed.R.Evid. 404(b); rather, it is evidence of the very racketeering crimes charged." *Id*.; *See, e.g., United States v. Matera*, 489 F.3d 115, 120-21 (admission of uncharged murders committed by members of the Gambino La Cosa Nostra family to prove the RICO enterprise, that being the Gambino La Cosa Nostra family); *United States v. Baez*, 349 F.3d 90, 93-94 (2d Cir. 2003) (admitting evidence of 16 uncharged robberies to establish the alleged enterprise and conspiracy); *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999) (admission of evidence that members of the Latin Kings Street gang, the RICO enterprise, committed uncharged drug trafficking and crimes of violence on behalf of the Latin Kings "to prove the existence, organization and nature of the RICO enterprise, and a pattern of racketeering by each defendant-appellant")

Other circuits have similarly found that evidence that is inextricably intertwined with the evidence used to prove a crime charged is not extrinsic evidence under Rule 404(b). *See United States v. Randall*, 887 F.2d 1262, 1268 (5th Cir. 1989). Such evidence is considered intrinsic and is admissible so that the jury may evaluate all the circumstances under which the defendant acted. *Id.*; *see also United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990) (other act evidence is intrinsic when the evidence of the other act and the evidence of the crime charged are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged) (*citing United States v. Torres*, 685 F.2d 921, 924 (5th Cir. 1982)); *United States v. Hawkins*, 681 F.2d 1343, 1346 (11th Cir. 1982) (upholding the admission of a murder not mentioned in the indictment because the indictment included murder as one of the offenses in the pattern of racketeering activity).

Accordingly, evidence of criminal conduct not specified in the superseding indictment is properly admissible because such evidence establishes, and is inextricably intertwined with, the charged RICO enterprise and conspiracy. For example, witnesses will describe other shootings conducted by SG1700 members including several shootings at rival gangs where no person was hit; a shooting where M.C., an uninvolved motorist had his vehicle struck by gunfire on December 19, 2018, as he drove in front of the target of a shooting on the corner of Bridge and Hawthorne Streets; a shooting at D.S., a 4800 Tackawanna member, during a chance encounter at a local gas station; and a shooting motivated by a dispute over a video game contest between an SG1700 member and a rival gang member.

### P.  Violent Crimes in Aid of Racketeering ("VCAR")

In determining whether an underlying crime of violence was committed for the purpose of gaining entrance to or maintaining or increasing position in an enterprise, such purpose need

not be "the defendant's sole or principal motive." *United States v. Concepcion*, 983 F.2d 369, 381 (2d Cir. 1992). Rather, it is sufficient that the crime of violence was committed "as an integral aspect of membership in such enterprise." *Id*. (internal citations removed); *See United States v. Heilman*, 377 Fed.Appx. 157, 204-205 (3d Cir. 2010). In *Concepcion*, the court further held that the requisite purpose to maintain and improve the defendant's leadership position in a drug trafficking enterprise was established by evidence that the leader of the enterprise and several members shot or killed several competitor drug dealers to eliminate the enterprise's competition. *Id*. at 382-85.

Numerous decisions, each adopting the principles set forth in *Concepcion*, have upheld the sufficiency of the evidence that a crime of violence was committed for the purpose of gaining entrance to or maintaining or increasing a position in an enterprise. The Fourth Circuit adopted the rationale of *Concepcion* in *United States v. Fiel*, 35 F.3d 997, 1004-05 (4th Cir. 1994) and *United States v. Tipton*, 90 F.3d 861, 891 (4th Cir. 1996). In *Tipton*, the defendants challenged their convictions for VICAR murder on the basis that their motive was personal, and therefore unrelated to their drug trafficking organization. *Tipton,* 90 F.3d at 890-91. The Fourth Circuit rejected their argument, finding that the defendants' mixed motives were acceptable, and that the VICAR motive need not be the "primary purpose" of the violent act. *Id*. at 91. Because the defendant enlisted the aid of his fellow enterprise members in his behalf, he acted not only for himself but as a member of the enterprise in furthering its policies of retaliatory violence against any who sufficiently antagonized any of its members, and in order to maintain his position in [the enterprise]. *Id*.

In other Section 1959 cases involving enterprises consisting of violent street gangs or motorcycle clubs, courts have likewise found, under the principles announced in *Concepcion*,

that violent crimes committed to retaliate against rival gang members, eliminate competition, or fulfill the enterprise's membership requirements were committed for the purpose of maintaining or enhancing a position in the enterprise within the ambit of Section 1959. *See*, e.g.*, United States v. Fernandez*, 388 F.3d 1199, 1232-33 (9th Cir. 2004); *United States v. Crenshaw*, 359 F.3d 977, 992-93 (8th Cir. 2004); *United States v. Philips*, 239 F.3d 829, 845 (7th Cir. 2001); United States v. Diaz, 176 F.3d 52, 93-96 (2d Cir. 1999); *United States v. Mapp*, 170 F.3d 328, 336 (2d Cir. 1999); *United States v. Wilson*, 116 F.3d 1066, 1078 (5th Cir. 1997); *United States v. Fiel*, 35 F.3d 997, 1004-05 (4th Cir. 1994).

### Q.  Evidence of Plea Agreements and Dishonesty

The government may offer evidence of some witnesses' dishonest conduct, guilty pleas, plea agreements (including the witnesses' obligation to tell the truth), and proffer letters. Such testimony may properly be introduced by the government. *See United States v. Ramos*, 27 F.3d 65, 67 n.4 (3d Cir. 1994).

Indeed, an *en banc* panel of the Third Circuit has recognized that such impeachment evidence properly can be offered during the government's direct examination of its witnesses. Evidence of a witness' plea agreement is permissible to allow the jury to assess the witness' credibility, to eliminate any concern that the defendant has been singled out for prosecution, and to explain how the witness possessed detailed first-hand knowledge regarding the events about which he testifies. *See United States v. Universal Rehab. Servs., Inc.*, 205 F.3d 657, 667 (3d Cir. 2000) (en banc). The Third Circuit also held that the government could adduce such evidence even in the absence of an affirmative challenge to witness credibility because in every case jurors are instructed that they must determine the credibility of the witnesses who testify. *Id*. At 666. *See also United States v. Montani*, 204 F.3d 761, 765-66 (7th Cir. 2000) ("The well-settled rule in this Circuit allows the government to take the sting out of a defendant's cross-examination by

introducing evidence of a co-defendant's plea agreement as part of its case in chief";
"introducing evidence of a witness's guilty plea or immunity deal serves the 'truth-seeking'
function of the trial by presenting all relevant aspects of the witness's testimony at one time").

The government recognizes, however, that the introduction of such evidence only may be
for a proper purpose. In this regard, for instance, the government may not argue that a witness's
guilty plea, or that the grant of immunity to a witness, is substantive proof of the defendant's
guilt. *Universal Rehab.*, 205 F.3d at 668. The Third Circuit has suggested a cautionary
instruction to the jury, which, it has held, insulates the defendant from any prejudicial effect. *Id*.
at 668. The Third Circuit has observed that the jury in such cases should be instructed that it may
not consider the guilty plea and/or plea agreement as evidence that the defendant is guilty of the
offenses with which he is charged, but rather that such evidence is offered only to allow the jury,
for instance, to assess the witness's credibility. *Id. See also Montani*, 204 F.3d at 767 (suggesting
similar cautionary instruction). The Court can employ similar instructions here. *See, e.g.,* Third
Circuit Model Instructions 2.22 (during trial) (Witness Who has Pleaded Guilty to the Same or
Related Charges), and 4.19 (final instructions) ("Credibility of Witnesses – Witness Who Has
Pleaded Guilty to Same or Related Offense, Accomplices, Immunized Witnesses, Cooperating
Witnesses").

### R. Hostile Witnesses

The government anticipates that, in the course of presenting witness testimony during its
case-in-chief, certain witnesses might demonstrate hostility, which may manifest itself in a
variety of forms, including a reluctance or unwillingness to respond directly to questions, feigned
forgetfulness, or even a surly disposition, among others. This might occur because, given the
nature of the charges at issue, necessary witnesses are closely associated with the defendants,
including as social friends. If hostility arises (which cannot be predicted with certainty at this

time), the government may request that, pursuant to Federal Rule of Evidence 611(c), it be permitted to question hostile witnesses with leading questions as if on cross-examination.

Rule 611(c) provides that, "[o]rdinarily, the court should allow leading questions . . . when a party calls a hostile witness . . . or a witness identified with an adverse party." Thus, when a witness is hostile or is identified as having a relationship with an adverse party, the court has discretion to permit the government to ask leading questions on direct examination. *See, e.g., United States v. Hicks*, 748 F.2d 854, 859 (4th Cir. 1984) (trial court did not abuse its discretion in allowing government to ask leading questions of defendant's girlfriend); *see also United States v. Centeno*, 2014 WL 99578 at *4 (E.D. Pa. 2014), *aff'd in part, vacated in part on other grounds, remanded*, 793 F.3d 378 (3d Cir. 2015) (finding no error in district court allowing the government to cross-examination its own witness because the witness was "hostile" – i.e., he "was resistant and unwilling to respond directly to many questions during his direct examination," and appeared only pursuant to subpoena, demonstrating his reluctance – and because he "identified with the adverse party" – i.e., he was "friends" with one defendant and "associated" with another, and accompanied the defendants at times during the narcotics scheme); *United States v. McLaughlin*, 1998 WL 966014 at *1 (E.D. Pa. 1998) (allowing government to call, and cross-examine, defendant's accountant, who "clearly is 'identified with an adverse party'" in that he prepared the tax returns at issue, provided paid testimony at the prior trial, and, while not "in cahoots" with the defendant, "they were, at the very least, cohorts"); *Vanemmerik v. The Ground Round, Inc*., 1998 WL 474106, at *1 (E.D. Pa. 1998) (Smith, M.J.) ("The normal sense of a person 'identified with an adverse party' has come to mean, in general, an employee, agent, friend, or relative of an adverse party.").

Whether a witness is hostile or identified with an adverse party involves a variety of factors, including the witness's relationship with a party, demeanor, facial expression, voice

inflections, and whether the witness's answers are evasive. *See, e.g., United States v. Tunnell*, 667 F.2d 1182, 1188 (5th Cir. 1982) (trial court did not abuse its discretion in permitting prosecution to ask leading questions on direct examination of a witness whose videotaped deposition revealed hostility to the prosecution through his motions, facial expressions, and voice inflection); *United States v. Brown*, 603 F.2d 1022, 1025 (1st Cir. 1979) (witness was close friend of defendant); 28 Wright & Miller, Federal Prac. and Proc. § 6168(c) (2017) ("The witness's refusal to meet with the direct examiner before trial to prepare for testimony may be particularly important since the refusal suggests hostility and the inability to prepare reduces the likely impact of suggestive questions at trial."). Moreover, where a witness may have been a participant – even an innocent participant – in some of the events that are related to the criminal activity, the trial court has discretion to permit the government to ask leading questions as if on cross. *See Brown*, 603 F.2d at 1026. Furthermore, a hostile witness can be one who feigns memory loss or is reluctant to divulge memory. *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 762 (5th Cir. 2008); *Brown*, 603 F.2d at 1026 (affirming district court's finding of hostility because, while "[t]he evidence strongly suggests that [he] was a participant in the crime," "[h]is testimony [was] replete with lapses of memory attributed to alcohol and drugs"); *cf. United States v. Salameh*, 152 F.3d 88, 128 (2d Cir. 1998) (court may allow leading questions on direct examination to develop nervous witness's testimony).

Another district court in this circuit summarized the rationale:

> A witness should not have words put in his mouth. But neither should an attorney, confronted with an obviously recalcitrant witness, be confined to neutral questions. . . . Leading questions are prohibited in order to prevent a partisan witness from accepting suggestions from a friendly attorney. . . . When the witness is hostile leading questions are as permissible as if the witness had been called by the other side.

*United States v. Barrow*, 229 F. Supp. 722, 728 (E.D. Pa. 1964) (Lord, J.) (citations omitted), *aff'd in part, rev'd in part on other grounds*, 363 F.2d 62 (3d Cir. 1966). Where this situation

occurs, it is appropriate for the government to interrogate by leading questions.

If a witness demonstrates the characteristics that courts generally have recognized evince hostility or being identified with an adverse party, government counsel will request that the Court make such a finding and allow the government to use leading questions during the direct examination of the witnesses.

### S.  Admission of Prior Testimony as Substantive Evidence

To the extent that government witnesses who previously testified – either before the grand jury or before the district court during their change of plea hearings – claim memory loss or equivocate during their trial testimony, the government may move for admission of their prior testimony.

Sworn prior inconsistent statements are admitted as substantive evidence under Rule 801(d)(1)(A) of the Federal Rules of Evidence if the declarant is available for cross-examination in the current proceeding. It is "well established" that poor recall of events, equivocation, and claims of memory loss satisfy the requirement of "inconsistent" testimony under this rule. *See United States v. Mayberry*, 540 F.3d 506, 516 (6th Cir. 2008) (grand jury testimony available as substantive evidence after witness claims memory loss); *United States v. Mornan*, 413 F.3d 372, 379 (3d Cir. 2005) (inconsistency under Rule 801(d)(1)(A) is not limited to diametrically opposed statements). *See also United States v. Tran*, 568 F.3d 1156, 1163 (9th Cir. 2009) ("portion of Nguyen's plea agreement that was admitted into evidence was inconsistent with Nguyen's reluctant and evasive in-court testimony").

Although the Third Circuit has noted that a prior statement should not be admitted if the witness's current memory loss regarding that statement is genuine, *United States v. Palumbo*, 639 F.2d 123, 128 n.6 (3d Cir. 1981), it has held that a prior statement may be admitted under Rule 801(d)(1)(A) where the witness's memory loss is not genuine, *Mornan*, 413 F.3d at 379.

*See also United States v. Kane*, 798 F. App'x. 715, 718 (3d Cir. 2020) (co-conspirator's assent to statement of facts read by prosecutor at his guilty plea hearing was admissible as substantive evidence; co-conspirator assented under penalty of perjury to prosecution's summary of factual basis of his plea, and although at defendant's subsequent trial, co-conspirator denied defendant was one of perpetrators and testified he had lied to FBI and at plea hearing, district court provided a jury instruction on limited purposes for which it could consider co-conspirator's guilty plea and plea agreement); *United States v. Odom*, 627 F. App'x 151, 153-54 (3d Cir. 2015) (because witness's testimony that she had memory loss was likely viewed by the district court, within its discretion, as disingenuous, admission of grand jury testimony as prior inconsistent statement was not an abuse of discretion); *United States v. Gerard*, 507 F. App'x 218, 221-22 (3d Cir. 2012) (witness's trial testimony that she could not remember many of the events of the date in question "was a complete reversal of her sworn grand jury testimony, in which she offered a detailed, first-person account"; "Because [witness's] trial testimony is irreconcilable with her grand jury testimony, the District Court properly held that the Government could read the relevant grand jury testimony into the record as a prior inconsistent statement under Rule 801(d)(1)(A)."); *United States v. Iglesias*, 535 F.3d 150, 159 (3d Cir. 2008) ("[W]here a witness demonstrates a 'manifest reluctance to testify' and 'forgets' certain facts at trial, this testimony can be inconsistent under Rule 801(d)(1)(A)") (quotations in original). *Accord United States v. Owens*, 484 U.S. 554, 565 (1988) ("It would seem strange . . . to assert that a witness can avoid introduction of testimony from a prior proceeding . . . by simply asserting lack of memory of the facts to which the prior testimony related").[16]

---

[16] Similar to the Third Circuit's decision in *Kane*, many circuits have also concluded that a third party's testimony at the third party's guilty plea hearing may be introduced as substantive evidence after the third party gives inconsistent testimony at the defendant's trial. *See, e.g., United States v. Cervantes*, 646 F.3d 1054, 1060 (8th Cir. 2011); *United States v. Valiente*, 392

The trial judge has broad discretion to determine if an evasive answer is inconsistent with the statements made in another proceeding. This is so because the policy behind Rule 801(d)(1)(A) is to "provide a party with desirable protection against the turncoat witness who changes his story on the stand and deprives the party calling him of evidence essential to his case." *United States v. Bigham*, 812 F.2d 943, 946-47 (5th Cir. 1987) (permitting the admission of grand jury testimony of a witness who feigned a memory loss); *United States v. Murphy*, 696 F.2d 282, 284 (4th Cir. 1982) (permitting admission of grand jury testimony of a witness who stated that he could not recall and was vague about what he stated to the grand jury except that he lied to the grand jury). Thus, partial or vague recollection is deemed to be inconsistent with total or definite recollection. *United States v. Distler*, 671 F.2d 954, 958 (6th Cir. 1981); *see also Williams*, 737 F.2d at 608 (permitting admission of grand jury testimony where the witness claimed a partial memory loss in his testimony at trial); *United States v. Marchand*, 564 F.2d 983, 999 (2d Cir. 1977) (permitting the admission of grand jury testimony where the witness testified to facts before the grand jury and forgets or denies them at trial). Further, as noted in *Argnellino v. New Jersey*, 493 F.2d 714, 730 (3d Cir. 1974), "[a] complete answer to a question may be as inconsistent with a partial reply as one completely different in detail." If the prior statement indicates that, at an earlier time, the witness remembered the events about which he testified with more certainty, or in more detail, then it is permissible to admit the prior statement of the witness who recalled the event incompletely or with some equivocation. *Distler*, 671 F.2d at 958.

In sum, a claimed inability to recall, when disbelieved by the trial judge, or a failure to testify about details previously provided, may be viewed as inconsistent with previous statements

---

F. App'x 844, 851 (11th Cir. 2010). *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 758-79 (5th Cir. 2008); *United States v. Meza-Hurtado*, 351 F.3d 301, 303-04 (7th Cir. 2003).

when the witness does not deny that the previous statements were made. All such statements are admissible under Rule 801(d)(1)(A).

### T.  Lay Opinion Testimony

It is anticipated that witnesses for the government will be called upon to give opinion testimony as to various aspects of the case, including their determination, based upon their training and/or experience, that the substance found, observed, or used, was a controlled substance, most notably cocaine, cocaine base, and marijuana. These witnesses will be law enforcement officers who participated in the arrests and searches of various defendants, as well as law enforcement officers who participated in the execution of the search warrants and the recovery of contraband at those locations. These witnesses will also include civilian drug users who purchased and used narcotics obtained from the defendants. These witnesses (law enforcement and the drug users) will base their testimony on their extensive prior experience and/or training with respect to narcotics.

Under Federal Rule of Evidence 701, a witness who is not testifying as an expert can testify in the form of opinions or inferences provided such testimony is "(a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge with the scope of Rule 702." Therefore, it is clear that lay witnesses can give opinions as to evidence that they are personally familiar with and that will be helpful to resolving an issue in the case. Under Federal Rule of Evidence 704, this opinion testimony is "not objectionable because it embraces the ultimate issue to be decided by the trier of fact."

For instance, courts have permitted lay witnesses to testify that a substance appeared to be a narcotic, so long as a foundation of familiarity with the substance is established. See, e.g.,

*United States v. Westbrook*, 896 F.2d 330 (8th Cir. 1990) (two lay witnesses who were heavy amphetamine users were properly permitted to testify that a substance was amphetamine; but was error to permit another witness to make such an identification where she had no experience with amphetamines). Such testimony is not based on any specialized knowledge, but rather, upon a lay person's personal knowledge.

Moreover, there is no theoretical prohibition against allowing lay witnesses to give their opinions as to the mental states of others. *See, United States v. Rea*, 958 F.2d 1206, 1215 (2d Cir. 1992). However, before doing so, the proponent of the testimony must establish a proper foundation. For instance, a participant in a conversation may testify as to his understanding of the conversation to satisfy Rule 701 requirement that the testimony be rationally based on the witness' perceptions. *See, United States v. Garcia*, 291 F.3d 127, 141 (2d Cir. 2002).

The Second Circuit has held that this is properly admitted evidence where a witness derives his opinion solely from insider perceptions of a conspiracy of which he was a member. Under those circumstances, the witness may share his perspective as to aspects of the scheme about which he has gained knowledge as a lay witness subject to Rule 701, not as an expert subject to Rule 702. *See United States v. Rigas,* 490 F.3d 208, 225 (2d Cir.2007) (concluding the district court did not abuse its discretion in allowing a lay witness to testify about an organization's fraudulent financial conduct where that witness made first-hand observations and was well aware of the organization's financial misstatements).

No different conclusion is mandated by Rule 701's requirement that a lay opinion must be the product of "reasoning processes familiar to the average person in everyday life," and not "scientific, technical, or other specialized knowledge." *United States v. Garcia,* 413 F.3d 201, 216–17 (2d Cir.2005). In *United States v. Yannotti*, 541 F.3d 112, 126 (2d Cir. 2008), the Second

Circuit held that while loansharking is not an activity about which the average person has

knowledge, we find that the opinion a government witness reached from his own loansharking

experience derived from a reasoning process familiar to average persons. In short, his opinion

did not depend on the sort of specialized training that scientific witnesses or statisticians rely

upon when interpreting the results of their own experiments or investigations. *United States v.

Yannotti*, 541 F.3d 112, 126 (2d Cir. 2008). Based on the foregoing, the opinion testimony of

SG1700 insiders should be admitted with the proper evidentiary foundation.

### U.  Photos of Defendant and Co-Conspirator Tattoos

It is well-settled that evidence of gang tattoos is relevant and admissible to prove

membership in a RICO enterprise, or to prove membership in a narcotics conspiracy. *See, e.g.,

United States v. Applins*, 637 F.3d 59, 77 (2d Cir. 2011) (tattoos of Elk Block gang membership

admitted in RICO Conspiracy); *United States v. Alviar*, 573 F.3d 526, 538 (7th Cir. 2009) (gang

tattoos admitted to prove membership in gang and involvement in charged conspiracy); *United

States v. Gibbs*, 182 F.3d 408, 430 (6th Cir. 1999) (gang membership probative of charged

conspiracy); *United States v. Miller*, 48 Fed. Appx. 933, 948 (6th Cir. 2002) (gang tattoos

relevant to interrelationship of individuals participating in the conspiracy).

Accordingly, the government may properly introduce evidence of SG1700 tattoos of the

defendants, cooperating witnesses, and other charged and uncharged co-conspirators to prove

membership in the charged enterprise, and involvement in the charged RICO conspiracy.

### V.  Photos of Co-Conspirators Not on Trial

In some instances, cooperating or other witnesses may only know other members or

associates of the charged enterprise by nickname. The government will introduce a photo of a co-

conspirator who is not presently on trial, as his activities are relevant to the charged conspiracies,

and to the defendants presently proceeding to trial. It is submitted that introduction of such a

photo is relevant under Rule 401, and not unduly prejudicial under Rule 403, as related to the defendants presently on trial. Moreover, as set forth above, photos of SG1700 members' or associates' tattoos will be offered into evidence.

### W. Prohibition of Using of Agents' Reports to Cross-Examine Witnesses

The government has provided defendants with reports of witness interviews by government agents. To the extent that the agents who prepared the reports testify, those reports, if materially inconsistent, provide an appropriate basis for impeachment of the agents. However, under the Federal Rules of Evidence, those reports may not be used to impeach the subject of the underlying interview unless the subject has somehow adopted those reports. *United States v. Almonte*, 956 F.2d 27, 29 (2d Cir. 1992).

In *Almonte*, a DEA agent testified at trial about the post-arrest statements that he had obtained from two defendants. *Id*. at 28. One defendant sought to cross-examine the agent with interview notes taken by an Assistant U.S. Attorney who had interviewed the agent. *Id*. at 28-29. The district court rejected the effort and the Second Circuit affirmed, holding that the AUSA's notes were not the agent's statement, but merely a "third party's characterization" of the agent's statement, and therefore irrelevant to impeachment and consequently inadmissible:

> We have held, however, that a "third party's characterization" of a witness's statement does not constitute a prior statement of that witness unless the witness has subscribed to that characterization. . . . Thus, in the absence of endorsement by the witness, a third party's notes of a witness's statement may not be admitted as a prior inconsistent statement unless they are a verbatim transcript of the witness's own words. The problem, in essence, is one of relevancy. If a third party's notes reflect only that note taker's summary characterization of a witness's prior statement, then the notes are irrelevant as an impeaching prior inconsistent statement, and thus inadmissible.

*Id*. at 29 (citation omitted).

As a matter of evidence, the burden of proving that reports or notes reflect the witness's own words rather than the note taker's characterization falls on the party seeking to introduce the

notes. *Id*. Thus, a party seeking to use a report to impeach bears the burden of proving a rational

basis for concluding that the report either was adopted by the witness or represents the verbatim

transcript of the witness's statement. *See id*. at 30. In the absence of such proof, cross-

examination from such reports or notes should be carefully scrutinized so that a statement that is

otherwise inadmissible is not back-doored into evidence and read into the record. *See also*

*United States v. Shoenborn*, 4 F.3d 1424, 1427-28 and n.3 (7th Cir. 1993). In this case, the

defendant should not be permitted to admit reports to impeach the underlying subjects of those

interviews or cross-examine witnesses using any portion of the reports. *See also United States v.*

*Barile*, 286 F.3d 749, 757-58 (4th Cir. 2002); *United States v. Adames*, 56 F.3d 737, 744-45 (7th

Cir. 1995); *United States v. Saget*, 991 F.2d 702, 710 (11th Cir. 1993).

### X.  Summary Charts

Much of the evidence in this case consists of numerous cell phone and social media

records, recordings and images of the defendants, and forensic findings regarding DNA,

fingerprint, gunshot residue (GSR), and ballistic evidence. The government intends to introduce

into evidence summary charts of this voluminous evidence and in particular, summaries of the

attribution evidence from service providers tracing cellphone and social media accounts back to

the defendants. The government will also provide summaries of DNA, fingerprint, GSR, and

ballistics evidence showing the connections of recovered firearms to the defendants and their

numerous shootings. Under Federal Rule of Evidence 1006, summary charts are admissible if

they are based upon evidence that is: (i) voluminous, (ii) admissible, and (iii) available to the

opponent. Fed. R. Evid. 1006; *United States v. Strissel*, 920 F.2d 1162, 1163-64 (4th Cir. 1990).

Although much of the evidence underlying the government's summary charts will, in fact, be

offered for admission, it is not necessary that all of the evidence depicted in the charts be

admitted as long as it is otherwise admissible. "It is well established that summary evidence is

admissible under Rule 1006 only if the underlying materials upon which the summary is based are admissible." *United States v. Hevener*, 382 F. Supp. 2d 719, 728-29 (E.D. Pa 2005) (citing *United States v. Pelullo*, 964 F.2d 193, 204 (3d Cir.1992)); *See also United States v. Bansal,* 663 F.3d 634, 668 (3d Cir 2011); *United States v. Hevener*, 382 F.Supp. 2d 719, 729 (E.D. Pa. 2005); *United States v. Onque*, 169 F.Supp. 3d 555, 574 (D.N.J. 2015), aff'd 665 F. Appx. 189 (3d Cir 2016).

A Rule 1006 summary may be admitted into evidence and go to the jury during deliberations like any other admitted exhibit. See, e.g., *United States v. White*, 737 F.3d 1121, 1135 (7th Cir. 2013); *United States v. Faulkenberry*, 614 F.3d 573, 588 (6th Cir. 2010); *United States v. Janati*, 374 F.3d 263, 272–73 (4th Cir. 2004). Because a Rule 1006 summary is itself evidence, no limiting or cautionary instruction is generally required. *See, e.g., United States v. Williams*, 264 F.3d 561, 575 (5th Cir. 2001) ("A summary chart that meets the requirements of Rule 1006 is itself evidence and no instruction is needed."); *United States v. Bray*, 139 F.3d 1104, 1111–12 (6th Cir. 1998) (concluding that the district court was not required to give a limiting instruction when it admitted in evidence charts under Rule 1006).

In addition to summaries of voluminous evidence, the government may also rely upon charts or summaries as educational devices. *See Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 431 (5th Cir. 1985) ("[I]t is critical to distinguish between charts or summaries as evidence and charts or summaries as pedagogical devices"). Under the rules, and even apart from Rule 1006, a trial court "has the discretion to permit the parties to show to the jury charts and other visual aids that summarize or organize testimony or documents that have already been admitted in evidence." *Id*. In this case, charts will be essential in order to demonstrate how several pieces of evidence meld together at a particular time to prove the charged offenses.

## Y.  Summary Witnesses

The government contemplates using the assigned agent, ATF Special Agent Ryan Rooney, PPD Homicide Detective Thorston Lucke, Philadelphia Firearms Examiner and Forensic Laboratory Supervisor Ann Marie Kelly, and others to testify as summary witnesses in connection with the presentation of much of the records described above. Such testimony is properly admitted under Federal Rule of Evidence 1006 to describe the contents of voluminous writings, recordings, or photographs that cannot conveniently be examined in court. *United States v. Velasquez*, 304 F.3d 237, 240 (3d Cir. 2002); s*ee also United States v. Haidara*, 112 F.3d 511, 2007 WL 205378 *2 (4th Cir. 1997) (unpub. op.). In this case, there are numerous video, cell phone, and social media records and service provider attribution documents. Records and findings regarding DNA analysis, fingerprint comparison evidence, and ballistics evidence are likewise numerous. This evidence is voluminous by any definition, and their individual examination in court would, at a minimum, be inconvenient and time-consuming. Thus, summary testimony is both necessary and appropriate under Rule 1006.

Summary testimony is also appropriate under Rule 611(a) if the evidence would aid the jury in ascertaining the truth and would not be overly prejudicial to the defendant. *Id.* Here, there is a large body of documents and other evidence within the purview and knowledge of the government agents. As such, they should be permitted to testify about and summarize that material. *United States v. Moore*, 997 F.2d 55, 57-59 (5th Cir. 1993). As long as the material summarized is in evidence, any underlying assumptions are made explicit, and the witness is available for cross-examination, summary testimony is appropriate. *See id.; see also Haidara*, 112 F.3d at *2.

94

### Z.  Business Records/Public Records

The government intends to introduce records of T-Mobile, Sprint, Google, Verizon, AT&T, Apple iCloud, Instagram/Facebook (Meta, Inc.), First Judicial District of the Commonwealth of Pennsylvania, Eastern District of Pennsylvania, Philadelphia Department of Prisons, Federal Bureau of Prisons, Pennsylvania Department of Corrections, Jefferson Hospital, and Temple Hospital, among others. In the event that the defendants do not stipulate to the admission of these records at trial, these records are admissible under Fed. R. Evid. 803 and 902.

### 1.  Business Records

The prerequisites for admissibility of business records under Rule 803(6) (or any other rule of evidence) must be established by a preponderance of the evidence. *See In re Japanese Electronic Products Antitrust Litigation*, 723 F.2d 238, 287 (3d Cir. 1983); *see also Bourjaily v. United States*, 483 U.S. 171, 175 (1987). Rule 803(6) provides that the following is not excluded by the hearsay rule:

> (6) Records of Regularly Conducted Activity. A record of an act, event, condition, opinion, or diagnosis if:
>
> > (A) the record was made at or near the time by - or from information transmitted by - someone with knowledge;
> >
> > (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
> >
> > (C) making the record was a regular practice of that activity;
> >
> > (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
> >
> > (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).

In this matter, the government will establish the authenticity of some of the records in question, as well as their admissibility under Rule 803(6), through a certification obtained from the custodian of records from T-Mobile, Sprint, Google, Verizon, AT&T, Apple iCloud, Instagram/Facebook (Meta, Inc.), First Judicial District of the Commonwealth of Pennsylvania, Eastern District of Pennsylvania, Philadelphia Department of Prisons, Federal Bureau of Prisons, Pennsylvania Department of Corrections, Jefferson Hospital, and Temple Hospital, among others, as contemplated in Rule 803(6). That rule references Rule 902(11), which provides for the authenticity of the following:

> (11) Certified Domestic Records of a Regularly Conducted Activity. The original or a copy of a domestic record that meets the requirements of Rule 803(6)(A)-(C), as shown by a certification of the custodian or another qualified person that complies with a federal statute or a rule prescribed by the Supreme Court. Before the trial or hearing, the proponent must give an adverse party reasonable written notice of the intent to offer the record--and must make the record and certification available for inspection--so that the party has a fair opportunity to challenge them.

Fed. R. Evid. 902(11). The government hereby gives notice that it intends to introduce these records by certifications that comply with Rules 902(11) and 803(6).

The government may also seek to introduce records produced as a result of a grand jury subpoena without a 902(11) certification. Federal Rule of Evidence 901(a) states, "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." A noncustodial witness may be used to lay the foundation required for admissibility under Rule 803(6), as the rule states that such testimony may be provided by either the custodian or "other qualified witness." *See United States v. Pelullo*, 964 F.2d 193, 201 (1992). The testimony of a custodian is not a *sine qua non* of admissibility where an otherwise qualified witness, or even documentary evidence, can demonstrate that the records were made contemporaneously with the

act the documents purport to record by someone with knowledge of the subject matter, that they

were made in the regular course of business, and that such records were regularly kept by

the business. *Id*. In fact, even a government agent may be a "qualified witness" to lay a business

records foundation, given that the agent is thoroughly knowledgeable. *See, e.g. United States v.*

*Franco*, 874 F.2d 1136, 1140 (7th Cir. 1989) (agent gave thorough description of the manner in

which records were prepared and maintained based on agent's conversations with owner and

employee of business as well as agent's own observations); *see also United States v.*

*Hathaway,* 798 F.2d 902, 906 (6th Cir. 1986) (FBI agent permitted to lay foundation where agent

had familiarity with the record-keeping system). As long as a proper foundation has been

otherwise laid, the government should be permitted to introduce business records through a non-

custodial witness.

### 2.  Public Records

The government also seeks to introduce certified public records which were produced by

the Clerk of Courts the First Judicial District of the Commonwealth of Pennsylvania and the

Eastern District of Pennsylvania. These records are admissible under Rule 803(6), as well as

Rules 803(8).

Rule 803(8) provides that the following is not excluded by hearsay:

(8) Public Records. A record or statement of a public office if:
    (A) it sets out:
        (i)    the office's activities;
        (ii)   a matter observed while under a legal duty to report, but not including,
            in a criminal case, a matter observed by law-enforcement personnel; or
        (iii)  in a civil case or against the government in a criminal case, factual
            findings from a legally authorized investigation; and
    (B) the opponent does not show that the source of information or other
        circumstances indicate a lack of trustworthiness.

Fed R. Evid. 803(8). *See, e.g., United States v. Crute*, 238 Fed. Appx. 903, *2 (3d Cir. 2007)

(vehicle registration records admissible under Rule 803(8)): *In Re Garm*, 114 B.R. 414, 416-17

(M.D. Pa. 1990) (IRS records admissible under Rules 803(6) and 803(8)); *United States v.*

*Stevenson*, 2010 WL 2490756, *3 (E.D. Pa. 2010) (same).

Rule 902 further provides additional ways to establish authenticity of public records:

The following items of evidence are self-authenticating; they require no extrinsic evidence of authenticity in order to be admitted:

(1) Domestic Public Documents That Are Sealed and Signed. A document that bears:
   (A) a seal purporting to be that of the United States; any state, district, commonwealth, territory, or insular possession of the United States; the former Panama Canal Zone; the Trust Territory of the Pacific Islands; a political subdivision of any of these entities; or a department, agency, or officer of any entity named above; and
   (B) a signature purporting to be an execution or attestation.

(2) Domestic Public Documents That Are Not Sealed but Are Signed and Certified. A document that bears no seal if:
   (A) it bears the signature of an officer or employee of an entity named in Rule 902(1)(A); and
   (B) another public officer who has a seal and official duties within that same entity certifies under seal--or its equivalent--that the signer has the official capacity and that the signature is genuine.

Fed. R. Evid. 902(1) and (2). The government hereby gives notice that it intends to introduce

records from the Clerk of Courts by certifications that comply with Rules 902(1) and (2) and

803(6) and (8).

### 3.  Crawford and Business and Public Records

It bears mentioning that the admissibility of business and public records is unaffected by

the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004), which applies to

certain hearsay. In *Crawford*, the Supreme Court held that any testimonial hearsay may not be

admitted in a criminal trial unless the declarant is unavailable and the defendant had a prior

opportunity for cross-examination. The Supreme Court declined to define testimonial hearsay.

Instead, it recognized that, "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogation." *Id.* at 68. At the same time, the Court made clear that business records admitted pursuant to an evidentiary hearsay exception are not the type of testimonial statements with which the Sixth Amendment Confrontation Clause is concerned. *Id.* at 56; *United States v. Onyenson*, 615 Fed. Appx. 734 (3d Cir. 2015) ("Evidence constituting 'business records or statements in furtherance of a conspiracy' which are 'by their nature ... not testimonial' also does not implicate the Confrontation Clause"); *United States v. Schwartz*, 2009 WL 532796 *3 (3d Cir. 2009) (business records admitted pursuant to a hearsay exception are not testimonial under *Crawford* and citing to other courts that found public records and business records not to be testimonial in support); *United States v. Jimenez*, 513 F.3d 62, 79-30 (3d Cir. 2008) (declining to decide whether the certified public records introduced at trial without a witness were testimonial because, even if they were, their admission was harmless).

Accordingly, the business and public records at issue in this case are admissible pursuant to Rules 803 and 902. The government has provided the defendant a copy of the records. Moreover, through this pretrial memorandum, the government complies with the requirement of advance notice to the defense. Any unobjected-to business and public records should be deemed authentic and admissible, and presented to the jury during trial absent a custodial witness. This process for pre-review and reasonable opportunity for objection will avoid needless waste of trial time and efficiently resolve any objections well in advance of the presentment of evidence. This will also provide the government adequate time to identify and subpoena a live custodial witness for any document over which the Court then deems necessary upon consideration of defendant's objections.

**AA.**    **Admissibility of Defendants' Text messages and Social Media Chats**

The government intends to introduce text message and social media exchanges between the defendants, between the defendants and their girlfriends, and between the defendants and their rivals. The statements of the defendants, including the statements made by the other party to the exchange, are admissible against the defendants as non-hearsay statements of a party opponent, pursuant to Fed. R. Evid. 801(d)(2)(A), and as co-conspirator statements, pursuant to Rule 801(d)(2)(E) and are highly probative of intent and knowledge.

Under Federal Rule of Evidence 801(d)(2)(A), statements made by a party and offered against that party are admissible. *See e.g., Savarese v. Agriss*, 883 F.2d 1194, 1201 (3d Cir. 1989) (since the statement is that of the party himself, he can hardly be heard to complain that he cannot cross-examine himself as to his own utterances); *see also McGlory*, 968 F.2d at 335 n. 17. Therefore, the government may offer the defendants' statements against them as admissions by a party-opponent, under Fed. R. Evid. 801(d)(2)(A). The defendants' statements are incriminating and admissible against each defendant as admissions by a party opponent. Moreover, the statements of the person with whom the defendants are corresponding are not hearsay in that they are not offered for the truth of the matter (indeed, much of what is said by the other party to the conversation is not true), but to provide proper context for the defendants' statements. Without the other side of the conversations, compelling evidence of the defendants' knowledge and intent would be incomprehensible.[17]  *See United States v. Hendricks*, 395 F.3d 173, 183-84 (3d Cir. 2005) (holding that recorded conversations with an unavailable informant are admissible as party opponent statements and coconspirator statements and are not "testimonial" statements subject to *Crawford*.  In addition, unavailable informant's statements admissible to provide

---

[17]  The jury should be properly instructed regarding the admissibility of the statements.

context to defendant's statements).  Evidence of the defendants' conversations and interactions were gathered properly in the government investigation. Further, the defendants used these communications to further their crimes and intimidate rivals.

     **BB.**       **Defense Use of Defendant's Statements**

     The government in this case will present a variety of evidence as co-conspirator statements and admissions of a party opponent under Fed. R. Evid. 801(d)(2).  Such evidence is, by definition, not hearsay as to that party.  Fed. R. Evid. 801(d).  Thus, for example, emails may be admitted against the party who wrote them, *United States v. Siddiqui*, 235 F.3d 1318, 1323 (11th Cir. 2000), and confessions may be admitted against the party who gave them.  *United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005).  Such statements, however, may not be admitted <u>by</u> the party who gave them, because Rule 801(d)(2) does not allow a party "to introduce his or her *own* statements through the testimony of other witnesses."  *Id*. (emphasis in original).  Indeed, if such statements were admissible, "parties could effectuate an end-run around the adversarial process by, in effect, testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury."  *Id*.  *See also, United States v. Palow*, 777 F.2d 52, 56 (1st Cir. 1985) (Rule 801(d)(2)(A) (simply requires that an admission at issue be contrary to a party's position at trial, and that the requirement that an admission be offered against a party is designed to exclude the introduction of self-serving statements by the party making them); *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982) (a party's statement, if offered against him, is not hearsay under Rule 801(d)(2)(A), but is hearsay and not admissible if offered by the party himself).

     In this case, the conversations containing statements of the defendants will be introduced by the government. This does not mean that the defendants will be able to do likewise.

Statements that the defendants made are not admissible by the defendants.  It does not matter whether the information that the party seeks to admit is inculpatory or exculpatory.  In either case, a party simply cannot admit his or her own statements as admissions of a party opponent. *United States v. Kapp*, 781 F.2d 1008 (3d Cir. 1986) (upholding district court's ruling that tape recording of a conversation between a codefendant and a government informant that defendant considered exculpatory on the issue of his knowledge of illegality was inadmissible because it was not offered "against a party" as required by Rule 801(d)(2)).  *McDaniel*, 398 F.3d 545, n.2.

Defendants cannot make an end-run around these hearsay rules by citing the Rule of Completeness. For example, many of the recordings that the government will present at trial have been redacted. Portions of the conversations that are unrelated to the subjects discussed in the portions that will be played have been redacted to make the presentation of the government's case more efficient, and to avoid jury confusion. In those instances, the defendants cannot introduce the redacted portions of the conversations by citing the Rule of Completeness, as set forth in Federal Rule of Evidence 106, which provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." *United States v. Hoffecker*, 530 F.3d 137, 192 (3d Cir. 2008). In *Hoffecker*, the Third Circuit upheld, under Rule 801(d)(2), the exclusion of portions of an audiotape in which the defendant made exculpatory statements, even though the government had played a portion of the recording in its case-in-chief. The Court found that the Rule of Completeness did not compel a different result. *Id.* at 192.

This principle applies to both recorded conversations as well as witness testimony that contains statements of the defendants; even if only a portion of the conversation or statement is

played or presented by the government, the defendants may not present their statements that were not introduced unless they testify. *See United States v. Lentz*, 524 F.3d 501, 526 (4th Cir. 2008) ("Rule 106 does not ... render admissible the evidence which is otherwise inadmissible under the hearsay rules, [n]or does it require the admission of self-serving, exculpatory statements made by a party which are being sought for admission by that same party") (internal quotations and citations omitted); *United States v. Mitchell*, 502 F.3d 931, 964 (9th Cir. 2007) (defendant was properly precluded from eliciting, on cross-examination of government agents, exculpatory statements that he had made during interviews with agents, since those statements were inadmissible hearsay); *United States v. Rivera*, 61 F.3d 131, 136 (2d Cir. 1995) ("Rule 106 does not render admissible evidence that is otherwise inadmissible"); *United States v. Mahaffy*, 2007 WL 1094153, at *2 (E.D.N.Y. Apr. 10, 2007) ("A court may ... exclude any portion that consists largely of a defendant's own self-serving statements, which, as offered by him, are inadmissible hearsay") (internal quotations omitted).

Similarly, in *United States v. Ortega*, 203 F.3d 675 (9th Cir. 2000), the court affirmed the district court's decision precluding the defendant from eliciting his own exculpatory statements on cross-examination of a law enforcement officer, holding that the defendant's statements were inadmissible hearsay. *Id.* at 682. The court recognized that any other ruling would have allowed the defendant to put his own statements before the jury without having to take the stand himself – the precise situation the hearsay rule forbids. *Id.* at 682. In reaching its decision, the *Ortega* court distinguished the defendant's attempt to elicit his own exculpatory statements from the government's use of the defendant's inculpatory statements, noting that only the latter constitute "admissions by a party opponent and . . . therefore not hearsay," and noted that the Rule of Completeness did not apply. *Id.* at 681-682.

The Third Circuit in *Hoffecker* identified a narrowly-drawn exception to the general rule that the defendants may not present their statements that were not introduced unless they testify. In that case, the Third Circuit noted that additional portions of a recording may be played "if it is necessary to (1) explain the admitted portion, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) ensure a fair and impartial understanding." *Hoffecker*, 530 F.3d at 192 (citing *United States v. Soures*, 736 F.2d 87, 91 (3d Cir.1984) (citing *United States v. Marin*, 669 F.2d 73, 84 (2d Cir.1982)). The Third Circuit cautioned that "[t]he Rule does not require introduction of portions of a statement that are neither explanatory of nor relevant to the passages that have been admitted." *Id. See Marin*, 669 F.2d at 84; *United States v. Bailey*, 322 F. Supp. 3d 661, 675 (D. Md. 2017) ("Neither Rule 106 nor the common-law rule of completeness is triggered unless some clearly identifiably unfairness would exist without allowing the party that would be prejudiced the opportunity to offer information that would clarify or explain"). That an omitted portion of a conversation merely deals with the same subject matter as a published portion is not enough. In *Hoffecker*, the Court rejected a Rule 106 claim where the defendant sought to admit his statements from one conversation to explain his statements during another conversation, where the prior statements were not necessary to avoid misleading the jury or to ensure a fair and impartial understanding. 530 F.3d at 192.

If the defendants seek to introduce any of their prior statements under Rule 106, the defendants must specify the particular passages that they believe are necessary for purposes of Rule 106 completeness and, for each passage, set forth why the admission of the prior statements are necessary to avoid misleading the jury or to ensure a fair and impartial understanding. *United States v. Price*, 516 F.3d 597, 604-05 (7th Cir. 2008) (as the party seeking to admit the additional evidence, the defendant must establish both that the evidence is relevant to the issues in the case

and that it clarifies or explains the portion offered by the government).

**CC.    Reference to Punishment for Charged Offenses**

The punishment for the offenses charged is not a proper matter for the jury's consideration. *See Shannon v. United States*, 512 U.S. 573 (1994); *United States v. Fisher*, 10 F.3d 115, 121 (3d Cir. 1993); *United States v. Austin*, 533 F.2d 879, 885-86 & n.14 (3d Cir. 1976); see generally 1 L. Sand, J. Siffert, W. Loughlin, and S. Reiss, Modern Federal Jury Instructions -- Criminal 9.01 (1993).  It is well settled that, "presenting information to the jury about possible sentencing is prejudicial."  *United States v. Greer*, 620 F.2d 1383, 1384 (10th Cir. 1980).  Questioning and argument addressing these issues, thus, would be improper.  Evidence should be excluded where it is irrelevant to the issue being tried or where it will "induce the jury to decide the case on an improper basis, commonly an emotional one, rather than on the evidence presented."  *United States v. Vretta*, 790 F.2d 651, 655 (7th Cir. 1986) (citation omitted). Accordingly, references by defense counsel or witnesses to punishment for the offenses charged should not be permitted.

Respectfully submitted,

JACQUELINE C. ROMERO
United States Attorney

*/s/ Christopher Diviny*
CHRISTOPHER DIVINY
ASHLEY N. MARTIN
LAUREN E. STRAM
Assistant United States Attorneys

Dated: December 4, 2024

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date I caused a true and correct copy of the

government's trial memorandum to be served by electronic filing upon the following:

Patrick Egan, Esquire
Fox Rothchild LLP
2000 Market Street, 20th Floor
Philadelphia, PA 19103
Pegan@foxrothchild.com

Kenneth Montgomery, Esquire
198 Rogers Avenue
Brooklyn, New York 11225
ken@kjmontgomerylaw.com
*Attorneys for Hassan Elliott*

Marni Jo Snyder, Esquire
100 South Broad Street, Suite 1910
Philadelphia, PA 19110
marni@snyderlawyer.com
*Attorney for Khalif Sears*

Thomas O. Fitzpatrick, Esquire
Mincey, Fitzpatrick, Ross, LLC
1650 Market Street, Suite 3600
Philadelphia, PA 19103
tom@minceyfitzross.com
*Attorney for Kelvin Jiminez*

Michael Parkinson
Parkinson, Tarpey & Lloyd
1315 Walnut Street, Suite 1650
Philadelphia, PA 19107
mp@ptlfirm.com
*Attorney for Dominique Parker*

*/s/ Christopher Diviny*
CHRISTOPHER DIVINY
Assistant United States Attorney

Dated: December 4, 2024