**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 20-417 |
| HASSAN ELLIOTT<br>a/k/a "Haz" | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its attorneys, David Metcalf, United States Attorney for the Eastern District of Pennsylvania, and Christopher Diviny, Ashley N. Martin, and Lauren E. Stram, hereby files its sentencing memorandum.

### Preliminary Statement

Defendant Hassan Elliott's crimes are among the most serious confronted by the law. He engaged in a pattern of wanton violence, damaging the lives of his shooting victims, their families, and the community where he fueled the drug culture of addiction. A serious sentence at the top of the range agreed to by the parties is required to punish the defendant for his crimes, to deter him and others from committing future crimes, and to protect society from further harm.

As set forth below, the advisory guidelines range is correctly set forth in the presentence report (PSR) as Life plus 660 months. The government requests that the Court accept the guilty plea agreement recommendation, consider the advisory guidelines, and sentence the defendant to incarceration for 900 months, in accordance with the agreement of the parties.

**Background**

**A.  Racketeering ("RICO") Conspiracy and Drug Trafficking Conspiracy**

Hassan Elliott was a central member of a criminal organization known by several names, including "1700 Scattergood" ("SG1700"), whose members and associates engaged in acts of violence, including four murders and numerous assaults, and distributed controlled substances on behalf of the organization. The organization served to enrich its membership through drug sales, and used violence to preserve the organization's power, territory, and reputation. The organization operated principally in the Frankford section of Philadelphia. Elliott and other SG1700 members obtained controlled substances, including "crack" cocaine and marijuana, primarily from SG1700 leadership or more senior members, and distributed those controlled substances to users in areas within SG1700's control. In addition to distributing controlled substances, SG1700 members, including Elliott, committed violent acts, such as murder and assaults, on behalf of the organization and for the purpose of maintaining or increasing their standing within the organization.

The organization originally operated in and around the 5300 block of Lesher Street, and used various names including "LBlock," "5300," and "Lesher." Over time, the organization expanded to other areas of Frankford, specifically "1700 Scattergood," which is both a location and the name. In summary, Elliott was a member of the organization during the period of the conspiracy, from June 2017 to May 2021, who committed violent acts, including four murders and numerous assaults, on behalf of the organization and who sold drugs for the organization for approximately four years.

Elliott's membership within SG1700, his occupation as a drug dealer, and the violent acts he committed on behalf of the organization are corroborated by witnesses, music videos, social

media photographs, Instagram messages, telephone contacts between Elliott and members of SG1700, his presence inside of the home where he murdered Sergeant James O'Connor and his proximity to controlled substances, drug packaging materials, and firearms, his possession of controlled substances, and forensic evidence including the presence of his DNA on firearms recovered from within that property.

Members of SG1700 primarily sold "crack" cocaine and marijuana, but occasionally sold fentanyl. Kelvin Jimenez (a/k/a "Nip"), Dominique Parker (a/k/a "Dom"), and S.M., who were all members of SG1700, pooled their money[1] to purchase powder cocaine and "cooked" the cocaine to form "crack" cocaine. Members of SG1700 then cut, weighed, and packaged the drugs into user quantities, typically at a "trap house" or an abandoned property controlled by the group and "bundled" a set amount to provide to younger members, including Elliott, to sell on the street (typically $130 worth of "crack" cocaine, packaged in $5 containers known as "trash cans"). Street-level sellers, including Elliott, in turn sold the "crack" to users, returning $100 to the drug partnership and keeping a $30 profit for themselves. Over the span of the conspiracy, the organization trafficked five kilograms or more but less than 15 kilograms of cocaine.

Members of SG1700 sold controlled substances in areas within the organization's control. Some SG1700 members worked in shifts to ensure that the area was always staffed to avoid missing any sales and sold all day, every day. Individuals who were not members or associates of SG1700 were not permitted to sell drugs in their area. In the event an unauthorized individual attempted to sell within their area of control, SG1700 members would first offer a

---

[1] Members of the group also pooled money to purchase firearms, clothing, and vehicles. They additionally used group funds to support members who were incarcerated.

warning, but if the sales persisted, would retaliate with violence.

Members of SG1700, including Elliott, gained admission and advanced within the organization by progressively selling larger quantities of controlled substances for the organization, committing violent acts on behalf of the organization, often against opposing drug gangs (such as the Tackawanna Projects or Hawthorne Street gangs), and refusing to cooperate with law enforcement if arrested (e.g., not "ratting"). Members of SG1700 produced numerous rap videos and songs describing their crimes.

The organization's territory abutted Frankford Avenue, a heavily trafficked thoroughfare in Northeast Philadelphia. Members of SG1700 sold controlled substances on Frankford Avenue and at times, permitted associates to sell along Frankford Avenue; however, SG1700 members had a right of first refusal to drug buyers. The organization's reputation for violence was an integral part of the organization's success in that it deterred other individuals or organizations from selling within their area of control and consequently allowed the group to control the sale of drugs within their highly profitable territory.

The illegal sale, distribution, possession with intent to distribute, and trafficking of controlled substances are activities which affect interstate commerce as follows: they have a substantial and detrimental effect on the health and general welfare of the American people; a major portion of the traffic in illegal narcotics and controlled substances flows through interstate and foreign commerce. Incidents of the traffic which are not an integral part of the interstate or foreign flow, such as manufacture, local distribution, and possession, nonetheless have a substantial and direct effect upon interstate commerce because many illegal narcotics and controlled substances: (i) after manufacture, are transported in interstate commerce; (ii) that are

distributed locally usually have been transported in interstate commerce immediately before their distribution; and (iii) immediately prior to the possession of such substances, commonly flow through interstate commerce. Local distribution and possession of illegal narcotics and controlled substances contribute to swelling the interstate traffic in such substances; and illegal narcotics and controlled substances manufactured and distributed intrastate cannot be differentiated from controlled substances manufactured and distributed interstate.

Members of SG1700, including Elliott, committed homicides and shootings in the name of the organization, to protect its reputation and territory, and to maintain or increase a member's standing within the organization, including the following:

**B. Murder of Kaseem Rogers and Shooting of D.S. and J.L.**

Kaseem Rogers was murdered on December 3, 2018. Elliott and SG1700 members Bilal Mitchell and C.A. drove to the territory of an opposing drug gang after exchanging insults on social media with opposition group members. Prior to their departure, S.M. and Kelvin Jiminez ("Nip") drove to the area to ensure that their intended targets were exposed and police were not in the area. After receiving confirmation from S.M. and Jiminez, Mitchell drove one car with Elliott in the passenger seat, while C.A. drove a second car directly behind. As Mitchell and Elliott approached the intersection of Tackawanna and Harrison Streets, they noticed two opposition gang members—Kaseem Rogers and D.S.—standing with others outside of a corner store.

Once at the intersection, Elliott and Mitchell fired at the gang from the first car, each shooting their weapons, striking and killing Rogers, and injuring D.S. and another woman standing with the gang, J.L. Rogers was shot five times in his head, chest, back, and legs. After

the shooting, C.A., who was following behind Elliott and Mitchell in a separate car, also fired.

### C. Shooting of C.S. and M.H.

On January 25, 2019, just after 5:00 a.m., Elliott and Bilal Mitchell went to the 1800 block of Harrison Street to destroy a makeshift memorial dedicated to their murder victim, Kaseem Rogers, located at the scene of his killing. While Mitchell destroyed the memorial, Elliott noticed movement inside a car parked a few feet from the memorial. Elliott, who was armed with a firearm, began shooting at the car, hitting C.S. in the thigh and M.H. in the hip, who were asleep inside the car.

### D. Murder of Tyrone Tyree

On March 1, 2019, at approximately 11:59 a.m., Elliott and fellow SG1700 member, Khalif Sears, murdered Tyrone Tyree on the 5300 block of Duffield Street. Tyree drove to the 5300 block of Duffield Street to buy marijuana. Elliott and Sears approached to sell to him but saw that he had a wad of cash and decided to rob Tyree. Before they approached to commit the robbery, Elliott and Sears called Kelvin Jiminez for permission to leave the drug block unattended.

When they pointed their guns at Tyree, Tyree reached down – likely for the gearshift – and Elliott and Sears shot and killed him. At the scene, officers recovered seven .40 caliber fired cartridge casings ("FCCs") and four 9mm FCCs.

Elliott and Sears fled down alleyways between Brill and Scattergood Streets toward the 5300 block of Charles Street. They stashed the handguns inside a barbecue grill in the rear yard of 1775 Scattergood Street, and Sears left his coat on the fence. Officers followed footprints in the snow down the alleyway and discovered the abandoned evidence. Police ultimately

6

recovered: (1) a .40 caliber Smith and Wesson semiautomatic handgun, loaded with two live rounds in the magazine and one in the chamber; and (2) a 9mm Smith & Wesson semiautomatic handgun, loaded with 11 live rounds in the magazine, with an obliterated serial number. Inside the coat pockets, Sears left an ALCATEL flip phone, a tube of ChapStick, and headphones. Both firearms were matched to the FCCs at the murder scene. DNA analysis showed strong links between the .40 caliber handgun and Elliott, between the ALCATEL phone and Sears and Elliott, between the coat and Sears, between the earbuds and Sears, and between the ChapStick and Sears.

**E. Shooting of R.B.**

Members of the SG1700 routinely traveled to the Tackawanna Projects—a territory controlled by a nearby opposition group—to shoot rival gang members. This was done to show their willingness to kill or engage in violence to protect their drug area and retaliate against any threats, perceived or actual, from other groups. In the event the group did not encounter any known opposition members, the group sent a message to the opposition by shooting anyone present in the opposition territory, even those unaffiliated with the opposition, to communicate to the opposition that the group was looking for them and as proof that they had crossed enemy lines. This was the case when, in the early morning hours of August 20, 2019, SG1700 members received word that opposition gang members were standing on a corner within the Tackawanna Housing Projects, and decided to go to the area to shoot them. As Bilal Mitchell and Kelvin Jimenez attempted to get a car to use during the shooting, Elliott and Dominique Parker rode bicycles to the location. When Elliott and Parker arrived on the 1800 block of Fillmore Street, they saw R.B. sitting on his porch and both began shooting, hitting R.B. ten times throughout his

body. After the shooting, they believed they had murdered R.B. but he survived with extraordinary medical intervention. Mitchell took the guns used during the shooting from Elliott and Parker and returned them to 1688 Bridge Street, a property used by SG1700 members to package controlled substances and store firearms.

### F. Murder of Dontae Walker and Shooting at U.W.

Dontae Walker was murdered on August 22, 2019, by SG1700 members in retaliation for the shooting of a 5300 Lesher/SG1700 member on August 17, 2019. The organization was unsure which opposition group was responsible for the shooting, so they retaliated against both of their main opposition groups. One of these groups was the Hawthorne Street gang. On the day of the murder, Elliott, Bilal Mitchell, Dominique Parker, and M.B., all SG1700 members, agreed to try to shoot members of the Hawthorne Street gang who were on a nearby porch on Marlowe Street. Mitchell and Elliott approached the targeted location from one direction and M.B. and Parker approached from another. They converged on the corner of Hawthorne and Bridge Streets, where they saw Walker sweeping the sidewalk near a barber's chair. Elliott, Mitchell, and the others fired at Walker and U.W., killing Walker.

### G. Shooting of R.F.

On December 20, 2019, Elliott and other SG1700 members exchanged insults over social media with members of the Tackawanna Projects opposition gang and agreed to meet up at Wissinoming Park in Frankford. Elliott, Khalif Sears, Bilal Mitchell, K.S., Kelvin Jimenez, and other SG1700 members armed themselves with firearms, went to the area, and waited in an alleyway for the opposition gang members to arrive. The group noticed a car that resembled the same car driven by an opposition gang member, and, Elliott, Sears, K.S., and Mitchell opened

fire, shooting the driver, R.F., in the hand. The group later learned that the car did not belong to

an opposition gang member, and that they had shot the wrong car. Elliott fired a Draco, semi-

automatic firearm, known to SG1700 members as a "baby AK," utilizing larger, 7.62 caliber

ammunition.

### H.  Attempted Shooting of L.H. and Shooting of R.R.

On December 27, 2019, Bilal Mitchell exchanged words with members of the Hawthorne

Street gang, including L.H. After the exchange, Mitchell went to a property used by SG1700 and

told Elliott and K.S. of the exchange and the opposition gang's whereabouts. Elliott, Mitchell,

and K.S. agreed to go retaliate by shooting the opposition gang members. Mitchell armed

himself with a handgun and stationed himself in a nearby alleyway in the event one of their

targets ran in that direction, while Elliott and K.S. approached using another alleyway. Elliott

opened fire from across the street as the opposition gang members, including L.H., stood on the

corner of Bridge and Hawthorne Streets. Elliott missed his intended targets, but instead struck

R.R. in the stomach as he drove through the intersection. R.R. was an innocent passerby who

required emergency surgery and months of medical care for his wounds.

### I.  Shooting of M.M.

On January 28, 2020, Elliott and other SG1700 members argued with Tackawanna

Project opposition gang members over Instagram. Elliott and the SG1700 members decided to

retaliate by shooting at the opposing members. Fellow SG1700 member M.J. drove Elliott,

Khalif Sears, Bilal Mitchell, Sherman Easterling, and S.M. to the 4800 block of Tackawanna

Street. When they arrived, SG1700 members shot at the opposing gang members who were

standing outside, grazing M.M. in the head.

**J.  Murder of Sergeant James O'Connor and Use of 1688 Bridge Street**

Beginning in the summer of 2019, SG1700 members rented the middle room inside the second-floor apartment of 1688 Bridge Street from V.R., a "crack" cocaine user. At times, in lieu of rent, SG1700 members provided V.R. with "crack" cocaine, and frequently sold "crack" cocaine to V.R. and his associates. At first, while all SG1700 members had access to the room, only Bilal Mitchell and M.E. resided there until Elliott and Khalif Sears, who were both wanted for the March 1, 2019, Tyrone Tyree murder and running from police, moved into the property. Later, Sherman Easterling joined Mitchell, Elliott, and Sears and also began staying there. Over time, the middle room became a "stash house" for SG1700 members who used it as a place to meet, store their shared firearms and drugs, and package drugs, including cocaine and marijuana, into user quantities for distribution. The location of 1688 Bridge Street was particularly advantageous to SG1700 members due to its proximity to the area where they peddled drugs.

Only members of SG1700 had access to the room and its contents, including the communal firearms stored therein. Because Elliott and Sears were wanted for murder and actively evading capture, they were almost always present inside the room. Elliott, Sears, and other SG1700 members were aware of their fugitive status. Elliott openly discussed with SG1700 members his plan that they would shoot police to avoid apprehension.

In the early morning hours of March 13, 2020, Elliott, Mitchell, Sears, and Easterling were present inside the middle room. At approximately 6:00 a.m., after knocking without success, members of the Philadelphia Police Department SWAT Unit, led by Sergeant James O'Connor, breached the door of 1688 Bridge Street to search for and arrest Elliott. As the SWAT officers ascended the staircase loudly announcing their presence, Elliott retrieved a .22 caliber

Mossberg rifle that was laying nearby and began firing at the officers through the closed middle room door in the direction of the officers, striking Sergeant O'Connor in the chest and killing him.

After the killing, Elliott, Mitchell, Sears and Easterling were ordered out of the room. Philadelphia Police detectives obtained a search and seizure warrant to search the second-floor apartment. During their search, detectives and Crime Scene Unit officers found nine handguns of various calibers, makes, and types littered throughout the room, as well as the .22 caliber Mossberg rifle used to kill Sergeant O'Connor concealed under the bed. Philadelphia Police personnel also found "crack" cocaine in both bulk and user quantities, marijuana in bulk and user quantities, and drug packaging materials. Officers searched Mitchell incident to his arrest and found an additional 59 containers of "crack" cocaine concealed in his groin.

The controlled substances recovered from inside the middle room and from Mitchell's person were analyzed by the Philadelphia Chemistry Lab and determined to be "crack" cocaine and marijuana. In total, officers recovered approximately 30 grams of "crack" cocaine and 442 grams of marijuana from inside the middle room and on Mitchell's person. These amounts are consistent with distribution and not personal use and firearms are used by drug dealers, such as Elliott and SG1700, to protect their product and profits.

At the time of this murder, Elliott knew he had been convicted on January 24, 2018, in Pennsylvania of carrying a firearm without a license, a third-degree felony in violation of 18 Pa.C.S. § 6106(a)(1), based on his guilty plea to the charge. The firearms listed in Count 28 of the superseding indictment were manufactured outside of Pennsylvania, such that their presence in Pennsylvania means that they traveled in interstate commerce.

11

## Procedural History

On March 22, 2023, defendant Hassan Elliott was charged in a 31-count superseding

indictment with conspiracy to engage in a racketeer influenced corrupt organization ("RICO"), in

violation of 18 U.S.C. § 1962(d) (Count 1); conspiracy to distribute 5 kilograms or more of

cocaine and marijuana, in violation of 21 U.S.C. § 846 (Count 2); murder in aid of racketeering,

and aiding and abetting, in violation of 18 U.S.C. §§ 1959(a)(1) and 2 (Counts 3, 10, 14, and 26);

assault with a deadly weapon in aid of racketeering, and aiding and abetting, in violation of 18

U.S.C. §§ 1959(a)(3) and 2 (Counts 4, 5, 7, 8, 12, 15, 17, 20, and 22); attempted assault with a

deadly weapon in aid of racketeering, and aiding and abetting, in violation of 18 U.S.C. §§

1959(a)(6) and 2 (Count 19); causing death through the use of a firearm during and in relation to

a violent crime or a drug trafficking offense, and aiding and abetting, in violation of 18 U.S.C. §§

924(c)(1)(A), (j)(1) and 2 (Counts 6, 11, 16, and 27); carrying and using a firearm during and in

relation to a violent crime or a drug trafficking offense, and aiding and abetting, in violation of

18 U.S.C. §§ 924(c)(1)(A)i. and (iii) and 2 (Counts 9, 13, 18, 21, 23, and 25); possession with

intent to distribute cocaine and marijuana, and aiding and abetting, in violation of 21 U.S.C. §

841(a)(1), (b)(1)(C), and (b)(1)(D) and 18 U.S.C. § 2 (Count 24); possession of a firearm by a

felon, in violation of 18 U.S.C. § 922(g) (Count 28); maintaining a drug-involved premises, in

violation of 21 U.S.C. § 856(a)(1) (Count 29); and notices of forfeiture, charging criminal

forfeiture under 21 U.S.C. § 853, 28 U.S.C. § 2461(c), and 18 U.S.C. § 924(d), all arising from

his participation in a RICO conspiracy from as early as in or about June 2017 through in or about

May 2021, his participation in murders, assaults with a deadly weapon in aid of racketeering, his

possession with intent to distribute controlled substances, his possession, use, and discharge of

firearms during and in relation to that conspiracy, and his possession, use, and discharge of firearms resulting in the deaths of individuals.

On January 15, 2025, the defendant entered a guilty plea pursuant to a plea agreement with the government to Count 1; a lesser included offense of Count 2, (namely, 21 U.S.C. § 841(a)(1) and (b)(1)(C); and Counts 4-9, 11-13, 15-25, and 27-29 of the superseding indictment. The government agreed to dismiss Counts 3, 10, 14, and 26, charging murder in aid of racketeering, and aiding and abetting, in violation of 18 U.S.C. §§ 1959(a)(1) and 2, at the time of sentencing.

The plea agreement was made pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), with the parties agreeing that the following specific sentence is the appropriate disposition of this case: a sentence of imprisonment within a range of 660-900 months' imprisonment. The parties further agree that at sentencing the government and the defendant may each make a recommendation for any specific sentence of imprisonment within the agreed upon range. If the Court does not accept this plea agreement, then either the defendant or the government will have the right to withdraw from the plea agreement and the defendant will have the right to withdraw the guilty plea.

The defendant agrees to pay the special assessment of $2,500 as directed by the Court. The defendant agrees to pay a fine and restitution as directed by the Court.

## **Sentencing Calculation**

A.    Statutory Maximum Sentence

The defendant could be sentenced to the following statutory maximum sentences: Count 1 (conspiracy to participate in a racketeering ("RICO") enterprise), lifetime imprisonment, 5 years' supervised release, a $250,000 fine, and a $100 special assessment; Count 2 (conspiracy

to distribute cocaine and marijuana, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C)), 20 years' imprisonment, a mandatory minimum 3 years' supervised release up to lifetime supervised release, a $1,000,000 fine, and a $100 special assessment; Counts 4, 5, 7, 8, 12, 15, 17, 20, and 22 (assault with a dangerous weapon in aid of racketeering, and aiding and abetting), 20 years' imprisonment, 5 years' supervised release, a $250,000 fine, and a $100 special assessment; Counts 6, 11, 16, and 27 (causing death using a firearm during and in relation to a violent crime or a drug trafficking crime, and aiding and abetting), lifetime imprisonment, 5 years' supervised release, a $250,000 fine, and a $100 special assessment; Counts 9, 13, 18, 21, and 23 (carrying and using a firearm in furtherance of a violent crime, and aiding and abetting), lifetime imprisonment, a 10-year mandatory minimum term of imprisonment which must be imposed consecutive to any other sentence of imprisonment imposed, 5 years' supervised release, a $250,000 fine, and a $100 special assessment; Count 25 (carrying and using a firearm in furtherance of a drug trafficking offense, and aiding and abetting), lifetime imprisonment, a 5-year mandatory minimum term of imprisonment which must be imposed consecutive to any other sentence of imprisonment imposed, 5 years' supervised release, a $250,000 fine, and a $100 special assessment; Count 24 (possession with intent to distribute controlled substance(s)), 20 years' imprisonment and a mandatory minimum term of 3 years' supervised release, a $1,000,000 fine, and a $100 special assessment; Count 28 (possession of a firearm by a felon), 10 years' imprisonment, 3 years' supervised release, a $250,000 fine, and a $100 special assessment; and Count 29 (maintaining a drug involved premises), 20 years' imprisonment, 3 years' supervised release, a $500,000 fine, and a $100 special assessment.

<u>Total Maximum and Mandatory Minimum Sentence</u>: is life imprisonment, a mandatory minimum of 55 years' imprisonment, 55 years of which is to run consecutive to any other sentence imposed, a 5-year period of supervised release up to a lifetime of supervised release, an $8,000,000 fine, and a $2,500 special assessment. Forfeiture of any property used or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such offenses, and any property constituting, derived from, or proceeds obtained directly or indirectly from the commission of such offenses also may be ordered. Further, if supervised release is imposed and subsequently revoked, the original term of imprisonment may be increased without credit for time already spent on supervised release.

B.    <u>Sentencing Guidelines Calculation</u>

The defendant's advisory guideline range is correctly set forth in the PSR as follows: The offense level for the defendant's most serious crime, the murder of Sergeant James O'Connor, is 49, which is increased to 52 as a result of grouping under the guidelines. As a result of his guilty plea, the offense level is decreased by 3 levels for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a) and (b). The total offense level is, therefore, 49, but pursuant to Chapter 5, Part A (comment n.2), a score above 43 is converted to 43 – the highest score contemplated under the guidelines. The defendant has five criminal history points, placing him in criminal history category III. The guideline range is Life, plus 660 months' imprisonment. The 660 months added to the life sentence results from the consecutive terms of 120 months on each of Counts 9, 13,18, 21, and 23, plus a consecutive term of 60 months for Count 25. *See* PSR, ¶ 344.

## <u>Analysis of Sentencing Factors</u>

A thorough consideration of all of the sentencing factors set forth in 18 U.S.C. § 3553(a) indicates that the Court should accept the calculation of the advisory guidelines as set forth above, review all other factors, and impose a sentence of 900 months' (75 years') imprisonment, which is within the range of imprisonment agreed upon by the parties.

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

This Court must also consider all of the sentencing factors set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

16

A.    <u>The nature and circumstances of the offense and the history and characteristics of the</u> <u>defendant</u>.

### 1.    **The nature and circumstances of the offense**

The defendant's murders, assaults, drug dealing, and related gang crimes represent the most serious criminal behavior which our laws must address. The defendant showed a callous disregard for the laws of society and the value of human life. He caused irreparable and devastating harm to the families of his murder victims, his shooting victims, and his community. He embarked on a course of horrors that terrorized his neighborhood and left a wake of permanent victimization. Nobody is entitled to inflict such mayhem.

The victim impact statements outlined in the PSR—which we expect will be presented during their testimony or letters at the sentencing hearing—detail the horrific trauma the victims and families of murder victims have experienced at the hands of the defendant. *See* PSR, ¶¶ 125-149. There can be no doubt that their lives were forever altered due to his blatant disregard for his fellow human beings and the community. His offenses are the most serious under the law and warrant significant punishment.

### 2.    <u>The history and characteristics of the defendant</u>

The defendant is a 26-year-old man, born on August 14, 1998, who resided in Philadelphia. He has no work history to speak of. Rather he spent his life from his teen years until his arrest at age 21, engaged in gang-related criminal behavior. Despite his admitted gang behavior, the defendant was only adjudicated delinquent for theft at age 16 and convicted of illegal firearm possession at age 19. *See* PSR, ¶¶ 259-265.

The defendant has been incarcerated since the day he murdered Sergeant O'Connor,

March 13, 2020. By the date of his sentencing, he will have been in federal custody for 55 months during which he has amassed a record of 24 disciplinary infractions. *See* PSR, ¶¶ 13-14. He has shown his disdain for authority and rules both inside and outside of prison. Inside prison, the defendant has continued his violent behavior. The most serious example was his involvement in the August 27, 2024, coordinated attack on another inmate in the Brooklyn, New York, detention center (MDC), where Elliott wielded a prison shank and his cohort buried an icepick in the target inmate's back. He has shown no inclination to change, incurring his most recent infraction for fighting on April 7, 2025.

B.    <u>The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense</u>.

A sentence of 900 months' imprisonment, within the agreed range, appropriately reflects the seriousness of the defendant's violent criminal behavior. It also sends a message to deter others who might engage in similar conduct. It is difficult to overstate the seriousness of the defendant's offenses, taking and impacting so many lives. The offenses here are serious ones, and the punishment must also be serious.

C.    <u>The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant</u>.

The need for adequate deterrence of this type of crime is great. Given the prevalence of gun violence in Philadelphia, the need to deter others—and the defendant—from similar crimes is especially important. The importance is even more great when considering that the defendant armed himself with numerous firearms to commit his multiple crimes, including large capacity firearms and those with extended magazines. The need to deter this defendant is especially great.

The defendant's continuing interactions with the criminal justice system have not deterred him. Accordingly, a lengthy period of incarceration must be imposed to ensure this defendant does not reoffend. Such a sentence would not only deter this defendant but would protect the public from additional crimes by the defendant for at least as long as he remains in prison and under post-release supervision. This type of criminal behavior is devastating to the Philadelphia community that is inundated by gun violence. Those who are inclined to engage in such crimes must be deterred by the possibility of receiving a serious sentence.

D.      The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.

There is no demonstrated need to adjust the sentence in order to provide the defendant with needed educational or vocational training, medical care, or additional treatment that cannot be adequately addressed by the Bureau of Prisons during incarceration. Should the defendant desire to avail himself of opportunities for education, treatment, or training, the recommended sentence will not inhibit those efforts while in custody or on supervised release.

E.      The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

While the Sentencing Guidelines are advisory, they remain the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform Act of 1984. Reference to the Guidelines, while carefully considering the 3553(a) factors particularly relevant to an individual defendant, is the only available means of preventing the disfavored result of basing sentences on the luck of the draw in judicial assignments. The Third Circuit explained:

> Even under the current advisory system, district courts must "meaningfully consider" § 3553(a)(4), i.e., "the applicable category of offense . . . as set forth in the guidelines." The section of *Booker* that makes the Guidelines advisory explains that "the remaining system, while not the system Congress enacted, nonetheless continue[s] to move sentencing in Congress' preferred direction, *helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary*." *Booker*, 543 U.S. at 264-65 (emphasis added). The Guidelines remain at the center of this effort to "avoid excessive sentencing disparities," and, as the *Booker* Court explained, the Sentencing Commission will continue "to promote uniformity in the sentencing process" through the Guidelines. *Id*. at 263. We have likewise observed that the "'Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country.'" *Cooper*, 437 F.3d at 331 (quoting *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005)).

*United States v. Ricks*, 494 F.3d 394, 400 (3d Cir. 2007) (emphasis in original). Therefore, the

Supreme Court has held that "district courts must begin their analysis with the Guidelines and

remain cognizant of them throughout the sentencing process" in order to assure fair,

proportionate, and uniform sentencing of criminal offenders. *Gall*, 552 U.S. at 50 n.6.

As Congress has codified, it is part of our sense of justice that similarly situated

defendants should be given similar sentences. The Sentencing Guidelines provide a

recommended sentencing range so that similarly situated defendants receive similar punishment.

The government asserts that the proper consideration in this case of the advisory guideline range

and of the Section 3553(a) factors supports the sentence consistent with that agreed to in the plea

agreement pursuant to Fed. R. Crim. P. 11(c)(1)(C), of 900 months' incarceration.

F.    The need to provide restitution to victims.

Pursuant to the Crime Victims' Rights Act, a crime victim has the right to "full and

timely restitution as provided by law." *See* 18 U.S.C. § 3771(a)(6). In cases where, as here, the

victims suffered bodily injury, restitution statutes authorize restitution for an amount equal to the

cost of necessary medical and related services, psychological care, non-medical care and

20

treatment, therapy, and lost income. 18 U.S.C. § 3663(b)(2). As permitted by Title 18, United States Code, Section 3664(d)(5), the government requests that the Court defer final determination of the victims' losses to a date and time convenient for the Court, but not more than 90 days after sentencing.[2]

### Conclusion

The defendant committed incredibly serious crimes. For all the reasons set forth above, this Court should accept the agreement of the parties, consider the properly calculated guideline range, and impose a sentence at the top of the agreed range.

Respectfully submitted,

DAVID METCALF
United States Attorney

/s/ *Christopher Diviny*
CHRISTOPHER DIVINY
ASHLEY N. MARTIN
LAUREN E. STRAM
Assistant United States Attorneys

---

[2] Section 3665(d)(5) provides in relevant part: "If the victim's losses are not ascertainable by the date that is 10 days prior to sentencing, the attorney for the Government or the probation officer shall so inform the court, and the court *shall* set a date for the final determination of the victim's losses, not to exceed 90 days after sentencing." (emphasis added).

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the Government's Sentencing

Memorandum has been served by electronic filing upon:


Patrick Egan, Esquire
Fox Rothchild LLP
2000 Market Street, 20th Floor
Philadelphia, PA 19103
Pegan@foxrothchild.com

Kenneth Montgomery, Esquire
198 Rogers Avenue
Brooklyn, New York 11225
ken@kjmontgomerylaw.com
*Attorneys for Hassan Elliott*


<u>/s/ *Christopher Diviny*</u>
CHRISTOPHER DIVINY
ASHLEY N. MARTIN
LAUREN E. STRAM
Assistant United States Attorneys


DATE: July 17, 2025